# **EXHIBIT B**

Irrevocable offer for the purchase of the RDA PROPERTIES("Bid")

Bidder: H Capital Holdings, LLC ("Bidder")
     1 Bridgeview Plaza, Suite 860
     Fort Lee, New Jersey

Date: July 18, 2024 (REVISED)

Dear Sir or Madam,

The Bidder hereby irrevocable offers to purchase the RDA Properties (the FER Property and the 600 Guyon Property) for a total consideration collectively as allocated below:

1. 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149); (ii) 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136); (iii) 1000 Frank E Rodgers Boulevard, Harrison NJ  (the "FER Property")

               **Forty Two Million Dollars ($42,000,000.00)***

               **Forty Eight Million Dollars ($48,000,000.00)^**

2. 600 Guyon Drive, Harrison NJ (lot 16.01 in block 150) (the "600 Guyon Property")

               **Eight Million Dollars ($8,000,000.00)*^**

     **PURCHASE PRICE:**      **Fifty Million Dollars ($50,000,000.00)***

     **\*initial price offered to qualify for auction**

     **PURCHASE PRICE:**      **Fifty Six Million Dollars ($56,000,000.00)^**
     **^price based upon purchasing without an auction**

The Bid is 100% cash and not subject to any financing.

The Bidder is not submitting any bid on the non-RDA Properties.

The bid on the FER Property is not conditioned on the successful bid on the 600 Guyon Property bid.

The bid on the 600 Guyon Property is conditioned on the successful bid on the FER Property.

3. The Bid is being submitted such that the RDA Properties shall be free of all debt and mortgages of record and the Bidder shall assume no cure costs. The Bid is subject only to the executory contracts, unexpired leases, covenants running with the land and the Redevelopment Agreement with the City of Harrison Redevelopment Authority (including any amounts due and owing thereunder) attached hereto as Exhibit A.

4. **Good Faith Deposit**: a deposit in the amount equal to $5,000,000.00 (10% of the aggregate purchase price of the Bid) is presently held in trust and able to be funded within 24 hours upon Debtor's approval of Potential Bidder's title company (the "Good Faith Deposit").

5. **PSA.** Attached hereto as Exhibit B is a redline copy of the form of purchase agreement ("PSA").

6. **Proof of Funds.** Attached hereto as Exhibit C is proof of funds.

7. **No Joint Venture**. The Bidder confirms that they are not jointly bidding or have any undisclosed partners. H Capital Holdings, LLC reserves the right to internally allocate ownership in a newly formed single purpose entity amongst affiliated entities of H Capital Holdings, LLC or its Manager, Anthony He. Nothing contained herein shall prohibit any joint ventures post closing.

8. **Corporate Authority**. Attached hereto as Exhibit D is a resolution of H Capital Holdings, LLC and H Equities, LLC authorizing the submission of this bid. H Capital Holdings, LLC is managed by Anthony He in his capacity as the Manager. Bidding resolutions attached hereto. H Capital Holdings LLC is owned 100% by H Equities, LLC. H Equities, LLC is 100% owned by Anthony He.

9. **Non-Collusion**. Attached hereto as Exhibit E is a non-collusion affidavit.

10. **Acknowledgement of compliance with bid requirements.** This bid does not entitle such bidder to any Break-Up Fee, termination fee, Expense Reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Debtor Properties. This Bid is in compliance in all respects with the Bidding Procedures Order, Bankruptcy Code and any applicable non-bankruptcy law.

11. **As-Is, Where-Is**: The Bidder represents that it: (i) has had an opportunity to conduct any and all due diligence prior to making its offer, with the exception that the Successful Bidder(s) as to non-RDA Properties may have thirty (30) days after execution of the PSA to conduct limited Environmental Due Diligence; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Debtor Properties in making its Bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Bidder's proposed purchase

agreement; and (iv) is otherwise willing to purchase the applicable Debtor Property, "as is, where is."

12. **Adequate Assurance of Future Performance:** Attached hereto is a list of Executory Contracts and Unexpired leases to be assumed or assumed and assigned in connection with the Bid.  H Capital Holdings LLC does not anticipate any immediate change in current use of the property and has sufficient capital to assure future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code.

13. **Irrevocable/Back Up Bid.**  In the event such Bid is chosen as the Back-Up Bid it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale Transaction. This Bid may be utilized as a Back-Up Bid if it is the next highest or otherwise best bid.

14. **Expected Closing Date**: The expected date of closing shall be as set forth in the PSA and subject to the satisfaction of all contingencies. It being noted that 3rd party approvals (Bankruptcy Court and Harrison Redevelopment Authority) are beyond the control of the Bidder.

15. **No Fees**: Bidder  will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is disclaiming any right to receive a fee analogous to a Break-Up Fee, Expense Reimbursement, termination fee, or other similar form of compensation and is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

16. **Adherence to Bidding Procedures**: By submitting its Bid, Bidder agrees to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

17. **Consent to Jurisdiction**: Bidder submits to the jurisdiction of the Court and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the closing of the Sale Transaction, as applicable.

Respectfully submitted,

H Capital Holdings, LLC
By: Anthony He, Manager

Exhibit A

Assumed Contracts and Leases

1. RDA with Harrison Redevelopment Authority
2. Limited Property Access Agreement (Railworks)
3. Parking Facility Management Agreement
4. Red Bull Parking Agreement
5. All existing easements of record
6. All existing entitlements

Exhibit B

PSA Redline

**PURCHASE AND SALE AGREEMENT**

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is made and entered into as of this _____ day of July, 2024 (the "Effective Date") by and between the entities identified on **Exhibit A**[1] hereto (each, a "Seller", and collectively, the "Sellers"), and H Capital Holdings, LLC, a New Jersey limited liability company, or a newly formed single purpose urban renewal entity_____, a _____ ("Purchaser"). Sellers and Purchaser are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

**WHEREAS**, subject to the DILFs (defined below) Sellers are the owners of certain property located at 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149) ("FER 1 Property"); 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 1.07 in block 136) ("FER 2 Property"); and 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 1 in block 172) ("FER 3 Property"), in the Town of Harrison, County of Hudson and State of New Jersey more particularly described on **Exhibit B** [2] attached hereto. FER 1 Property, FER 2 Property and FER 3 Property are collectively referred to as the "Properties" (defined below).

**WHEREAS**, the Properties are subject of an Amended and Restated Redevelopment Agreement dated February 24, 2021, by and between Seller, the Harrison Redevelopment Agency (the "HRA"), the Town of Harrison (the "Town"), Supor 136-1 Realty LLC, Supor Properties Enterprises LLC and Supor-172 Realty LLC. (the "RDA"). The RDA was recorded with the Hudson County Register on April 20, 2021, at book 9552, page 39, index number 20210420010031740.

**WHEREAS**, 1000 Frank E. Rodgers 1, LLC ("FER 1 Lender") has recorded mortgages on the FER Properties to secure a certain mortgage loan.  FER 1 Lender caused to be recorded the following deeds in lieu of foreclosure (collectively, the "DILFs") to 1000 Frank E. Rodgers Blvd Owner LLC (the "DILF Holder"), a single purpose entity owned or controlled by FER 1 Lender:

1.  DILF for FER Property 1 recorded with the Hudson County Register of Deeds on January 29, 2024, as Instrument 20240129010006630 for stated consideration of $19,000,000 to DILF Holder;

2.  DILF for FER Property 2 recorded with the Hudson County Register of Deeds on January 29, 2024, as Instrument 20240129010006640 for stated consideration of $500,000 to DILF Holder; and

3.  DILF for FER Property 3 recorded with the Hudson County Register of Deeds on January 29, 2024, as Instrument 20240129010006650 for stated consideration of $5,500,000 to DILF Holder.

---

[1] **[Note: Additional Sellers may be added per Bid of Purchaser]**

[2] **[Note: Additional Properties may be added per Bid of Purchaser]**

319033286.1

**WHEREAS,** Sellers contend, among other things, that: (i) the fair market value of the Properties, and related properties, exceeds the outstanding amounts due to FER 1 Lender and 1000 Frank E. Rodgers 2, LLC ("FER 2 Lender" and together with FER-1 Lender collectively, the "Lenders" and each such entity, a "Lender") and exceeds the consideration reflected in the DILFs, and (ii) the transfers of the Properties and related properties subject to the DILFs are subject to avoidance under applicable law ("Debtor Avoidance Claims").

**WHEREAS** Sellers, affiliates of Sellers, and Lenders negotiated resolution of the Debtor Avoidance Claims and certain transactions including a sale of the Property on the terms set forth in the Restructuring Support Agreement dated April 2, 2024 (the "RSA").

**WHEREAS,** on April 2, 2024, Sellers and certain affiliates each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court, District of New Jersey ("Bankruptcy Court"), which is jointly administered under Case Number 24-13427 (SLM) ("Bankruptcy Cases"). The debtors in the Bankruptcy Cases are Supor Properties Enterprises LLC; J Supor 136-1 Realty LLC; Supor-172 Realty LLC; Supor Properties Breiderhoft LLC; Supor Properties Devon LLC; Shore Properties Associates North LLC; Supor Properties 600 Urban Renewal, LLC; JS Realty Properties, LLC; and Supor Properties Harrison Avenue LLC (each a referred to as a "Debtor" and collectively as the "Debtors").

**WHEREAS,** each Debtor remains a Chapter 11 debtor in possession. No trustee or committee has been appointed in the Bankruptcy Cases.

**WHEREAS,** on April 12, 2024, the Debtors filed a motion to assume the RSA pursuant to 11 U.S.C. § 365. Bankruptcy Case ECF. No. 51. That motion was granted by Bankruptcy Court order dated May 21, 2024. Bankruptcy Case ECF. No. 115.

**WHEREAS,** on April 22, 2024, the Debtors filed a motion for an order *(I) (a) Approving the Bidding and Auction Procedures, (b) Scheduling Bid Deadlines and an Auction, (c) Approving the Form and Manner of Notice Thereof, and (II) (a) Authorizing Sale of Assets and (b) Granting Related Relief*. Bankruptcy (the "Sale Procedures Motion"). Case ECF. No. 58. The Sale Procedures Motion was granted by Bankruptcy Court order dated April 29, 2024 (the "Sale Procedures Order"). Bankruptcy Case ECF. No. 80. This Agreement is entered in accordance with the Sale Procedures Order.

**WHEREAS,** on May 6, 2024, the Debtors filed a Combined Disclosure Statement and Plan of Reorganization and/or Liquidation for Debtors (the "Plan"). Bankruptcy Case ECF. No. 92.

**WHEREAS,** on May 30, 2024, the Bankruptcy Court entered an order *(I) Approving the Disclosure Statement Contained in the Combined Plan and Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the Confirmation Notice; and (IV) Granting Related Relief*. Bankruptcy Case ECF. No. 133 (the "Order Approving the Disclosure Statement").

**WHEREAS,** a hearing to consider confirmation of the Plan is scheduled to be held before the Bankruptcy Court on July 23, 2024.

2

319033286.1

**WHEREAS,** on May 6, 2024, the Debtors filed a *Motion Seeking Entry of an Order Authorizing the Rejection of Certain Unexpired Leases and Granting Related Relief* (the "Rejection Motion") seeking to reject the Affiliate Leases (defined below), effective on the date of the closing of a Sale Transaction as to the applicable Debtor Property(ies). Bankruptcy Case ECF. No. 93. A hearing to consider the Rejection Motion is scheduled to be held before the Bankruptcy Court on July 23, 2024.

**WHEREAS**, Purchaser is the "Successful Bidder" (as such term is defined in the Sale Procedures Motion, as hereinafter defined), and accordingly, Sellers desire to sell the Properties (defined below) to Purchaser, and Purchaser desires to purchase the Properties from Sellers, on the terms set forth in this Agreement, in accordance with and pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1** Definitions. In addition to the terms defined elsewhere in this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Section 1.1. Any capitalized term in the Agreement that is not defined herein shall have the meaning ascribed to it in the Plan.

"Affiliate" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Affiliate Leases" means those master leases or sub-leases regarding the Property listed at **Exhibit C** hereto.

"Affiliate Tenants" means those tenants or subtenants identified in the Affiliate Leases.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all federal, state, and local statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, board of fire underwriters and similar quasi-governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

3

319033286.1

"Assumed Liabilities" has the meaning set forth in Section 2.4 hereof.

"Business Day(s)" shall mean every day other than (i) Saturdays, (ii) Sundays, (iii) all days observed by the Federal Government of the United States as legal holidays and (iv) all days on which commercial banks in New York State are required by law to be closed.

"Buyer's Premium" means the 1% fee due to CBRE and to be paid by Purchaser at closing as set forth in the Sale Procedures Motion. The Buyer's Premium shall be in addition to the Purchase Price.

"Casualty" has the meaning set forth in Section 13.1 hereof.

"Closing" has the meaning set forth in Section 10.1 hereof.

"Closing Date" has the meaning set forth in Section 10.1 hereof.

"Closing Statement" means a title closing statement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations, rulings and guidance issued by the Internal Revenue Service.

"Condemnation" has the meaning set forth in Section 13.2 hereof.

"Contracts" means, collectively, the Leases and Executory Contracts and any written or oral note, bond, mortgage, contract, license, lease, sublease, covenant, commitment, power of attorney, proxy, indenture, or other binding agreement or arrangement.

"Confirmation Order" means the Order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

~~"Cure Amounts" or "Cure Costs" mean the aggregate monetary sum required to be paid to the counterparties under the Purchased Contracts to be assigned by the applicable Sellers and assumed by Purchaser in accordance with Section 2 hereof.~~

"Deeds" has the meaning set forth in Section 10.2.1(a) hereof.

"Earnest Money" means, at the time in question, the amounts then deposited with Escrow Agent (and any additional amounts as may be deposited with Escrow Agent pursuant to Section 10.1 hereof), together with all interest and any other amounts earned thereon.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1 hereof.

"Environmental Claims" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous Substances over, on, in, under or from any one or more of the Properties, or (ii) violation of any Environmental Laws with respect to any one or more of the Properties.

4

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media, including, without limitation, (a) the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); (b) the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.) ("RCRA"); (c) the National Environmental Policy Act (42 U.S.C. §§ 4321 et seq. (1969), as amended); (d) the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.); (e) the Clean Air Act (42 U.S.C. §§ 7401 et seq.); (f) the Clean Water Act (33 U.S.C. §§ 1251 et seq.); (g) the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.); (h) the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101 et seq.); (i) any state, county, municipal or local Applicable Laws similar or analogous to the federal statutes listed in parts (a)-(h) of this definition; and (j) any rules, regulations, directives, or orders pursuant to or implementing the Applicable Laws listed in parts (a)-(i) of this definition.

"Executory Contract Order" means a Final Order determining the Assumption/Rejection Motion.

"Executory Contract" means any existing executory contract or unexpired lease of personal property between any Seller and any other Person or Persons regarding the Properties. For avoidance of doubt, the RDA is an Executory Contract.

"Final Order" means an Order of the Bankruptcy Court or a court of competent jurisdiction to hear appeals from the Bankruptcy Court that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing shall then be pending; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

"Governmental Authority" means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question. For the avoidance of doubt, Governmental Authority shall include all Taxing Authorities.

"Hazardous Substances" means all substances, chemicals, wastes, materials, pollutants, or contaminants defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or defined as hazardous or toxic by, or regulated as such under, any applicable Environmental Law, including RCRA hazardous wastes, CERCLA hazardous substances, asbestos, toxic mold, and polychlorinated biphenyls.

"Land" has the meaning set forth in Section 2.1.1 hereof.

5

"Lease" means, other than an Affiliate Lease, any lease, master lease, sublease or sub-sublease, letting, license, sublicense or sub-sublicense, concession, or other agreement (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of the Property, and every modification, amendment, or other agreement (whether written or oral) relating to such lease, license, or other agreement entered into in connection with such lease, license, or other agreement, whether in existence before or after the Petition Date. A list of "Unexpired Leases" is attached at **Exhibit D** hereto.

"Liability" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"Licenses and Permits" has the meaning set forth in Section 2.1.7 hereof.

"Lien" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in Section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Material Casualty" has the meaning set forth in Section 13.1.1 hereof.

"Material Condemnation" has the meaning set forth in Section 13.2.1 hereof.

"Order" means an order or judgment entered in the Bankruptcy Case by the Bankruptcy Court as entered on the Docket as well as any writ, judgment, decree, award, ruling, subpoena, verdict, injunction or similar order of any Governmental Authority (in each such case whether preliminary or final).

"Permitted Exceptions" has the meaning set forth in Section 5.3 hereof.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Petition Date" means April 2, 2024, the date upon which the Debtors filed petitions commencing the Bankruptcy Case.

"Plans and Specifications" has the meaning set forth in Section 2.1.8 hereof.

"Properties" has the meaning set forth in Section 2.1 hereof.

"Prorations" has the meaning set forth in Section 11.1 hereof.

"Retained Liabilities" has the meaning set forth in Section 2.5 hereof.

"Release" means any release, spill, emission, discharge, leaking, leaching, pumping, pouring, dumping, emptying, injection, deposit, disposal of or migration into or through the indoor or outdoor environmental medium or into or out of any property.

319033286.1

"Rejected Contract(s)" means those Executory Contracts and Leases which are rejected by the Debtors pursuant to Section 365 of the Bankruptcy Code.

"Rejection Claim" means any Claim under the Bankruptcy Code that arises in favor of the Third Party to any Executory Contract or Lease that is a Rejected Contract.

"Sale Order" shall mean the Final Order of the Bankruptcy Court, substantially similar to the form of Sale Order attached at **Exhibit E** hereto, approving the sale of the Property free and clear of all liens, encumbrances and claims other than the Permitted Exceptions.

"Tax Appeal" means those certain actions as set forth in **Schedule 3**.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Sellers with respect to the Properties, including any assessment, interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Tenant" means a Person counterparty to a Lease entered into with a Seller.

"Title Commitments" has the meaning set forth in Section 5.1 hereof.

"Title Company" means ⬛⬛⬛⬛⬛⬛⬛⬛

"Unpermitted Exceptions" has the meaning set forth in Section 5.3 hereof.

1.2     Unless the context clearly indicates to the contrary, the following rules shall apply to the construction of this Agreement:

1.2.1   All references herein to articles or sections without reference to a specific document are references to articles or sections of this Agreement.

1.2.2   The terms "hereby", "hereof", "hereto", "herein", "hereunder" and any similar terms, as used in this Agreement, refer to this Agreement in its entirety and not the article or section of this Agreement in which they appear.

1.2.3   The word "including" means "including but not limited to."

1.2.4   All Recitals and Exhibits to this Agreement, including any amendments and supplements hereto, are hereby incorporated herein and made a part of this Agreement.

## ARTICLE II
## THE PROPERTIES AND LIABILITIES

**2.1**     Description of the Properties. Subject to the terms set forth in this Agreement, including entry of the Sale Order by the Bankruptcy Court, at the Closing, Sellers shall sell, convey, transfer,

7

319033286.1

assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all right, title and interest of Sellers in and to the properties and assets set forth in this Section 2.1 (collectively, the "Properties"):

2.1.1.   all of the fee simple interest in, to and under the land of FER 1 Property, FER 2 Property and FER 3 Property, described in **Exhibit B** attached hereto, (collectively, the "Land");

2.1.2.   all of Seller's right, title and interest in, to and under all privileges and easements appurtenant to the Land, including, without limitation, all of Seller's right, title and interest in, on and under the Land, all easements, rights of way or other appurtenances of Seller used in connection with the beneficial use and enjoyment of the Land and all assignable permits, licenses, approvals and authorizations issued by any Governmental Authority (collectively, the "Appurtenances");

2.1.3.   all of Seller's right, title and interest in and to all improvements and fixtures located on the Land, including, without limitation, all buildings and structures located on the Land (collectively, the "Improvements");

2.1.4.   subject to the provisions of Section 2.2 hereof, all of Seller's right, title and interest in and to the Executory Contracts and Unexpired Leases identified on **Schedule 1** hereto;

2.1.5.   subject to the provisions of Section 2.2 hereof, all leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Properties, together with all deposits made thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "Equipment Leases") each if which are referenced on **Schedule 2** attached hereto;

**2.2**    Executory Contracts and Unexpired Leases.

2.2.1    On the Closing Date, pursuant to a Final Order granting the Rejection Motion, the Affiliate Leases shall be deemed rejected pursuant to Section 365(a) of the Bankruptcy Code and terminated and Purchaser shall take title to the Property free and clear of the Affiliate Leases and any rights, claims or interests of any Affiliate Tenants. Purchaser shall have no liability for any Rejection Claim of an Affiliate Tenant.

2.2.2    Purchaser herby designates the Executory Contracts and Unexpired Leases, Equipment Leases, identified on **Schedules 1-2** hereto as "Purchased Contracts" under this Agreement. Any Executory Contracts and Unexpired Leases, Equipment Leases that are not identified on **Schedules 1-2** hereto shall be deemed an "Excluded Contract" under this Agreement. Any Excluded Contract may be assumed or rejected by Sellers in their sole discretion.

2.2.3    Within seven (7) days after the execution of this Agreement, the Sellers shall file a motion regarding the proposed assumption or rejection of Purchase Contracts and Excluded Contracts (the "Assumption/Rejection Motion"). The Assumption/Rejection Motion shall provide all applicable counterparties with (i) notice of the proposed treatment of their respective executory contract(s) or unexpired lease(s); ~~(ii) the amount to be paid, if any, to cure any existing default(s) — the Cure Costs;~~ (iii) establishing deadlines for objection to the proposed treatment of the

8

executory contract/unexpired lease as set forth in the Assumption/Rejection Motion, ~~including payment of the Cure Costs;~~ and (iv) establishing a hearing date for the resolution of any filed objections to the Assumption/Rejection Motion.

2.2.4 Subject to entry of a Final Order on the Assumption/Rejection Motion and the Sale Order, on the Closing Date the Purchased Contracts shall be deemed assumed by the Seller and assigned to Purchaser pursuant to Sections 365(b)(l)(A) and (B) and 365(f) of the Bankruptcy Code. In addition to the Purchase Price, Purchaser shall assume all obligations and Liabilities under the Purchased Contracts, including any Cure Amounts allowed by Final Order. For the avoidance of doubt, after the Closing Sellers shall not be responsible for compliance with any Purchased Contract and shall not be responsible for any costs associated therewith. If there are any costs or fees associated with the assignment of a Purchased Contract to Purchaser, Purchaser shall be responsible for payment of all such costs and fees. ~~All Cure Costs shall be the responsibility of Purchaser, in addition to the Purchase Price and payment of Cure Costs shall not be credited/deducted from the Purchase Price.~~

2.2.5 Purchaser shall have no Liability for any Cure Costs or Rejection Claim of a counterparty to an Excluded Contract.

2.2.6 Notwithstanding the foregoing, so long as an Excluded Contract has not been rejected by the Sellers pursuant to Section 365 of the Bankruptcy Code and Final Order of the Bankruptcy Court, Sellers shall, upon written request by Purchaser, seek to assign such Excluded Contract to Purchaser, and Purchaser shall assume the same in accordance with Sections 2.2 hereof.

**2.3** <u>Cure Costs</u>. Subject to a Final Order on the Assumption/Rejection Motion and the Sale Order, Cure Costs shall be paid (or in the case of a dispute, the disputed amount escrowed with the Escrow Agent pursuant to an escrow arrangement reasonably acceptable to Sellers and Purchaser) at the Closing.

**2.4** <u>Assumed Liabilities</u>. At Closing, Purchaser shall assume all Liabilities arising or occurring from and after the Closing with respect to the Properties and the Purchased Contracts, but expressly excluding the Retained Liabilities (all Liabilities, except for the Retained Liabilities, shall be referred to herein as "<u>Assumed Liabilities</u>").

**2.5** <u>Retained Liabilities</u>. At Closing, Sellers shall retain all Liabilities arising or occurring prior to the Closing Date with respect to the Properties, the Purchased Contracts or the Excluded Contracts (the "<u>Retained Liabilities</u>").

**2.6** <u>Survival</u>. The Parties rights and obligations under this Article II shall survive the Closing.

**ARTICLE III**
**PURCHASE PRICE**

**3.1** <u>Purchase Price</u>. The purchase price for the Properties is $\underline{\hspace{4cm}}$ and 00/100 Dollars ($\underline{\hspace{4cm}}$) (the "<u>Purchase Price</u>"), as same has been allocated by Purchaser in its Bid among FER 1 Property, FER 2 Property, and FER 3 Property and

9

as set forth herein in **Schedule 4**, as adjusted by the prorations and adjustments provided elsewhere in this Agreement.

**3.2**     Earnest Money.

3.2.1.   Earnest Money Deposit. Prior to the Effective Date, Purchaser shall deposit with Escrow Agent the sum which is equal to ten percent (10%) of the Purchase Price (the "Earnest Money Deposit"). The Earnest Money Deposit shall be held by Escrow Agent in escrow as earnest money pursuant to the escrow agreement in the form attached hereto as **Exhibit F**, entered into among Sellers, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"). The Earnest Money Deposit shall be maintained by the Escrow Agent as to comply with the requirements of the Bankruptcy Court and the Sale Procedures Order. Except as specifically set forth in this Agreement or in the Sale Order, the Earnest Money Deposit shall be nonrefundable to Purchaser.

3.2.2.   Disbursement of Earnest Money to Sellers. At Closing, the Earnest Money Deposit shall be applied to the Purchase Price. At Closing, Escrow Agent is authorized and directed to disburse, and Purchaser shall otherwise cause Escrow Agent to disburse, the Earnest Money to Sellers or in such manner as Sellers shall instruct Escrow Agent, and Purchaser shall receive a credit against the Purchase Price in the amount of the Earnest Money disbursed to Sellers. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Earnest Money Deposit pursuant to the express provisions of this Agreement, the Earnest Money Deposit shall be disbursed to Sellers. This Section 3.2.2 shall survive the termination of this Agreement.

**3.3**     Payment of Purchase Price. At Closing, Purchaser shall pay to Sellers, in immediately available funds, an amount equal to the Purchase Price as adjusted by the prorations and adjustments provided elsewhere in this Agreement and less the Earnest Money Deposit.

**3.4**     Like-Kind Exchange.

Notwithstanding anything to the contrary in this Agreement, each Party acknowledge and agrees that the other Party or Parties (as the case may be) has the right to designate this transaction to qualify as a tax-free exchange under Section 1031 of the Code, and that Purchaser shall have the right to assign this Agreement to a "qualified intermediary" (as defined in Treas. Reg. § 1.1031(k)-1(g)(4) of the Code) or such other entity or entities as is necessary to carry out a 1031 Exchange. Each Party shall execute and deliver such documents as may reasonably and customarily be required to complete the transactions contemplated by any such tax-free exchange, which are in form and substance reasonably acceptable to the other applicable Parties, and otherwise cooperate in all reasonable respects with respect to such tax-free exchange, provided that (i) Sellers shall not be required to take title to any property, and (ii) neither such tax-free exchange nor Sellers' cooperation therewith shall result in any delay to the Closing, nor the imposition of any cost or liability upon Sellers or Purchaser, as the case may be.

**ARTICLE IV**
**CONTINGENCIES**

**4.1**     No Contingencies. The Purchaser's obligation to close title herein is expressly conditioned on Purchaser's approval as a designated redeveloper of the the Properties and subject to the entry

10

319033286.1

of an amendment to the existing RDA. Otherwise, Purchaser acknowledges and agrees that Purchaser has completed all of its due diligence investigations with respect to the Properties and is satisfied with the same. For the avoidance of doubt, it is expressly understood and agreed to by Purchaser that there is no due diligence or financing contingency, or other contingency under this Agreement, which gives Purchaser a right of termination. Purchaser's only termination rights are set forth in Sections 5.3, 5.4, 12.1, 13.1.1, 13.2.1 hereof.

## ARTICLE V
## TITLE TO THE PROPERTY

5.1     Title Commitments. Within ten (10) days of the Effective Date of this Agreement, Purchaser shall obtain at Purchaser's sole cost and expense, a commitment (or commitments separately as to each FER 1 Property, FER 2 Property, and FER 3 Property) for an owner's title insurance policy (or policies, as the case may be) from a title company of its choosing for the Properties (collectively, the "Title Commitment").

5.2     Exceptions to Title. Except as provided in this Agreement or otherwise accepted by Purchaser in writing, the sale of the Properties to Purchaser hereunder shall be subject to the Permitted Exceptions defined below but otherwise free and clear of any interest or liens in accordance with the Sale Order.

5.3     Permitted Exceptions and Unpermitted Exceptions. Within five (5) days of receipt of the Title Commitment, Purchaser shall give written notice to Sellers (the "Exception Notice") of all of Purchaser's exceptions to title which Purchaser is unwilling to take title subject to (the "Unpermitted Exceptions"). Any exception to title not raised as an Unpermitted Exception shall be deemed Permitted Exceptions. Other than Permitted Exceptions, Sellers shall notify Purchaser within seven (7) Business Days after receipt of the Exception Notice whether it will cure the matters set forth therein which Purchaser has indicated it is unwilling to accept title subject to. If Sellers notify Purchaser that Sellers will not cure all such other matters, then, within five (5) Business Days thereafter, Purchaser shall, by notice to Sellers either, elect to terminate this Agreement or accept such matters as Permitted Exceptions; and, if Purchaser does not notify Sellers that it has elected to accept such matters, Purchaser shall be deemed to have elected to accept title subject to such matters without any reduction to the Purchase Price. Purchaser shall cause copies of all updates and/or continuations of the Title Commitments to concurrently be delivered to Sellers' attorneys. Purchaser acknowledges and agrees that Purchaser shall be obligated to take title to the Properties and complete the Closing subject to all Permitted Exceptions.

5.4     Failure to Cure. Sellers shall have until the Closing Date (as the same may be adjourned, extended, or postponed by Sellers or Purchaser pursuant to the terms hereof) to cure any Unpermitted Exceptions. In the event that Sellers shall be unable to deliver title as required under this Article V, including without limitation, the curing of any Unpermitted Exceptions, Purchaser's sole and exclusive right shall be either to (i) terminate this Agreement, in which case the Earnest Money Deposit shall be refunded to Purchaser and the Parties shall have no further recourse, rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) proceed to Closing pursuant to this Agreement and accept title to the Properties subject to the Unpermitted Exceptions, which thereafter shall be deemed to constitute Permitted

11

319033286.1

Exceptions without offset or deduction from the Purchase Price. Notwithstanding anything to the contrary set forth in this Agreement, Sellers shall have the right extend the Closing Date for a period of up to sixty (60) days in order to effect cure of any Unpermitted Exceptions.

5.5     Conveyance of the Properties. At Closing, Sellers shall convey insurable fee simple title (as determined by the Title Company) to the Properties, subject to all Permitted Exceptions and otherwise in accordance with the terms of the Sale Order.

## ARTICLE VI
## CONDITION OF THE PROPERTY

**6.1**     Remediation Activities and Permits.

6.1.1.   Current Regulatory Status of Property.  A summary of the regulatory history and environmental condition of the Properties is set forth in the informational documents listed in **Exhibit G**, which Purchaser acknowledges receiving from Seller or its consultants prior to the execution of this Agreement.

6.1.2.   Remediation Activities.  Purchaser shall be solely responsible at its sole cost and expense for completing any required remediation of environmental conditions at the Properties which may exist as of the Closing Date and which may arise thereafter ("**Remediation Activities**").

6.1.3.   Remedial Action Permits/ Remedial Action Outcome.   Purchaser shall at its sole cost and expense obtain and comply with the terms of any Remedial Action Permits required to be issued by NJDEP pursuant to N.J.A.C. 7:26C-7.1 et seq. with respect to the Properties, including but not limited to maintenance of any engineering controls required for remediation of soils at FER 1 Property, FER 2 Property, and FER 3 Property, individually, and the Properties, collectively, submittal of any certifications regarding inspection and maintenance of such engineering controls, the establishment and maintenance of any financial assurances required to ensure ongoing inspection and maintenance of such engineering controls, and compliance with the terms of any Classification Exception Areas/Well Restriction Areas (CEA/WRAs) established for the Properties, and shall obtain a Site wide Remedial Action Outcome (RAO) for the Properties.  For the avoidance of doubt, after the Closing Date, Sellers shall not be responsible for the costs of compliance with any Remedial Action Permit issued by NJDEP for FER 1 Property, FER 2 Property, and/or FER 3 Property, individually, and/or the Properties, collectively, for obtaining or maintaining a RAO for FER 1 Property, FER 2 Property, and/or FER 3 Property, individually, and/or the Properties, collectively, or for compliance with any other requirements established under Environmental Laws applicable to the FER 1 Property, FER 2 Property, and FER 3 Property, individually, and the Properties, collectively.

**6.2**     Release and Indemnity.  By accepting Sellers' deeds at Closing, Purchaser irrevocably waives and releases, on behalf of Purchaser, Purchaser's agents, Purchaser's affiliates, agents, and all successors in title to the Properties, any claims against Sellers (and against Sellers' members, managers, officers, representatives) as owner, operator or otherwise, arising out of or in connection with any conditions, including environmental and subsurface conditions, whether known or unknown, latent or apparent, and whether such claims are based on or sound in contract, tort,

12

statute, common law liability, contribution, indemnity, strict liability or any other theory or cause of action. Further, Purchaser shall indemnify, defend and hold Sellers harmless in respect of any and all claims, proceedings, losses, damages, liabilities and expenses, whether or not due and payable, asserted against, incurred or suffered by Sellers due to (i) the negligent, improper or ineffective maintenance of any capping engineering controls required for remediation of the soils at the Properties which Purchaser is obligated to maintain pursuant to this Agreement; (ii) the failure to submit any required certifications and establish and maintain financial assurances to ensure ongoing inspection and maintenance of all engineering controls as required by any Soils Remedial Action Permit; (iii) post-Closing changes in soil remediation standards by an order of magnitude or greater than the soil remediation standards in effect as of the Closing, as set forth at N.J.S.A. 58:10B-13(e), or any obligation to remediate the Properties to such more stringent standards; (iv) Purchaser's failure to comply with the conditions of any Groundwater Remedial Action Permit and requirements of any CEA/WRA; or (v) an environmental condition alleged to have arisen after Closing or from the exacerbation after Closing of a condition of the Properties that existed prior to Closing.

**6.3** <u>'AS-IS', 'WHERE IS' Condition</u>. Purchaser acknowledges and agrees that (a) the purchase of the Properties shall be on an "As Is", "Where Is", "With All Faults" basis, subject to wear and tear from the Effective Date until Closing Date, and (b) except as expressly set forth in this Agreement, Seller has no obligation to repair any damage to or defect in the Properties, replace any of the Properties or otherwise remedy any matter affecting the condition of the Properties. Upon Closing, Purchaser shall assume the risk that adverse matters, including but not limited to, construction defects and adverse physical and environmental conditions, may not have been revealed by Purchaser's investigations, and Purchaser, upon Closing, except as otherwise expressly set forth in this Agreement, shall be deemed to have waived, relinquished and released Sellers from and against any and all claims, demands, causes of action (including causes of action in tort), losses, damages, liabilities, costs and expenses (including attorneys' fees and court costs) of any and every kind or character, known or unknown, which Purchaser might have asserted or alleged against Sellers at any time by reason of or arising out of any latent or patent construction defects or physical conditions, violations of any applicable laws (including, without limitation, any environmental laws) and any and all other acts, omissions, events, circumstances or matters regarding the Properties. Seller agrees to maintain the Properties in substantially the same condition as it is in as of the Effective Date of this Agreement.

**6.4** <u>No Reliance on Seller</u>. Purchaser is entering into this Agreement on the basis of Purchaser's own independent evaluation and investigation, and Purchaser does not rely on any statement or representation by Sellers or any of Sellers' representatives. Notwithstanding anything to the contrary, Sellers are not making, and specifically disclaim, any representations, warranties or covenants of any kind or character, express or implied, with respect to the operational, environmental or physical condition of the Properties, including, but not limited to, representations, warranties or covenants as to: (a) matters of title, zoning, permitted uses, tax consequences, physical or environmental conditions (including but not limited to Purchaser's phase one environmental assessment), availability of access, ingress or egress, operating projections, valuations, governmental approvals, governmental regulations or any other matter or thing relating to or affecting the operational, environmental or physical condition of the Properties; (b) the value, condition, merchantability, marketability, profitability, suitability or fitness for a particular use or purpose of the Properties; (c) the Properties' compliance or non-compliance with

13

Environmental Laws applicable to the Properties or the presence or absence of hazardous or toxic materials, wastes or substances on, at or under the Properties or migrating to or from the Properties; or (d) the manner, quality, state of repair or lack of repair of the Properties.

**6.5**     Survival. The provisions of this Article VI shall survive Closing.

### ARTICLE VII
### REPRESENTATIONS AND WARRANTIES

**7.1**     Seller's Representations and Warranties. Sellers hereby make the following representations and warranties to Purchaser, upon which Sellers acknowledge and agree that Purchaser is entitled to rely.

7.1.1.   Organization and Authority. Subject to approval of the Bankruptcy Court and entry of the Sale Order, (i) Sellers have full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Sellers pursuant to this Agreement (collectively, the "Sellers Documents"), and to perform the respective obligations of Sellers under each of the Sellers Documents, (ii) the execution and delivery by the signer on behalf of each party comprising Seller of each of the Sellers Documents, and the performance by each party comprising Seller of its obligations under each of the Sellers Documents, has been (or as of Closing will be) duly and validly authorized by all necessary action by each party comprising Seller, and (iii) each of the Sellers Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller enforceable against the Parties comprising Seller in accordance with their terms, except to the extent Purchaser is in default thereunder.

7.1.2   No Conflicting Agreements. The execution and delivery by Seller of, and the performance of and compliance by Seller with, the terms and provisions of this Agreement, do not (a) conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, Seller's by-laws, or any other agreement or instrument to which Seller is a Party or by which all or any part of the Property is bound, (b) violate any restriction, requirement, covenant or condition to which all or any part of the Property is bound, (c) constitute a violation of any applicable code, resolution, law, statute, regulation, ordinance or rule applicable to Seller or the Property, (d) constitute a violation of any judgment, decree or order applicable to Seller or specifically applicable to the Property, or (e) require the consent, waiver or approval of any third party.

7.1.3   Title. To the best of Seller's knowledge, there are no unrecorded or undisclosed documents or other matters which affect title to the Property.

7.1.4   FIRPTA. Seller is not a "foreign person" within the meaning of Section 1445(f) of the Code.

7.1.5   Condemnation Proceedings/Property Damage. To the best of Seller's knowledge, there are no presently pending or, to the best of Seller's knowledge, contemplated proceedings to condemn the Property or any part of it.

7.1.6   Option to Purchase. Seller has not granted any option or other right to purchase or otherwise acquire any portion of the Property, or any interest therein, to any party except Purchaser

14

pursuant to this Agreement and there are no existing and outstanding agreements affecting or relating to the Property, including, but not limited to, agreements for the sale of the Property (or any portion thereof), option agreements, leases, licenses, or powers of attorney, to which the Seller is a party or by which the Seller or the Property is bound.

      7.1.7   Environmental Matters.

      (a)   Seller has delivered to Purchaser copies of all material, non-privileged reports, assessments, audits, studies, analyses, and tests initiated by or on behalf of or in the possession of Seller pertaining to the environmental condition of, or any Hazardous Substance in, on, or under, the Property or concerning compliance by Seller with Environmental Laws.

      (b)   To the knowledge of Seller, Seller does not operate, or permit to be operated, any business at the Property which has a North American Industry Classification System ("NAICS") number, which is subject to the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6, et seq., and the regulations promulgated thereunder ("ISRA").

      (c)   This Section 7.1.7 contains the sole and exclusive representations and warranties of Seller with respect to matters arising under Environmental Laws or any other environmental matters.

      7.1.8   Anti-Terrorism. None of Sellers' property or interests is subject to being "blocked" under any Anti-Terrorism Laws and neither Sellers nor any Person holding any direct or indirect interest in Sellers is in violation of any Anti-Terrorism Laws. Neither Sellers nor any of their affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "Seller Party") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Purchaser from conducting the business activities contemplated by this Agreement with Sellers. Sellers, including their Seller Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. §5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. §1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

319033286.1

7.1.9    Survival. All of the representations, warranties, and covenants made by Seller with regard to Environmental Matters contained in Section 7.1.7 survive Closing.

7.2    Purchaser Representations and Warranties. Purchaser hereby makes the following representations and warranties to Sellers, upon which Purchaser acknowledges and agrees that Sellers are entitled to rely.

7.2.1    Organization and Authorization. Purchaser has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby. To the extent applicable, the execution, delivery and performance of this Agreement and all documents contemplated hereby have been duly and validly authorized by all necessary action on the part of Purchaser and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which Purchaser is a Party or otherwise bound.

7.2.2    Authority and Binding Obligation (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the "Purchaser Documents"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent Sellers is in default thereunder.

7.2.3    No Conflicting Agreements. The execution, delivery and performance of this Agreement and all documents contemplated hereby by Purchaser have been duly and validly authorized by all necessary action on the part of Purchaser and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which Purchaser is a Party or otherwise bound.

7.2.4    Sufficient Funds. Purchaser represents it has sufficient funds and/or assets to pay the full amount of the Purchase Price and consummate the Closing, without the need to obtain any financing.

7.2.5    No Violation of Anti-Terrorism Laws. None of Purchaser's property or interests is subject to being "blocked" under any Anti-Terrorism Laws, and neither Purchaser nor any Person holding any direct or indirect interest in Purchaser is in violation of any Anti-Terrorism Laws. Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "Purchaser Party") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the OFAC of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and

16

Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Sellers from conducting the business activities contemplated by this Agreement with Purchaser.

7.2.6  Patriot Act. Purchaser, including its Purchaser Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

7.2.7  Survival. All of the representations, warranties, and covenants made by Purchaser survive Closing.

## ARTICLE VIII
## COVENANTS

**8.1**  Conduct of the Business.

8.1.1.  Operation in Ordinary Course of Business. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers will operate the Properties in the ordinary course and pursuant to the Cash Collateral Order in effect in the Bankruptcy Case, including maintaining current insurance coverages.

8.1.2.  Contracts. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers shall not, without Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) or Bankruptcy Court Order, (i) amend, extend, renew or terminate any Leases, Executory Contracts or Licenses and Permits regarding the Properties, except in the ordinary course of business or (ii) enter into any new Leases or Executory Contracts regarding the Properties.

**8.2**  Tax Contests.

8.2.1.  Taxable Period Terminating Prior to Closing Date. Sellers shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. Seller has initiated Tax Appeals for the Properties, which are currently pending before the Hudson County Tax Court. Sellers represent that they have not initiated any tax contest for a taxable period which includes the Closing Date and any periods thereafter.

319033286.1

**8.3**     Further Assurances. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. After the Closing, Sellers and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement.

## ARTICLE IX
## CLOSING CONDITIONS

**9.1**     Mutual Closing Condition.

9.1.1.   Satisfaction of Mutual Closing Condition. The respective obligations of Sellers and Purchaser to close the transaction contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following condition precedent (the "Mutual Closing Condition"): The Bankruptcy Court shall have entered the Sale Order and there shall be no applicable stay ordered by the Bankruptcy Court which is in effect.

9.1.2.   Failure of Mutual Closing Condition. If the Mutual Closing Condition is not satisfied at Closing, then each Party shall have the right to terminate this Agreement by providing written notice to the other Party, in which case the Earnest Money Deposit shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination.

**9.2**     Purchaser Closing Conditions.

9.2.1.   Satisfaction of Purchaser Closing Conditions. In addition to the Mutual Closing Condition, Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Purchaser Closing Conditions"):

(a)     Seller's Deliveries. All of the Sellers' Closing Deliveries shall have been delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser upon the consummation of the Closing.

(b)     Representations and Warranties. The representations or warranties of Sellers in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(c)     Covenants and Obligations. The material covenants and material obligations of Sellers in this Agreement shall have been performed in all material respects.

18

319033286.1

9.2.2.   Failure of Purchaser Closing Condition. If any of the Purchaser Closing Conditions are not satisfied on the Closing Date (as the same may be extended, adjourned, or postponed by Sellers or Purchasers to the extent they have the express right to do so under this Agreement), then Purchaser shall have the right (i) to terminate this Agreement by providing written notice to Sellers, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) to waive any of the Purchaser Closing Conditions at or prior to Closing, without offset or deduction from the Purchase Price; provided, however, that any such waiver shall be made in writing by Purchaser. Nothing contained herein shall be deemed or construed to limit Purchaser's rights under Section 12.1 hereof.

**9.3**   Sellers Closing Conditions.

9.3.1.   Satisfaction of Sellers Closing Conditions. In addition to the Mutual Closing Condition, Sellers' obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Sellers Closing Conditions"):

(a)   Receipt of the Purchase Price. Purchaser shall have (A) paid to Sellers or deposited with Escrow Agent with written direction to disburse the same to Sellers, the Purchase Price (as adjusted pursuant to Section 3.1 hereof), and (B) delivered written direction to Escrow Agent to disburse the Earnest Money to Sellers.

(b)   Purchaser's Deliveries. All of the Purchaser Closing Deliveries shall have been delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers at Closing.

(c)   Representations and Warranties. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(d)   Covenants and Obligations. The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

9.3.2.   Failure of Sellers Closing Condition. If any of the Sellers Closing Conditions is not satisfied on the Closing Date, then Sellers shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Sellers in accordance with Section 3.2.2 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Sellers Closing Conditions at or prior to Closing; provided, however, that any such waiver shall be made in writing executed by Sellers. Nothing contained herein shall be deemed or construed to limit Sellers' rights under Section 12.2 and/or 12.3 hereof.

**ARTICLE X**
**CLOSING**

**10.1**   Closing Date. The closing of the transaction described in this Agreement (the "Closing") shall occur on the date which is no later than fourteen (14) days following the entry of the Sale

19

Order, or such other date as agreed to in writing between Sellers and Purchaser (the date on which the Closing occurs is referred to herein as the "Closing Date").

**10.2**   Closing Deliveries.

10.2.1. Seller's Deliveries. At the Closing, Sellers shall deliver or cause to be delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser at Closing, all of the (i) documents set forth in this Section 10.3.1, each of which shall have been duly executed by Sellers and acknowledged (if required) and (ii) other items set forth in this Section 10.3.1 (the "Sellers Closing Deliveries"), as follows:

(a)    Deeds conveying the Properties to Purchaser, subject to the Permitted Exceptions, to the extent applicable, respectively, to the Properties (collectively, the "Deeds")[3];

(b)    Title Documents. Such other documents and instruments, executed and properly acknowledged by Seller, if applicable, as Title Company may require from Seller in order to issue the Title Policy, including but not limited to Affidavits of Title and limited liability company resolutions in a form reasonably acceptable to the Purchaser's Title Company;

(c)    A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(d)    A resolution of each party comprising Seller, signed by each party comprising Seller's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(e)    The Sale Order;

(f)    The Closing Statement;

(g)    Such other documents and instruments as may be reasonably requested by Purchaser in order to consummate the transaction described in this Agreement;

10.2.2. Purchaser's Deliveries. At the Closing, Purchaser shall deliver or cause to be delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers all of the (i) documents set forth in this Section 10.3.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.3.2 (the "Purchaser Closing Deliveries"), as follows:

(a)    The Purchase Price (as adjusted pursuant to this Agreement) to be paid by Purchaser;

---

**3** [note: Parties to decide method of Deed transfer. From the Sale Order: "At the written direction of the Sellers and the Purchaser (the "DILF Direction"), at Closing the DILF Holder shall execute, convey and deliver the deed (in recordable form), affidavit of title, affidavit of consideration and any other agreements, affidavits or documents as may be reasonably required by Sellers or Purchaser (the "DILF Transfer Documents") to the applicable DILF Property to: (a) the applicable Seller (for conveyance of the Property to the Purchaser or the Purchaser Designees at Closing), or (b) the Purchaser or the Purchaser Designees."]

20

(b)     A letter of direction to Escrow Agent authorizing and directing Escrow Agent to disburse the Earnest Money to Sellers or to such party or parties as Sellers shall designate;

(c)     A counterpart of each of the documents and instruments to be delivered by Sellers under Section 10.2 hereof which require execution by Purchaser;

(d)     Such other documents and instruments as may be reasonably requested by Sellers or the Title Company in order to consummate the transaction described in this Agreement;

(e)     The Cure Amounts required under the Sale Order or Bankruptcy Court Order determining the Assumption/Rejection Motion; and

(f)     The Buyer's Premium of One Percent (1%) of the Purchase Price payable to CBRE.

**10.3**     Possession. Sellers shall deliver possession of the Properties and Properties to Purchaser upon completion of the Closing, subject to the rights of counterparties under the Purchased Contracts.

**ARTICLE XI**
**PRORATIONS AND EXPENSES**

**11.1**     Items to Be Prorated. The following shall be prorated between Seller and Purchaser as of the Closing Date with Purchaser being deemed the owner of the Property as of the Closing Date and with Purchaser receiving credit for or charged with the entire day of the Closing: Taxes, Water and Sewer. Except as hereinafter expressly provided, all prorations shall be done on the basis of the actual number of days in the year in which Closing occurs for the actual number of days elapsed to the Closing Date or the actual number of days in the month in which the Closing occurs and the actual number of days elapsed in such month to the Closing Date, as applicable. Any assessment for improvements completed prior to closing shall be Seller's responsibility. Notwithstanding anything else set forth herein, in the event any unpaid utilities could become liens, then Seller shall obtain a final reading within three days prior to the Closing, failing which Seller shall escrow a reasonable amount with the title company. All other customary purchase and sale closing costs and charges shall be paid by Seller or Purchaser in accordance with the law and customs with respect to title closings where the Property is located.

**ARTICLE XII**
**DEFAULT AND REMEDIES**

**12.1**     Sellers Default. If, at the time of Closing, Sellers fail to perform their material covenants or material obligations under this Agreement and no Purchaser Default has occurred (a "Seller Default") that has prevented the satisfaction of the conditions to the obligations of Purchaser to close the transactions set forth in Section 9 hereof, then Purchaser, as its sole and exclusive remedy, may elect upon written notice to Sellers to (a) terminate this Agreement, and if Sellers fail to remedy the Seller Default within fifteen (15) days thereafter, this Agreement shall terminate (a "Sellers' Breach Termination Event") and the Earnest Money Deposit shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without offset or deduction to the Purchase Price; or (c) obtain a court order for specific performance.

21

Purchaser hereby waives any and all other rights and/or remedies it may otherwise have at law and/or in equity.

**12.2**    Purchaser's Default. If Purchaser fails to perform any of its material covenants or material obligations under this Agreement and no Seller Default has occurred which remains uncured (a "Purchaser Default"), then Sellers, as their sole and exclusive remedy, may elect to (a) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money Deposit shall be disbursed to Sellers in accordance with Section 3 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing pursuant to this Agreement.

**12.3**    LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 12 HEREOF, THE DAMAGES THAT SELLERS WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLERS SHALL RETAIN THE EARNEST MONEY DEPOSIT AS A FAIR AND REASONABLE SUM AND AS FAIR MEASURE OF DAMAGES, AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLERS' SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION. NOTWITHSTANDING THE FOREGOING, THE REMEDY OF LIQUIDATED DAMAGES SHALL NOT LIMIT, AND SHALL NOT BE DEEMED TO LIMIT, IN ANY WAY THE RIGHTS AND REMEDIES AVAILABLE TO SELLERS WHICH SURVIVE TERMINATION OF THIS AGREEMENT.

## ARTICLE XIII
## RISK OF LOSS

**13.1**    Casualty. If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Properties or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Sellers shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

13.1.1. Material Casualty. If the amount of the repair restoration of the Properties required by a Casualty equals or exceeds twenty-five percent (25%) of the Purchase Price, as estimated by Sellers' architect (a "Material Casualty") then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of the estimate from Sellers' architect, to (a) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing, without terminating this Agreement, in which case Sellers shall (i) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (A) the applicable insurance deductible, and (B) and the reasonable estimated costs for the repair or restoration of the Properties required by such Material Casualty, and (ii) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty and lost profits insurance policies maintained by Sellers with respect to the Properties or the Business. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

22

13.1.2. <u>Non-Material Casualty</u>. In the event of any Casualty which is not a Material Casualty, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall (A) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (1) the applicable insurance deductible under Sellers' applicable insurance policy, and (2) the reasonable estimated costs for the repair or restoration required by such Casualty, and (B) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty insurance policies maintained by Sellers with respect to the Properties.

**13.2** <u>Condemnation</u>. If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Properties (a "<u>Condemnation</u>"), Sellers shall give written notice of such Condemnation to Purchaser promptly after Sellers receive notice of such Condemnation.

13.2.1. <u>Material Condemnation</u>. If the Condemnation would (i) result in the permanent loss of more than twenty-five percent (25%) of the fair market value of the Land or Improvements of the Properties, (ii) result in any permanent material reduction or restriction in access to the Land or Improvements of the Properties, or (iii) have a permanent materially adverse effect on the Business as conducted prior to such Condemnation (a "<u>Material Condemnation</u>"), then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of Sellers' written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Material Condemnation. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

13.2.2. <u>Non-Material Condemnation</u>. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Condemnation.

**ARTICLE XIV**
**SURVIVAL**

**14.1** <u>Survival</u>. Except only as expressly set forth in this Section 14.1, all representations, warranties, covenants, liabilities and obligations shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

14.1.1. <u>Survival of Representations and Warranties</u>. The payment of the Purchase Price by Purchaser and the delivery of the deed(s) by Sellers to Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

23

319033286.1

14.1.2. <u>Survival of Covenants and Obligations</u>. If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

14.1.3. <u>Survival of Indemnification</u>. All rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

14.1.4  Notwithstanding anything to the contrary contained herein, Articles II, VI, XII and XIV and Sections 3.2.2, 7.1.7, and 7.2 hereof shall survive the termination of this Agreement.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

**15.1**   <u>Notices</u>.

15.1.1. <u>Method of Delivery</u>. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) facsimile transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address, facsimile number or e-mail address:

<u>If to Seller</u>:

Supor Property Enterprises LLC
433 Bergen Avenue
Kearny, NJ
Attention:  Joseph Supor, III
owner24@jsupor.com

J Supor 136-1 Realty LLC
433 Bergen Avenue
Kearny, NJ
Attention:  Joseph Supor, III
owner24@jsupor.com

Supor-172 Realty LLC
433 Bergen Avenue
Kearny, NJ
Attention:  Joseph Supor, III
owner24@jsupor.com

With Required Copy to:      Forman Holt

24

319033286.1

365 West Passaic Street, Suite 400
Rochelle Park, NJ 07662
Attention: Michael E. Holt, Esq.
mholt@formanlaw.com

K&L Gates LLP
One Newark Center, 10th Fl.
1085 Raymond Blvd.
Newark, NJ 07102
Attention: Daniel Eliades, Esq
Daniel.eliades@klgates.com
Jennifer Mazawey, Esq.
Jennifer.mazawey@klgates.com
William Waldman, Esq.
william.waldman@klgates.com

Joseph Supor, III
583 Princeton Avenue
Brick, NJ 08724

Global International Advisors, LLC.
312 Sawmill Lane
Wyckoff, NJ 07481
Attn: Kevin M Cassidy
kcassidy@globalintadvisors.com

If to Purchaser:

_____
_____
_____
Attn: _____
E-mail address: _____

With a copy to:

_____
_____
_____
Attn: _____
E-mail address: _____

15.1.2. Receipt of Notices. All Notices sent by a Party (or its counsel pursuant to Section 16.1.4 hereof) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. **[Eastern]** on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party

25

refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to Section 16.1.3 hereof.

15.1.3. Change of Address. The Parties and their respective counsel shall have the right to change their respective address and/or facsimile number for the purposes of this Section 16.1 by providing a Notice of such change in address and/or facsimile number as required under this Section 16.1.

15.1.4. Delivery by Party's Counsel. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**15.2**     No Recordation. No Party shall record this Agreement, or any memorandum of this Agreement, in any public records.

**15.3**     Time is of the Essence. Time is of the essence as to all dates and/ or times, as applicable, set forth in this Agreement; provided, however, that notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**15.4**     Assignment. Purchaser shall not assign this Agreement or any interest therein to any Person, without the prior written consent of Sellers, which consent may be withheld in Sellers' sole discretion. Notwithstanding the foregoing, Purchaser shall have the right to designate any affiliate(s) (which is intended to be broader than the defined term "Affiliate") as its nominee to receive title to the Properties, or assign all of its right, title and interest in this Agreement to any affiliate(s) of Purchaser by providing written notice to Sellers no later than five (5) days prior to the Closing, provided that in any such event the originally named Purchaser shall remain liable for all Purchaser obligations hereunder.

**15.5**     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**15.6**     Third Party Beneficiaries. This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**15.7**     GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**15.8**     Rules of Construction. The following rules shall apply to the construction and interpretation of this Agreement:

319033286.1

15.8.1. Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

15.8.2. All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement. All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

15.8.3. The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

15.8.4. Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

15.8.5. The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

15.8.6. The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

15.8.7. The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

15.9    Severability. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

15.10  JURISDICTION AND VENUE. ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE BANKRUPTCY COURT AND SELLERS (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURT AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

15.11  WAIVER OF TRIAL BY JURY. EACH PARTY HEREBY WAIVE ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT.

27

319033286.1

**15.12**   Incorporation of Recitals, Exhibits and Schedules. The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 15.14 hereof) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement. Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**15.13**   Entire Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**15.14**   Amendments, Waivers and Termination of Agreement. No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**15.15**   Not an Offer. The delivery by Sellers of this Agreement executed by Sellers shall not constitute an offer to sell the Properties, and Sellers shall have no obligation to sell the Properties to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties and unless the Sale Order is entered.

**15.16**   Execution of Agreement. A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**15.18**   Substantial Contribution. Purchaser hereby waives any right it may have to pursue a substantial contribution claim in the Bankruptcy Case pursuant to 11 U.S.C. §503.

**15.19**   Real Estate Commission. Seller and Purchaser each represent and warrant to the other that neither Seller nor Purchaser has contacted or entered into any agreement with any real estate broker, agent, finder or any other party in connection with this transaction other than Seller's broker, CBRE ("Broker"), and that neither Party has taken any action which would result in any real estate broker's, finder's or other fees or commissions being due and payable to any Party other than Broker with respect to the transaction contemplated hereby. Purchaser shall pay Broker a real estate commission of One Percent (1%) of the Purchase Price as a Buyers' Premium at the Closing. This shall be in addition to the Purchase Price. Purchaser hereby indemnifies and agrees to hold the Seller harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the Seller by reason of a breach of the representation and warranty made by Purchaser in this Section. Seller hereby indemnifies and agrees to hold the Purchaser harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the Purchaser by reason of a breach of the representation and warranty made by Seller in this Section.

**15.20**   Bulk Sale Notice. Both Seller and Purchaser shall cooperate with each other in complying with the requirements of the NJ Bulk Sale Act. In the event the Bulk Sale Department (the

319033286.1

"Department") determines that any or all of the Seller's proceeds are to held back as an escrow pending a determination by the Department of any taxes due and owing from the Seller, then such funds as determined by the Department shall be withheld out of the Seller's proceeds at the Closing by Escrow Agent until such time as the parties are in receipt of a tax clearance letter from the Department authorizing the release of the escrow. The parties shall comply with any directive from the Department, including but not to any request to either remit sums from the sales proceeds to the Department or to hold sums in escrow with Purchaser's attorney. Purchaser shall submit the required notification of the pending sale to the Department, including notification that the sale is occurring pursuant to a Bankruptcy Court Order, not less than ten (10) business days prior to Closing, and the Seller agrees to fully cooperate with such submissions (including but not limited to submitting a TTD form). Seller may submit a TTD form and any supplemental documents it deems reasonably necessary to receive the tax clearance letter from the Department authorizing the release of the escrow. The last four digits of Seller's federal tax identification number are contained in Exhibit A attached here.

**15.21** Flood Notification. In accordance with the provisions of New Jersey's flood risk notification laws, N.J.S.A. 56:8-19.2, attached at **Exhibit H** is Seller's required Flood Risk declaration.

**[Remainder of page intentionally left blank;
Signatures on following pages]**

29

319033286.1

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER:**

**Supor Properties Enterprises LLC**

Witness/Attest

By:_____
Name:                                    Name:
Title:                                   Title:

**SELLER:**

**J Supor 136-1 Realty LLC**

Witness/Attest

By:_____
Name:                                    Name:
Title:                                   Title:

**SELLER:**

**Supor-172 Realty LLC**

Witness/Attest

By:_____
Name:                                    Name:
Title:                                   Title:

**PURCHASER:**

Witness/Attest

By:_____
Name:                                    Name:
Title:                                   Title:

A-1

319033286.1

## **Exhibit A**

## **SELLER ENTITIES**

Supor Properties Enterprises LLC (Seller of FER 1 Property) (EIN: 5580)

J Supor 136-1 Realty LLC (Seller of FER 2 Property) (EIN: 3205)

Supor-172 Realty LLC (Seller of FER 3 Property) (EIN: 5662) [4]

---

[4] **[Note: Additional Sellers to be added per Bid of Purchaser]**

A-2

319033286.1

## **Exhibit B**

**FER 1 PROPERTY:**

Legal Description

ALL THAT CERTAIN LOT, PARCEL OR TRACT OF LAND, SITUATE AND LYING IN THE TOWN OF HARRISON, COUNTY OF HUDSON, STATE OF NEW JERSEY, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**TRACT ONE:**

BEGINNING AT A POINT ESTABLISHED AS FOLLOWS: COMMENCING AT A POINT IN THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (F/K/A SOUTH FOURTH STREET) AT A POINT THEREIN DISTANT AS MEASURED ALONG THE SAID EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH ON A COURSE OF NORTH 2 DEGREE 47 MINUTES EAST, 1474.49 FEET FROM A POINT IN THE PIER HEAD AND BULKHEAD LINE OF THE PASSAIC RIVER AS FIXED BY THE UNITED STATES HARBOR LINE BOARD AND APPROVED MAY 22, 1916 AND FROM THENCE RUNNING

1.  (1) NORTH 1 DEGREE 47 MINUTES EAST 150.76 FEET TO A POINT; THENCE

2.  (2) SOUTH 88 DEGREES 13 MINUTES EAST 398.83 FEET TO A POINT; THENCE

3.  (3) NORTH 1 DEGREE 47 MINUTES EAST 70.00 FEET TO A POINT; THENCE

4.  (4) SOUTH 88 DEGREES 13 MINUTES EAST 126.77 FEET TO A POINT; THENCE

5.  (5) SOUTH 01 DEGREE 47 MINUTES WEST 220.76 TO A POINT; THENCE

6.  (6) NORTH 88 DEGREES 13 MINUTES WEST 59.85 FEET TO A POINT; THENCE

7.  (7) NORTH 1 DEGREE 47 MINUTES EAST 78.00 FEET TO A POINT; THENCE

8.  (8) NORTH 88 DEGREES 13 MINUTES WEST 314.00 FEET TO A POINT; THENCE

9.  (9) SOUTH 1 DEGREE 47 MINUTES WEST 78.00 FEET TO A POINT; THENCE

10. (10)      NORTH 88 DEGREES 13 MINUTES WEST 151.75 FEET TO THE POINT OR PLACE OF BEGINNING.

THE ABOVE DESCRIPTION IS IN ACCORDANCE WITH A SURVEY MADE BY BORRE, MCDONALD & WATSON, LAND SURVEYORS, DATED AUGUST 11, 2010.

FOR INFORMATIONAL PURPOSES ONLY: ALSO KNOW AS LOT 17.02 IN BLOCK 137 ON THE TOWN OF HARRISON TAX MAP.

319033286.1

**TRACT TWO:**

BEGINNING AT A POINT ESTABLISHED AS FOLLOWS: COMMENDING AT A POINT IN THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (F/K/A SOUTH FOURTH STREET) AT A POINT THEREIN DISTANT AS MEASURED ALONG THE SAID EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH ON A COURSE OF NORTH 1 DEGREE 47 MINUTES EAST, 1501.36 FEET FROM A POINT IN THE PIER HEAD AND BULKHEAD LINE OF THE PASSAIC RIVER AS FIXED BY THE UNITED STATES HARBOR LINE BOARD AND APPROVED MAY 22, 1916 AND FROM THENCE RUNNING ALONG A LIEN SOUTH 88 DEGREES 13 MINUTES EAST 942.93 FEET AND PARALLEL WITH THE NORTHERN LINE OF GUYON DRIVE, AND FROM SAID BEGINNING POINT RUNNING THENCE

(1)     NORTH 88 DEGREES 13 MINUTES WEST 417.33 FEET TO A POINT; THENCE

(2)     NORTH 1 DEGREE 47 MINUTES EAST 377.62 FEET TO A POINT; THENCE

(3)     SOUTH 88 DEGREES 13 MINUTES EAST 29.30 FEET TO A POINT; THENCE

(4)     SOUTH 1 DEGREE 47 MINUTES WEST 30.62 FEET TO A POINT; THENCE

(5)     SOUTH 88 DEGREES 13 MINUTES EAST 111.70 FEET TO A POINT; THENCE

(6)     NORTH 1 DEGREES 47 MINUTES EAST 4.50 FEET TO A POINT; THENCE

(7)     SOUTH 88 DEGREES 13 MINUTES EAST 5.75 FEET TO A POINT; THENCE

(8)     NORTH 1 DEGREE 47 MINUTES EAST 143.56 FEET TO A POINT; THENCE

(9)     SOUTH 88 DEGREES 13 MINUTES EAST 5.00 FEET TO A POINT; THENCE

(10) NORTH 1 DEGREES 47 MINUTES EAST 71.00 FEET TO A POINT; THENCE

(11) SOUTH 88 DEGREES 13 MINUTES EAST 170.43 FEET TO A POINT; THENCE

(12) SOUTH 1 DEGREE 4 MINUTES WEST 113.00 FEET TO A POINT; THENCE

(13) SOUTH 88 DEGREES 13 MINUTES EAST 91.15 FEET TO A POINT; THENCE

(14) SOUTH 1 DEGREE 47 MINUTES WEST 6.67 FEET TO A POINT; THENCE

(18) SOUTH 1 DEGREE 47 MINUTES WEST 340.00 FEET TO THE POINT OR PLACE OF BEGINNING

THE ABOVE DESCRIPTION IS IN ACCORDANCE WITH A SURVEY MADE BY BORRE, MCDONALD & WATSON LAND SURVEYORS, DATED AUGUST 11, 2010.

FOR INFORMATIONAL PURPOSES ONLY: ALSO KNOWN AS LOT 1.02 IN BLOCK 149 AND LOT 5.02 IN BLOCK 151 ON THE TOWN OF HARRISON TAX MAP.

319033286.1

**<u>FER 2 PROPERTY:</u>**

ALL THAT CERTAIN LOT, PARCEL OR TRACT OF LAND, SITUATE AND LYING IN THE TOWN OF HARRISON, COUNTY OF HUDSON, STATE OF NEW JERSEY, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TRACT THREE:

BEGINNING AT A POINT IN THE DIVIDING LIEN BETWEEN BLOCK 136 LOT 1.07 AND LOT 1.06, SAID POINT OF BEGINNING BEING THE FOLLOWING 3 COURSES FROM THE INTERSECTION OF THE PROLONGATION OF THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (FORMERLY SOUTH FOURTH STREET (80 FEET WIDE) AND THE PROLONGATION OF THE NORTHERLY LINE OF GUYON DRIVE 74 FEET WIDE):

1.     ALONG THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (FORMERLY SOUTH FOURTH STREET) (80 FEET WIDE), NORTH 03 DEGREES 08 MINUTES 49 SECONDS WEST 271.11 FEET TO A POINT; THENCE

2.     ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.03 AND BLOCK 137 LOT 35.03, NORTH 50 DEGREES 59 MINUTES 11 SECONDS EAST, 187.00 FEET TO A POINT; THENCE

3.     ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.03 AND LOT 1.06, NORTH 50 DEGREES 59 MINUTES 11 SECONDS EAST, 139.13 FEET TO THE POINT OF BEGINNING, RUNNING FROM THE POINT OF BEGINNING THENCE

4.     ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 AND LOT 1.03 THE FOLLOWING 3 COURSES, NORTH 50 DEGREES 59 MINUTES 11 SECONDS EAST 290.86 FEET TO A POINT; THENCE

5.     NORTH 53 DEGREES 33 MINUTES 41 SECONDS EAST 71.78 FEET TO A POINT; THENCE

6.     NORTH 58 DEGREES 47 MINUTES 11 SECONDS EAST 2.23 FEET TO A POINT; THENCE

7.     ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 ND BLOCK 150 LOT 16.01 THE FOLLOWING 13 COURSES, SOUTH 03 DEGREES 01 MINUTES 49 SECONDS EAST 33.72 FEET TO A POINT; THENCE

8.     SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 9.85 FEET TO A POINT; THENCE

9      SOUTH 04 DEGREES 14 MINUTES 49 SECONDS EAST 12.35 FEET TO A POINT; THENCE

10.    NORTH 86 DEGREES 51 MINUTES 11 SECONDS EAST 1.21 FEET TO T POINT; THENCE

319033286.1

11.      SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 9.87 FEET TO A POINT; THENCE

12.      NORTH 86 DEGREES 51 MINUTES 11 SECONDS EAST 3.77 FEET TO A POINT; THENCE

13.      SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 12.97 FEET TO A POINT; THENCE

14.      SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 21.68 FEET TO A POINT; THENCE

15.      SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 68.85 FEET TO A POINT; THENCE

16.      SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 11.58 FEET TO A POINT; THENCE

17.      SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 19.23 FEET TO A POINT; THENCE

18.      SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 4.38 FEET TO A POINT; THENCE

19.      SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 118.58 FEET TO A POINT; THENCE

20.      ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 AND B LOCK 137 LOT 1, SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 355.33 FEET TO A POINT; THENCE

21.      ALONG THE NEW DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 AND BLOCK 136 LOT 1.06, NORTH 03 DEGREES 08 MINUTES 49 SECONDS WEST 64.71 FEET TO THE POINT OF BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY ALSO KNOWN AS LOT 1.07 IN BLOCK 136 ON THE TOWN OF HARRISON TAX MAP.

**FER 3 PROPERTY:**

ALL that certain lot, tract or parcel of land situate lying and being in the Town of Harrison in the County of Hudson and the State of New Jersey and being all of Block 172 Lot 1, said lot as shown on the Official Tax Map of the Town of Harrison, said lot also as shown on a certain plan entitled "ALTA/NSPS Land Title Survey of J. Supor Harrison Redevelopment Block 136 Lot 1.07, Block 137 Lot 17.02, Block 149, Lot 1.02, Block 151 Lot 5.02, Block 172 Lot 1 prepared by Maser Consulting dated August 23, 2017" and being more particularly bounded and described as follows, to wit:

B-4

319033286.1

BEGINNING at a point in the existing northerly line of Lot 1.03 Block 174, said point being the following bearings and distances from the point of intersection formed by the existing northerly line of Guyon Drive (74' R.O.W.) and the existing easterly line of Frank E. Rogers Boulevard South (F.K.A. South Front Street) (variable width R.O.W.) as shown on the aforesaid map and plan.

A)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86º 52' 53" E) one thousand fourteen and seventy-eight hundredths feet (1,014.78') along the aforesaid existing northerly line of Guyon Drive to a point in the same, thence

B)      North three degrees seven minutes seven seconds West (N 03º 07' 07" W) sixteen and eighty-eight hundredths feet (16.88') along an existing easterly line of Lot 16.01 Block 150, said adjoining lot as shown on the aforesaid map and plan, thence

C)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86º 52' 53" E) thirty-three and twenty-two hundredths feet (33.22') along an existing southerly line of Lot 16.01 Block 150 to a point in the same, thence

D)      South three degrees seven minutes seven seconds East (S 03º 07' 07" E) seven and six hundredths feet (7.06') along an existing easterly line of Lot 16.01 Block 150 to a point in the same

AND from said point running, thence

1)      North three degrees seven minutes seven seconds West (N 03º 07' 07" W) four hundred eight and zero hundredths feet (408.00') along the aforesaid existing easterly line of Lot 16.01 Block 150 to a southerly line of same, thence

2)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86º 52' 53" E) one hundred ninety-three and zero hundredths feet (193.00') along the aforesaid southerly line of Lot 16.01 Block 150 to a point in the same, thence

3)      South three degrees seven minutes seven seconds East (S 03º 07' 07" E) two hundred sixty-five and eighty-one hundredths feet (265.81') along the existing westerly line of Lot 2.02 Block 169, said adjoining lot as shown on the aforesaid map and plan, thence

4)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86º 52'53" E) twenty-five and zero hundredths feet (25.00') along an existing southerly line of Lot 2.02 Block 169 to a point in the same, thence

5)      South three degrees seven minutes seven seconds East (S 03º 07' 07" E) one hundred forty-two and nineteen hundredths feet (142.19') along an existing westerly line of Lot 2.02 Block 169 to a point in the same, thence

6)      South eighty-six degrees fifty-two minutes fifty-three seconds West (S 86º 52' 53" W) two hundred eighteen and zero hundredths feet (218.00') along the existing northerly line of Lot 1.03 Block 174, said adjoining lot as shown on the aforesaid map and plan to a point in the same the point and place of BEGINNING.

B-5

BEING and intended to be the same premises conveyed to Grantor herein by way of Deed from Kevrich Associates, a New Jersey Partnership, dated April 19, 2001, recorded May 18, 2001 in the Register's Office of the County of Hudson, New Jersey in Deed Book 5805, Page 230.

319033286.1

## **Exhibit C**

## AFFILIATE MASTER LEASES AND SUBLEASES

1.  Master Lease dated December 31, 2020, between J Supor 136-1 Realty LLC as Landlord and J. Supor Realty LLC as Tenant as to property located at 1000 Frank E Rodgers Blvd (Block 136; Lot 1.07) Harrison, NJ.

2. Master Lease dated December 31, 2020, between J Supor 172 Realty LLC as Landlord and J. Supor & Son Trucking and Rigging Co., Inc. as Tenant as to property located at 1000 Frank E Rodgers Blvd (Block 172; Lot 1) Harrison, NJ.

3. Master Lease dated December 31, 2020, between J Supor 172 Realty LLC as Landlord and J. Supor & Son Trucking and Rigging Co., Inc. as Tenant as to property located at 1000 Frank E Rodgers Blvd (Block 136; Lot 1.07) Harrison, NJ.

C-1

319033286.1

C-2

## **EXHIBIT D**

## **LEASES**

1.  Parking Facility Management Agreement dated October 1, 2015 by and between S&B Realty and M&J Coraprelli, LLC for the exclusive right and obligation to manage parking at 1000 Frank E Rodgers Blvd., Harrison, NJ.

C-2

**EXHIBIT E**

**DRAFT SALE ORDER**

319033286.1

C-4

# EXHIBIT F

# FORM OF EARNEST MONEY ESCROW AGREEMENT

C-4

319033286.1

## EXHIBIT G

## ENVIRONMENTAL DOCUMENTS

FER 1 PROPERTY (1000 Frank E. Rodgers Blvd., Harrison, NJ, Block 151, Lot 5.02; Block 149, Lot 1.02; Block 137, Lot 17.02)
- 2018 PAR
  - PAR CID
  - S&B October 2018 PAR Compiled
- 2019 SIR RIR
  - RI CID
  - SI CID – correct
  - SI RI Compiled
  - Appendices
  - Drawings
  - Forms
  - Tables

FER 2 PROPERTY (1000 Frank E. Rodgers Blvd., Harrison, NJ, Block 136, Lot 1.07)
- 2018-06-4 RAO-A Letter
- 2018-12-11 RAO-A Letter
- 2019-02-07 RAO-A Letter
- July 12, 2017 Peak Environmental Response to NOV
- 2018 UST-RIR-RAR
  - Compiled SIR-RIR-RAR
  - Appendices
  - Drawings
  - Forms
  - Lab Data
  - Tables
- 2019 PAR
  - Compiled PAR 2019
- 2019 SIR
  - Appendices
  - Drawings
  - Forms
  - Tables
  - 2019 SIR text
- 2021 RIR RAW
  - 2021 RAW CID
  - 2021 RIR RAW Text
  - Appendices
  - Drawings
  - Forms
  - Tables

C-5

FER 3 PROPERTY (1000 Frank E. Rodgers Blvd., Harrison, NJ, Block 172, Lot 1)
- September 2017 PAR
- 2019 PAR
- 2020 SIR RIR
  - SIR RIR Text
  - Appendices
  - Drawings
  - Forms
  - Tables
- 2021 RAR
  - Farber 2021 RAR Text
  - Appendices
  - Drawings
  - Forms
  - Tables
- 06232022 Farber RAO
- 20240529 RAO Amendment

600 Guyon (600 Guyon Drive, Harrison NJ, Block 150, Lot 16.01)
- CEA – 2016-11-14 900-1000 FER Blvd
- RAO forms
- RAO Panasonic
- NJDEP – Soil Remediation Permit 7_21_14
- Final sign-off 081910

C-6

319033286.1

# **EXHIBIT H**

# **FORM OF FLOOD NOTIFICATION**

C-7

319033286.1

## LIST OF SCHEDULES[5]

Schedule 1          Purchased Contracts

Schedule 2          Equipment Leases

Schedule 3          Tax Appeals

Schedule 4          Purchaser Bid Allocation

---

[5] **[Note: Schedules 1, 2, and 4 to be prepared per Bid of Purchaser]**

319033286.1

**Schedule 3**
**Pending Tax Appeals**

FER 3 Property: Block 172, Lot 1 – 1000 FE Rogers Boulevard – Appealed for years 2020, 2021

FER 1 Property: Block 149, Lot 1.02 – 1000 FE Rogers Boulevard – Appealed for years 2020, 2021

FER 2 Property: Block 136, Lot 1.07 – 1000 FE Rogers Boulevard – Appealed for years 2020, 2021

319033286.1

Exhibit C
Proof of Funds Excerpt
Bidder currently has in excess of $80,000,000.00 in escrow with Fidelity National Title from the
successful sale closing of a New York property by an affiliated entity.



Exhibit D
Authority Documents

# H CAPITAL HOLDINGS, LLC

## *CONSENT OF SOLE MEMBER*

The undersigned, being the only member (the "Member") of H Capital Holdings, LLC a New Jersey limited liability company (the "Company"), hereby adopt the following resolutions:

**WHEREAS**, at a meeting on July 8, 2024 the Member has elected to authorize the submission of a bid to attempt to acquire those certain properties known as the FER Property and the Guyon properties pursuant to those certain bid instructions under In Re Supor et al Case No. 24-13427 (SLM) (the "Bid").

**WHEREAS**, the Member desires to designate and authorize certain parties to effectuate the Bid.

**NOW, THEREFORE**, the parties hereby consent as follows:

**RESOLVED**: that the Company shall submit the Bid in accordance with the bidding requirements and subject to the sole discretion of the Manager;

**RESOLVED**, that Anthony He is appointed Manager with full capacity to make all decisions on behalf of the Company;

**FURTHER RESOLVED**, that Michael Ochs, Esq., as counsel for the Company is hereby appointed and authorized to submit the Bid, and to the extent necessary, participate in the auction process through the submission of binding incremental bids on behalf of the Company at the direction of the Manager;

**IN WITNESS WHEREOF**, the undersigned have executed this Consent effective as of this 8th day of July, 2024.

H Capital Holdings, LLC
By its Sole Member H Equities, LLC

By: _____
Anthony He, Sole Member

# H EQUITIES, LLC

## *CONSENT OF SOLE MEMBER*

The undersigned, being the only member (the "Member") of H Equities, LLC a New York limited liability company (the "Company"), hereby adopt the following resolutions:

**WHEREAS**, the Company is the sole member of H Capital Holdings, LLC.

**WHEREAS**, at a meeting on July 8, 2024 the Member has elected to authorize H Capital Holdings, LLC to submit a bid to attempt to acquire those certain properties known as the FER Property and the Guyon properties pursuant to those certain bid instructions under In Re Supor et al Case No. 24-13427 (SLM) (the "Bid").

**WHEREAS**, the Member desires to designate and authorize certain parties to effectuate the Bid.

**NOW, THEREFORE**, the parties hereby consent as follows:

**RESOLVED**: that the Company shall consent to the submission of the Bid by H Capital Holdings in accordance with the bidding requirements and subject to the sole discretion of the Manager;

**FURTHER RESOLVED**, that Anthony He is appointed Manager with full capacity to make all decisions on behalf of the Company;

**IN WITNESS WHEREOF**, the undersigned have executed this Consent effective as of this 8th day of July, 2024.

**H Equities, LLC**

By: _____
Anthony He, Sole Member

Exhibit E
Non-Collusion Affidavit

## NON-COLLUSION AFFIDAVIT

State of New Jersey
County of Bergen                         ss:


I, Anthony He, residing in Fort Lee, New Jersey of full age, being duly sworn according to law on my oath depose and say that:

I am the Manager of H Capital Holdings, LLC (the "Bidder") making this  bid entitled "Irrevocable offer for the purchase of the RDA PROPERTIES" (the "Bid") , and that I executed the Bid with full authority to do so that said (a) Bidder has not, directly or indirectly entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free, competitive bidding in connection with the above named project; (b) that Bidder has not engaged in any collusion with respect to any Bids or the Sale Transaction, (c) Bidder has not agreed with any Potential Bidders or Potential Bidders to control price; and (d) Bidder agrees not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction.

Subscribed and sworn to

before me this day 18th
day of July, 2024

_____
Michael A. Ochs, Esq.
Attorney at Law of the State of New Jersey

_____
Anthony He, Manager
H Capital Holdings, LLC