# **EXHIBIT D**

**TRIF & MODUGNO, LLC**
89 Headquarters Plaza, Suite 1201
Morristown, New Jersey 07960
(201) 321-7816
Michael Ochs (mochs@tm-firm.com)
*Counsel for H Capital Group, LLC*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Supor Properties Enterprises LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-13427 (SLM)<br><br>(Jointly Administered) |

**CERTIFICATION ANTONG HE IN SUPPORT DEBTORS' MOTION TO
AUTHORIZE AND APPROVE (I) SALE OF REAL PROPERTY;
(II) ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES;
(III) REJECTION OF UNEXPIRED LEASES; AND
(IV) GRANTING RELATED RELIEF**

Antong He, of full age, hereby certifies as follows:

1.     I  am the Manager of H Capital Holdings, LLC. As such, I am familiar with the matters set forth herein. If asked to testify, I would testify to the facts herein.

2.     Purchaser is the "Successful Bidder" (as such term is defined in the Sale Procedures Motion.)

3.     On August 12, 2024, the Purchaser executed the Purchase and Sale ("PSA").

4.     The Purchaser has performed under the PSA by funding FOUR MILLION EIGHT

HUNDRED THOUSAND AND 00/100 DOLLARS ($4,800,000.00) into escrow with

Purchaser's title company.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  Supor Properties Enterprises (5580), J Supor 136-1 Realty LLC (3205), Supor-172 Realty LLC (5662), Supor Properties Breiderhoft LLC (7258), Supor Properties Devon LLC (6357), Shore Properties Associates North LLC (6707), Supor Properties 600 Urban Renewal, LLC (8604), JS Realty Properties, LLC (2497) and Supor Properties Harrison Avenue LLC (1728).

5.     The Purchaser has performed under the PSA by making three (3) separate submissions to the Harrison Redevelopment Authority ("HRA") to obtain an assignment of that certain Amended and Restated Redevelopment Agreement between The Harrison Redevelopment Authority, The Town of Harrison, and certain Debtor entities dated February 24, 2021 (the "RDA").

6.     The Purchaser submitted the initial response to the HRA on August 29, 2024 ("HRA Application"). A copy of the HRA Application is attached hereto Exhibit A.

7.     The Purchaser submitted the first supplemental response to the HRA on September 14, 2024 ("1st Supplement"). A copy of the 1st Supplement is attached hereto as Exhibit B.

8.     The Purchaser submitted the second supplemental response to the HRA on September 20, 2024 ("2nd Supplement"). A copy of the 2nd Supplement is attached hereto as Exhibit C.

9.     On September 23, 2024 the HRA denied the assignment of the RDA to Purchaser.

10.    The assignment of the RDA to Purchaser is an express condition to complete the sales transaction under the  PSA.

11.    The Purchaser has otherwise satisfied the Purchaser's obligations under the PSA and remains ready willing and able to perform under RDA.

12.     Upon information and belief, the HRA denied the request for the consent to assignment of the RDA based upon two articulated factors:

a. The development history of the applicant's Harrison Yards project ("Harrison Yars")

b. The uncertainty of Purchaser's capabilities to perform under the RDA.

**Harrison Yards Project History**

13. Affiliated entities of the Purchaser, East One Harrison Urban Renewal, LLC and

Accordia Harrison Urban Renewal, LLC  ("East One Entities") acquired Harrison Yards project. The Harrison Yards project consists of four buildings in two phases. Phase I consists of buildings A & D. Phase II consists of Buildings B & C.

## PHASE I

14. Building A received its temporary certificate of occupancy on or about July 2021. The residential portions of the building are complete and have been occupied for several years. The commercial portions of the building have recently signed leases and currently are under construction. There remain certain areas of external sitework and external façade work before a final certificate of occupancy can be completed.

15. The remaining façade completion was intentionally held until the commercial tenants were identified and the façade could be completed with one coordinated mobilization, as the façade work requires a temporary lane closure of Frank E. Rogers Boulevard. It is anticipated that the façade completion will take approximately two (2) weeks. The East One Entities have the subcontractors on standby and have sufficient funds available to complete the façade improvements.

16. Building D has all construction complete and inspections are ongoing. It is anticipated that corrective or punch list type construction items will be required to pass all final inspections on Building D.

17. Phase I was delayed for several reasons outside of the control of the East One Entities. The East One Entities, acquired the site with a development partner and construction manager already in place and engaged by our predecessors in title. We replaced the development partner and began to self-perform. The construction manager, Hollister Construction Services, LLC filed for bankruptcy on September 11, 2019. Additionally, during this time, the country also experienced the corona virus pandemic, which included government mandated shut down of

construction operations. Collectively, these events caused significant delays.

18. The East One Entities borrowed secured financing to acquire and complete the Harrison Yards project. The delays noted above also materially and severely negatively impacted our performance standards as required by our lenders. When the initial loans matured, we were still in the midst of the pandemic and financing options were limited. In December 2021 loans were recapitalized with aggressive lenders. Receiving regular funding from the lenders proved difficult and construction continued to fall behind.

19. The East One Entities have continued to fund the extended carrying costs, the aggressive debt service, and the extended costs to complete Phase I. A final accounting has not been conducted, but upon information and belief,  the East One Entities have spent approximately $70,000,000.00 in additional out of pocket dollars keeping the Harrison Yards Project moving forward towards the imminent completion of Phase I.

20. The East One entities have secured sufficient equity to payoff all existing Phase I debt and commence Phase II construction upon the successful completion of Phase I.

## PHASE II

21. Phase II of Harrison Yards consists of buildings B, C, and E. The deadline to commence construction on buildings B & C is June 1, 2025. The deadline to commence construction on Building E is December 2025. The overall deadline for completion of the entire project is December 2028.

22. The delays outlined in Phase I directly impacted the commencement of Phase II.

23. The East One Entities have secured sufficient equity to commence Phase II until institutional construction debt is obtained for the site.

24. As of September 25, 2024 the East One Entities have caused all outstanding taxes and fees due to the municipality to be paid through the payment of THREE MILLION DOLLARS

and 00/100 ($3,000,000.00).

## H CAPITAL GROUP, LLC

## CONSTRUCTION TEAM AND CAPACITY

25.  The Purchaser does not to self-perform any construction.

26. The Purchaser has an in-house construction management team with over 100 years of combined experience in the construction industry.

27. The in-house team consists of the following individuals:

**a. Matt Higgins** - *Construction Executive.*  Mr. Higgins has been in the construction industry for over 40 years in New Jersey and New York. Over his career Mr. Higgins has held leadership roles as a general contractor, construction  manager, owner's representative and consultant. Mr. Higgins specializes in operational leadership and subcontractor relations. Mr. Higgins holds a Bachelor of Arts from Lafayette College.

**b. John Chu** - *Project Manager.* Mr. Chu has over 20 years of construction management experience and managed the development of many significant projects which included new construction, building renovation, and building conversions in New York and New Jersey. Mr. Chu has overseen the development of over 1,143,000 square feet of new construction. Mr. Chu attended the City College of New York and holds a Bachelor of Science in Electrical Engineering.

**c. Robert Unice** – *Construction Superintendent.* Mr. Unice has overseen multiple projects simultaneously and his talents include managing ground up construction and renovations of large warehouse, office, and retail facilities, coordinating all aspects of construction from contracts to inspections and completion of projects well before the scheduled finish dates. Mr. Unice has more than 20 years of experience in New Jersey construction. Mr. Unice will lead the on site team through his hands-on leadership style. Mr. Unice attended Fairleigh Dickinson University.

**d. New Hire #1**  - *Portfolio/Asset Manager.* New Hire #1 is a seasoned real estate executive with over 25 years of experience in development, construction, and asset management. With a proven track record of delivering successful projects and driving profitable growth, New Hire #1 has led initiatives totaling over $15 billion in value. His expertise spans various asset classes and includes roles in strategic planning, financial analysis, team leadership, and operational execution. New Hire #1 attended Rutgers University and holds a Bachelor of Science in Organizational Psychology. New Hire 1 is scheduled to commence employment on or before October 15, 2024.

**e. New Hire #2 -** *Senior Project Manager.* New Hire #2 is a civil engineer with more than 17 years of experience in construction management. New Hire #2 has significant experience in constructing warehouse, hi-rise, hospitality, residential, commercial, and governmental projects. New Hire #2 attended Stevens Institute of Technology, where he received his master's in

construction management, and holds several professional certificates including Project Manager Professional certification, 3-D and 4-D BIM modeling and Revit architecture, structure and MEP. New Hire #2 is schedule to commence employment on or before January 15, 2025.

28. Given the scope and size of the overall project, it is anticipated that one or more construction managers (utilizing subcontractors) or general contractors will be engaged to physically construct and deliver the various buildings as required by the RDA under the direction of the in-house construction team.

29. The existing in-house team as identified herein has sufficient experience and capacity to commence the development as required under the RDA.

30. The Purchaser is financially positioned to retain additional development parties to complete the development as required under the RDA.

## H Capital Group, LLC Financial Capabilities

31.   The Purchaser has sufficient funds to purchase the property, complete pre-development, and commence construction. We have recently completed the sale of several assets with affiliated entites. As of the date of this certification, we have approximately EIGHTY-TWO MILLION and 00/100 DOLLARS held in trust with Fidelity National Title.

32. The Purchaser has made arrangements for additional funds available to be available via loan facility with additional funds available through loans from a family trust.  Attached is an account statement from HSBC Bank indicating additional liquid funds available. A HSBC account statement is attached hereto as Exhibit D.

33. We have attached the unaudited financial statements of H Capital Group, LLC as Exhibit E.

34. We have attached a personal financial statement of Tong He, the principal and ultimate owner of H Capital Group, LLC, as Exhibit F.

35. It is anticipated that institutional financing may be required to supplement our own equity to complete the project as required under the RDA. Given the significant amount of equity invested, it is anticipated that institutional financing in sufficient amounts to satisfy complete the construction as required under RDA can be obtained.

## H Capital Group, LLC

## Additional Projects

36. In addition to the projects in Harrison, I am a manager of the following projects with affiliates:

a. Hudson Lights Phase II, Fort Lee, New Jersey. We are the designated redeveloper of this site. The project is currently in pre-construction. This redevelopment project consists of a 28-story mixed-use building with 950,066 total gross sf. This project includes apartments, condos, retail, office and hotel elements.

b. 37-21 32nd Street, Long Island City, New York. This project consists of 84,600 sf of completed space. The project is a mix of ground floor commercial usage with residential condominiums and 160 parking spaces. Construction on this project is complete. It is anticipated that sales and marketing will commence October 15, 2024.

c. Yotel Hotel, Long Island City, New York. This project consists of an 11-story mixed use project hotel with amenities consisting of 178 rooms. This project is currently under construction. Anticipated completion for Q1 2025.

d. Roosevelt Oriental, Flushing, New York. This project will consist of 85 condo units, ground floor retail and office, and automatic parking. This project is currently in pre-construction.

e. The Huron Pier, Brooklyn, New York. The project is located at the waterfront of East River in Greenpoint, Brooklyn, and consists of an existing deck and an underwater site of 0.494 acres. Situated to the west of East River, the south of Green Street, the north of Huron Street, with its western boundary parallelled with the west side of West Street,  the subject site is 85,000 SF and the total buildable area is 458,000 SF, including residential condos and community facilities. This as of right project is currently in pre-construction.

f. 62-41 Forest Avenue, Ridgewood, New York. The project consists of newly 54 residential constructed rental units. The property is complete and occupied.

g. 3055 Vernon Boulevard, Astoria, Queens, New York. This project  consists of 98 residential newly constructed residential condominium units with retail and parking. This project is completed and in the process of being rented.

h. 3005 Vernon Boulevard, Astoria, Queens, New York. This project consists of 67 rental units and ground floor commercial. This project is completed and in the process of being rented.

i. 249 E. 50th Street, Manhattan, New York. This project consists of  38 condominium units. This project is completed and in the process of selling units.

## STIPULATION AS TO ACCEPTANCE OF THE RDA

37. Included in the 1st Supplemental Submission was a stipulation by Purchaser that confirmed "Notwithstanding the opportunity to improve the overall project through a collaborative reexamination, the Applicant is willing and able to perform pursuant the existing RDA."

38. Included in the Second Supplemental Submission was an additional stipulation by Purchaser "…the Applicant reaffirms their willingness and ability to perform the obligations set forth in the existing RDA."

39. At the September 23, 2024, HRA meeting,  Counsel for the Purchaser stipulated that the Purchaser agreed and acknowledged to continue to provide the existing public parking spaces (before development) and structured parking spaces as required under the RDA.

I make this Certification in support of the Debtors' motion to authorize and approve the (i) sale of real property, (ii) assumption and assignment of unexpired leases, (iii) rejection of unexpired leases, and (iv) granting related relief.   Unless otherwise indicated herein, this Certification is based upon my personal knowledge, a review of the Purchaser books and records, a review of publicly filed documents, and information provided to me through employees or representatives of the Purchaser or through my personal representatives.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 27, 2024

*/s/ Antong He*
Antong He

# EXHIBIT A

# TRIF & MODUGNO

## —— ATTORNEYS AT LAW ——

**Michael A. Ochs, Esq.**
mochs@tm-firm.com

August 29, 2024

**Sent Via Hand Delivery**
Harrison Redevelopment Agency Authority
318 Harrison Avenue
Harrison, NJ 07029

> Re: Application for Consideration of Assignment of Amended and Restated Redevelopment Agreement dated February 24, 2021 (the "RDA") by and between the Town of Harrison and various entities owned or controlled by Joseph Supor (collectively, the "Supor Entities") for the redevelopment project located at 1000 Frank E Rodgers Boulevard, Harrison, New Jersey lot 50.2 in block 151, lot 17.02 in block 137, and lot 1.02 in block 149) ("FER 1 Property"), and 1000 Frank E Rodgers Boulevard, Harrison, New Jersey Lot 1.07 in block 136 ("FER 2 Property"); and 1000 Frank E. Rodgers Boulevard, Harrison, New Jersey lot 1 in block 173 ("FER 3 Property") (collectively "the Properties") to H Capital FER 1, LLC, H Capital FER 2, LLC and H Capital FER 3, LLC (collectively "the H Capital Entities").

Dear Sir or Madam,

In connection with the above referenced matter, I represent the H Capital Entities. My clients have successfully negotiated a purchase and sale agreement with the Supor Entities for the sale of the Properties (the "PSA"). As you are aware, the Supor Entities filed for Chapter 11 bankruptcy protection under Case No. 24-13427.

As a condition of the PSA, the H Capital Entities are requesting the transfer and assignment of the RDA. Accordingly, we seek your consent and approval of such assignment. In support of the request, we have enclosed the following:

1. Application for Consideration of Assignment;
2. Organizational Chart of Assignees;
3. 10% disclosure form for all entities;
4. Resolutions Authorizing Submission of Application;
5. Purchase and Sale Agreement.

---

**NEW JERSEY**
89 Headquarters Plaza
North Tower, Suite 1201
Morristown, New Jersey 07960
973-547-3611,
Facsimile: 973-554-1220

**NEW YORK**
811 Broadway
Suite 615
New York, New York 10004
917-477-2999
Facsimile: 973-554-1220

**PENNSYLVANIA**
1700 Market Street
Suite 1005
Philadelphia, Pennsylvania 19103
267-869-0050
Facsimile: 267-869-0051

www.tm-firm.com

# TRIF & MODUGNO
Page 2

We kindly ask that this submission be reviewed and a hearing on the matter be held at the next available meeting date. To the extent that additional information is required or requested, please feel free to contact me.

Thank you for your consideration and I look forward to working with you on this matter.

Very truly yours,

MAO/

Michael A. Ochs/s

cc:     Client

**Application for Consideration of Assignment of a Redevelopment Agreement
in the Town of Harrison, County of Hudson, New Jersey**

A request has been made to the Town of Harrison, County of Hudson, New Jersey ("Harrison") for the assignment of a current Amended and Restated Redevelopment Agreement dated February 24, 2021 (the "RDA by and between the Town of Harrison, with offices located at 318 Harrison Avenue, Harrison, NJ 07029 and various entities owned or controlled by Joseph Supor (collectively, the "Supor Entities") designated redeveloper ("Redeveloper") for the redevelopment project located at 1000 Frank E Rodgers Boulevard, Harrison, New Jersey lot 50.2 in block 151, lot 17.02 in block 137, and lot 1.02 in block 149) ("FER 1 Property"), and 1000 Frank E Rodgers Boulevard, Harrison, New Jersey Lot 1.07 in block 136 ("FER 2 Property"); and 1000 Frank E. Rodgers Boulevard, Harrison, New Jersey lot 1 in block 173 ("FER 3 Property") (collectively "the Properties").

The Properties are subject to the Amended and Restated RDA dated February 24, 2021.

The Supor Entities filed for Chapter 11 bankruptcy protection under Case No. 24-13427 (the "Bankruptcy").

Pursuant to the Bankruptcy, a sales process was conducted for the Properties and H Capital Holdings, LLC ("H Capital") was the successful bidder. The Supor Entities and H Capital entered into a certain Purchase and Sale Agreement dated August 15, 2024 ("PSA") a copy of which is attached hereto as **Schedule A.**

The FER 1 Property is to be acquired by a newly formed entity "H Capital FER 1, LLC".

The FER 2 Property is to be acquired by a newly formed entity "H Capital FER 2, LLC".

The FER 3 Property is to be acquired by a newly formed entity "H Capital FER 3, LLC".

H Capital FER 1, LLC, H Capital FER 2, LLC and H Capital FER 3, LLC  are hereby requesting the assignment, and shall be referred to hereafter collectively as the "Transferee".

**II. Basis for Approval:**

Under the terms of the RDA,  assignments are only permitted with the approval of Harrison, which approval is subject to the satisfaction of the following requirements:

1) *Criteria: the Transferee does not own any other Project subject to long term tax exemption at the time of transfer;*

   **Response**: the Transferees are newly form entities and do not own any other Projects subject to long term tax exemptions.

2) *The Transferees are formed and eligible to operate under the Law;*

Law and, to the extent required, may be amended to be qualified as Urban Renewal entities formed under the Long Term Tax Exemption Law (NJSA 40A:20-1 et seq.).

3) *The Redeveloper is not then in Default of the RDA or the Law;*

**Response**: As a condition of the PSA the Transferees have assumed the cure obligations under the RDA of the Supor Entities.

4) *The Entity's obligations under the RDA are to be fully assumed by the Transferee;*

**Response**: As per the PSA, the RDA is to be fully assumed by the Transferees.

5) *The Transferee agrees to abide by all terms and conditions of the RDA including, without limitation, the filing of an application pursuant to N.J.S.A. 40A:20-8, and any other terms and conditions of the Town in regard to the Project;*

**Response**: As per the PSA, the RDA is to be fully assumed by the Transferees. Notwithstanding such assumption, it is anticipated that the Transferees may request future modifications to the RDA to meet current market conditions, incorporate updated overall planning concepts, and incorporate design elements to create a cohesive development in collaboration with the neighboring parcel, which is owned by affiliated entities of the Transferees.

6) *The principal owners of the Transferee entity possess a similar business reputation, financial qualifications and credit worthiness as the Redeveloper and are otherwise reputable.*

**Response**: The Supor Entities are presently bankrupt. The principal owners of the Transferees have previously been approved as a qualified redevelopers in Harrison. Despite the bankruptcy of the GC for our Harrison Yards property, and the subsequent COVID-related delays, we have recently brought over Eighty Million Dollars ($80,000,000) of new cash equity into our affiliated entities, as well as over Fifty Million Dollars ($50,000,000) of LP equity investment. Financial documentation is available upon request.

**III. Fees:**

*To the extent applicable, the Transferees shall pay the Town charges a fee of two percent (2%) of the then applicable Annual Service Charge for that portion of the Project being transferred for processing any application for assignment.*

**Response**: The Transferees request that the applicability of the transfer fee be determined by the HRA and said amount will be submitted as necessary

**IV. Information Required:**

1. *Description of Transferee and Its Capabilities*

319856285.1

The Transferees are owned and controlled by H Capital Holdings, LLC.

H Capital Holdings, LLC is a Delaware LLC and affiliated entity of Eastone Equities, LLC. See www.eastoneequities.com for a brief description of the existing projects and capabilities. An affiliated entity currently is in the final stages of Buildings A and D of the Harrison Yards redevelopment project.

An organizational chart is attached hereto as **Exhibit A.** Attached hereto as **Exhibit B is** a notarized statement disclosing the ownership and capital structure of the Transferees, the disclosure sets forth the names and addresses of all members of each entity who own 10% or more of any membership class. The disclosures also identify the percentage of ownership by minorities and women.

2. *Personnel*

H Capital plans to use a combination of in-house employees and third-party consultants to staff this redevelopment project. The Project Manager role has yet to be determined and H Capital reserves the right to supplement with third parties as necessary for the successful completion of the project.

3. *Summary of Related Experience*

H Capital currently has the following projects completed or close to completion:

a. Harrison Yards Redevelopment (600 Frank E Rodgers Blvd S, Harrison, NJ 07029): A Mixed-use, multi-phase redevelopment; Phase I consists of 205 residential units, 218 covered parking spaces and 8,110 sf of retail space. Phase II is approved for 884 residential units, a 200-room hotel, 1349 parking spaces, 212,399 sf of retail space, and a public park.

b. Meridian Towers Condominiums (37-21 32nd Street, Long Island City NY 11101) newly constructed condominium, consisting of 86 residential units, 43 parking spaces and 15,076 sf of retail space. Construction is complete and the units are being marketed for sale.

c. 249 East 50th Street Condominiums (251 E 50th St, New York, NY 10022) newly constructed condominium, consisting of 27 residential units. Construction is complete and a handful of units left unsold.

d. 62-41 Forest Avenue Condominiums (62-41 Forest Ave, Ridgewood, NY 11385), a multifamily rental building constructed in 2016 with 46 rental units and 7,600 sf of retail space

4. *Current Projects – Provide a list of all current projects and identify how such projects will not serve to inhibit the Transferee's ability to meet the requirement of the RDA and the FA.*

As a preliminary statement, each project is a stand-alone venture. Each project is independently

319856285.1

financed with separate ownership and equity structure. H Capital, LLC does not have any other current projects. The affiliated entity, Eastone Equities, LLC, currently has a robust pipeline of projects under construction or in the development process, including, but not limited to the following:

a. Harrison Yards Redevelopment (600 Frank E Rodgers Blvd S, Harrison, NJ 07029); Phase I construction nearly complete, Phase II to break ground this year
b. Yotel LIC (38-65 11th St, Long Island City, NY 11101)
c. Hudson Lights Phase II (2062 Lemoine Ave, Fort Lee, NJ 07024)
d. Huron Pier (Greenpoint Brooklyn, Block: 2520 Lot: 100)

The business model of H Capital, LLC allows multiple projects to be undertaken at any given time. The in-house development team can be utilized or independent third-party construction, project management, entitlement management teams can be utilized.

5. *Sub-Contracting Requirements* – *Indicate what portions of work, if any, would be performed by other entities operating on a sub-contract basis.*

It is anticipated that all construction activities with the exception of Construction Management will be performed by subcontractors.

6. *New Jersey Presence* – *Describe Transferee's presence in New Jersey, specifically including the number and type of staff and the location of offices.*

Presently the H Capital, LLC family of companies maintains a corporate office in Fort Lee, New Jersey and temporary construction offices in Harrison, New Jersey. There are approximately 10 employees in the corporate office and 2-3 employees per construction office.

7. *References* – *Provide the names, addresses and phone numbers of three professionals within the redevelopment industry, other than sub-contractors or former employees, who are qualified to comment on the Transferees previous performance as a redeveloper. Indicate the basis of each reference's knowledge of such previous performance.*

- **Michael Ochs** – Partner, Trif & Modugno.
89 Headquarters Plaza North Tower, Suite 1201 Morristown, New Jersey 07960
Phone: (201) 321-7816
*Mr. Ochs is the Outside General Counsel to H. Capital, LLC.*

- **Stephen Pastor** – Partner, Hill Wallack LLP
1000 Floral Vale Boulevard Suite 300 Yardley, PA 19067
Phone: (267) 759-2070
*Mr. Pastor is the existing Primary Counsel for the Harrison Yards redevelopment over the years, assisting with acquisitions and conducted majority of the legal work for the redevelopment*

- **Mitchell Berkey** – Chair, Real Estate, Chiesa Shahinian & Giantomasi PC
105 Eisenhower Parkway Roseland, NJ 07068
Phone: (973) 530-2085

319856285.1

*Mr. Berkey previously represented Accordia, the existing redeveloper whom we purchased the project from during the initial transaction and have inherited Mr. Berkey as a result. Mitchell has represented us as our Land Use and Zoning attorney.*

8. *Assurances Regarding Performance* – *Please indicate what types of guarantees or assurances that the Transferee intends to utilize to provide comfort to Harrison that the Transferee will be able to complete the Project.*

An affiliate of H Capital, LLC recently closed a sale of a property for $82,000,000.00. Portions of these funds are currently allocated to the acquisition and the development soft costs to launch the Project. With no acquisition debt, the subsequent phases of construction will be financeable on market rate terms.

It should be noted that the fortitude of the Harrison Yards project can also be viewed as assurance regarding performance. Despite the general contractor's bankruptcy, a worldwide pandemic, and various funding issues with secured lenders, there is one building complete and rented with an occupancy rate over 95% and another building in the final stages of construction and inspections.

9. *Financial Condition* – *Please provide an audited financial statement for the Transferee for the most recently completed fiscal year. If the Transferee is a subsidiary organization, provide audited financial statements for the most recently completed fiscal year for all entities to which the Transferee is subordinate.*

H Capital, LLC or the Transferees do not have audited financial statements for any periods of time. Financials of the affiliated entity Eastone Equities, LLC have been previously provided and are on file with the township.

10. *Bank Reference* – *Please provide the name, address and contact person for the principal bank utilized by the Transferee.*

Global Bank, 8 Catherine St, New York, NY 10038.
Yungman Lee, Chief Executive Officer, Phone: 855 552 7775

11. *Defaults* – *Please provide a complete list of any and all projects for which the Transferee, and/or any entities to which it is subordinate, for any reason, failed to complete any development project for which it was responsible. Provide explanations in each case as to reasons why the project was not completed.*

Harrison Yards. As noted above, the project suffered from the bankruptcy of the general contractor, a worldwide pandemic, and was forced to accept debt from aggressive lenders. Notwithstanding the foregoing, the ownership continually cured the defaults through the funding of additional equity. It is anticipated that the existing debt will be paid off on or before October 1, 2024 and all defaults cured.

12. *Conflicts* – *Describe any existing or potential legal or other policy conflicts of interest or appearance of conflict of interest the Transferee may have, or which reasonably might arise, because of Transferee's involvement in this Project. In preparing the response, please be aware that Harrison's redevelopment activities frequently involve other entities, including*

319856285.1

*other governmental entities and other redevelopers.*

A potential conflict may exist as to timing and obligations of the Project and the Harrison Yards project. It is anticipated that there may be impact to timing for future phases of both projects. It is the intent of the Transferees to incorporate and integrate the designs of both projects to have a more impactful overall neighborhood design. By way of example, there may be ways to incorporate green path ways connecting the sites with the goals of making alternative walk ways to the Red Bull Stadium. By way of further example, a project of this collective size may provide the opportunity to creatively collaborate with the municipal government and/or Port Authority to incorporate a public need into the private development (police substation). These collaborations come at the expense of scheduling and time for performance.

13. *Investigations – State whether Transferee, any entities to which it is subordinate or any of the principals of Transferee or any entities to which it is subordinate has been (in the past three years), or are currently the subject of any Federal, State or County investigation, and indicate the nature of that investigation.*

None.

14. *Litigation – Indicate any pending litigation in which Transferee and/or any entities to which it is subordinate and/or any of the principals of Transferee or any entities to which it is subordinate has been is involved which may directly or indirectly affect the Transferee's ability to complete the Project.*

There is no litigation out of the regular course of business. In large construction projects there will regularly be payment disputes with contractors and lenders.

15. *Authorization for Release of Information – Provide evidence that written authorization has been given to all persons, corporations or other related entities to furnish such information as may be necessary to verify the representations made to Harrison.*

See attached consents.

16. *Other Information – Discuss any other factors not mentioned above which you believe are relevant to Harrison's approval of the request for assignment of the RDA and FA.*

The Transferee's submissions herein are comprehensive together with the existing documentation on file with the municipality. Notwithstanding, the Transferee is available to supplement as may be reasonably requested by the HRA.

17. *Authorization to Apply* – Attached hereto as **Exhibit C** is a resolution of each Transferee that the Transferee has the legal authority to submit such documents as are required herein and that it is willing to be bound by all of the conditions set forth herein.

319856285.1

## EXHIBIT A

## ORGANIZATIONAL CHART



## EXHIBIT B

### DISCLOSURE OF OWNERSHIP

### EXHIBIT B-1

### DISCLOSURE OF OWNERSHIP
H Capital FER 1, LLC, H Capital FER 2, LLC, and H Capital FER 3, LLC

*(for use by Limited Liability Company)*

I.    MEMBER(S)

| Name | Percentage Owned | Address | Signature |
|------|------------------|---------|-----------|
| H Capital, LLC | 100% | 1 Bridge Plz N Suite 860, Fort Lee, NJ 07024 | By: Tong He, Manager |
| | | | |
| | | | |

**Notary Acknowledgement:**

State of ___New York___ )

)ss.:

County of ___Queens___ )

On the ___28th___ day of ___Aug___ in the year ___24___, before me, the undersigned notary public, personally appeared ___Tony He___, personally known  to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that  he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

CINTHIA CHUNGYIP
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CH6228972
Qualified in Queens County
Commission Expires September 27, 2026

_____
Notary Public

## EXHIBIT B-2

### DISCLOSURE OF OWNERSHIP

H Capital Holdings, LLC

*(for use by Limited Liability Company)*

II.     <u>MEMBER(S)</u>

| Name | Percentage Owned | Address | Signature |
|------|------------------|---------|-----------|
| H Equities, LLC | 100% | 1 Bridge Plz N Suite 860, Fort Lee, NJ 07024 | By: Tong He, Manager |
| | | | |
| | | | |

**Notary Acknowledgement:**

State of   New York    )

                    )ss.:

County of   Queens    )

On the 28th day of Aug in the year 24, before me, the undersigned notary public, personally appeared Tony He, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

CINTHIA CHUNGYIP
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CH6228972
Qualified in Queens County
Commission Expires September 27, 2026

~~Notary Public~~

**EXHIBIT B-3**

**DISCLOSURE OF OWNERSHIP**

H Equities, LLC

*(for use by Limited Liability Company)*

III.   MEMBER(S)

| Name | Percentage Owned | Address | Signature |
|------|------------------|---------|-----------|
| Tong He | 100% | 1 Bridge Plz N Suite 860, Fort Lee, NJ 07024 | By: Tong He |
| | | | |
| | | | |

Tong He is of Asian-Pacific Island descent.

**Notary Acknowledgement:**

State of ___New York___ )

                                              )ss.:

County of ___Queens___ )

On the _29th_ day of _August_ in the year _2024_, before me, the undersigned notary public, personally appeared ___Tony He___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

CINTHIA CHUNGYIP
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CH6228972
Qualified in Queens County
Commission Expires September 27, 2026

_____
Notary Public

## EXHIBIT C

## RESOLUTIONS AUTHORIZING SUBMISSION OF APPLICATION

Consent of Sole Member

PLEASE TAKE NOTICE that a meeting of the Members of H Capital FER 1, LLC  (the "Company") was held on August 26, 2024  at which time the following RESOLUTION was unanimously adopted:

RESOLVED that this Company is authorized to submit an application to the Town of Harrison Municipality for the assignment of a Redeveloper's Agreement.

BE IT FURTHER RESOLVED that if this Company's application is accepted by the Municipality, the Manager of this Company is authorized to execute and deliver on its behalf, a contract with the Municipality, substantially in agreement with the terms of these Requirements, with such changes thereto as may be negotiated by the parties.

The undersigned being the sole Member of the Company hereby certifies that the foregoing Resolution was lawfully adopted by the Company on the date set forth above, that the foregoing Resolution is a true, accurate and complete copy of the Resolution so adopted and placed in the Company's records, and that they are in full force and effect as of the date hereof.

_____  8/29/24

By: H Capital Holdings, LLC, Sole Member
By: H. Equities, LLC, Sole Member
By: Tong He, Sole Member          Date

**Notary Acknowledgement:**

State of ___New York___ )
                          )ss.:
County of ___Queens___ )

On the __29th__ day of __August__ in the year __2024__ before me, the undersigned notary public, personally appeared ___Tong He___, personally known  to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that  he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

CINTHIA CHUNGYIP
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CH6228972
Qualified in Queens County
Commission Expires September 27, 2026

## RESOLUTION AUTHORIZING SUBMISSION OF APPLICATION

Consent of Sole Member

PLEASE TAKE NOTICE that a meeting of the Members of H Capital FER 2, LLC  (the "Company") was held on August 26, 2024  at which time the following RESOLUTION was unanimously adopted:

RESOLVED that this Company is authorized to submit an application to the Town of Harrison Municipality for the assignment of a Redeveloper's Agreement.

BE IT FURTHER RESOLVED that if this Company's application is accepted by the Municipality, the Manager of this Company is authorized to execute and deliver on its behalf, a contract with the Municipality, substantially in agreement with the terms of these Requirements, with such changes thereto as may be negotiated by the parties.

The undersigned being the sole Member of the Company hereby certifies that the foregoing Resolution was lawfully adopted by the Company on the date set forth above, that the foregoing Resolution is a true, accurate and complete copy of the Resolution so adopted and placed in the Company's records, and that they are in full force and effect as of the date hereof.

_____        8/29/24.

By: H Capital Holdings, LLC, Sole Member
By: H. Equities, LLC, Sole Member
By: Tong He, Sole Member            Date

**Notary Acknowledgement:**

State of _____New York_____ )

)ss.:

County of _____Queens_____ )

On the 29th day of _____August_____ in the year 2024, before me, the undersigned notary public, personally appeared _____Tony He_____, personally known  to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that  he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

CINTHIA CHUNGYIP
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CH6228972
Qualified in Queens County
Commission Expires September 27, 2026

## RESOLUTION AUTHORIZING SUBMISSION OF APPLICATION

Consent of Sole Member

PLEASE TAKE NOTICE that a meeting of the Members of H Capital FER 3, LLC (the "Company") was held on August 26, 2024 at which time the following RESOLUTION was unanimously adopted:

RESOLVED that this Company is authorized to submit an application to the Town of Harrison Municipality for the assignment of a Redeveloper's Agreement.

BE IT FURTHER RESOLVED that if this Company's application is accepted by the Municipality, the Manager of this Company is authorized to execute and deliver on its behalf, a contract with the Municipality, substantially in agreement with the terms of these Requirements, with such changes thereto as may be negotiated by the parties.

The undersigned being the sole Member of the Company hereby certifies that the foregoing Resolution was lawfully adopted by the Company on the date set forth above, that the foregoing Resolution is a true, accurate and complete copy of the Resolution so adopted and placed in the Company's records, and that they are in full force and effect as of the date hereof.

_____   8/29/24

By: H Capital Holdings, LLC, Sole Member
By: H. Equities, LLC, Sole Member
By: Tong He, Sole Member          Date

**Notary Acknowledgement:**

State of __New York__ )
                            )ss.:
County of __Queens__ )

On the __29th__ day of __August__ in the year __2024__, before me, the undersigned notary public, personally appeared __Tong He__, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

CINTHIA CHUNGYIP
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CH6228972
Qualified in Queens County
Commission Expires September 27, 2026

_____
Notary Public

## SCHEDULE A

### PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is made and entered into as of this 15th day of August, 2024 (the "Effective Date") by and between the entities identified on **Exhibit A** hereto (each, a "Seller", and collectively, the "Sellers"), and H Capital Holdings, LLC, a New Jersey limited liability company (the "Purchaser"). Seller and Purchaser are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

**WHEREAS**, subject to the DILFs (defined below) Sellers are the owners of certain property located at 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149) ("FER 1 Property"); 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 1.07 in block 136) ("FER 2 Property"); and 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 1 in block 172) ("FER 3 Property"), in the Town of Harrison, County of Hudson and State of New Jersey more particularly described on **Exhibit B** attached hereto. FER 1 Property, FER 2 Property and FER 3 Property are collectively referred to as the "Properties" (defined below).

**WHEREAS**, the Properties are subject of an Amended and Restated Redevelopment Agreement dated February 24, 2021, by and between Seller, the Harrison Redevelopment Agency (the "HRA"), the Town of Harrison (the "Town"), Supor 136-1 Realty LLC, Supor Properties Enterprises LLC and Supor-172 Realty LLC. (the "RDA"). The RDA was recorded with the Hudson County Register on April 20, 2021, at book 9552, page 39, index number 20210420010031740.

**WHEREAS**, 1000 Frank E. Rodgers 1, LLC ("FER 1 Lender") has recorded mortgages on the FER Properties to secure a certain mortgage loan. FER 1 Lender caused to be recorded the following deeds in lieu of foreclosure (collectively, the "DILFs") to 1000 Frank E. Rodgers Blvd Owner LLC (the "DILF Holder"), a single purpose entity owned or controlled by FER 1 Lender:

1. DILF for FER Property 1 recorded with the Hudson County Register of Deeds on January 29, 2024, as Instrument 20240129010006630 for stated consideration of $19,000,000 to DILF Holder;

2. DILF for FER Property 2 recorded with the Hudson County Register of Deeds on January 29, 2024, as Instrument 20240129010006640 for stated consideration of $500,000 to DILF Holder; and

3. DILF for FER Property 3 recorded with the Hudson County Register of Deeds on January 29, 2024, as Instrument 20240129010006650 for stated consideration of $5,500,000 to DILF Holder.

**WHEREAS**, Sellers contend, among other things, that: (i) the fair market value of the Properties, and related properties, exceeds the outstanding amounts due to FER 1 Lender and 1000 Frank E. Rodgers 2, LLC ("FER 2 Lender" and together with FER-1 Lender collectively, the "Lenders" and each such entity, a "Lender") and exceeds the consideration reflected in the DILFs, and (ii) the transfers of the Properties and related properties subject to the DILFs are subject to avoidance under applicable law ("Debtor Avoidance Claims").

1

#319616022.1

**WHEREAS** Sellers, affiliates of Sellers, and Lenders negotiated resolution of the Debtor Avoidance Claims and certain transactions including a sale of the Property on the terms set forth in the Restructuring Support Agreement dated April 2, 2024 (the "RSA").

**WHEREAS,** on April 2, 2024, Sellers and certain affiliates each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court, District of New Jersey ("Bankruptcy Court"), which is jointly administered under Case Number 24-13427 (SLM) ("Bankruptcy Cases"). The debtors in the Bankruptcy Cases are Supor Properties Enterprises LLC; J Supor 136-1 Realty LLC; Supor-172 Realty LLC; Supor Properties Breiderhoft LLC; Supor Properties Devon LLC; Shore Properties Associates North LLC; Supor Properties 600 Urban Renewal, LLC; JS Realty Properties, LLC; and Supor Properties Harrison Avenue LLC (each a referred to as a "Debtor" and collectively as the "Debtors").

**WHEREAS,** each Debtor remains a Chapter 11 debtor in possession. No trustee or committee has been appointed in the Bankruptcy Cases.

**WHEREAS,** on April 12, 2024, the Debtors filed a motion to assume the RSA pursuant to 11 U.S.C. § 365. Bankruptcy Case ECF. No. 51. That motion was granted by Bankruptcy Court order dated May 21, 2024. Bankruptcy Case ECF. No. 115.

**WHEREAS,** on April 22, 2024, the Debtors filed a motion for an order *(I) (a) Approving the Bidding and Auction Procedures, (b) Scheduling Bid Deadlines and an Auction, (c) Approving the Form and Manner of Notice Thereof, and (II) (a) Authorizing Sale of Assets and (b) Granting Related Relief.* Bankruptcy (the "Sale Procedures Motion"). Case ECF. No. 58. The Sale Procedures Motion was granted by Bankruptcy Court order dated April 29, 2024 (the "Sale Procedures Order"). Bankruptcy Case ECF. No. 80. This Agreement is entered in accordance with the Sale Procedures Order.

**WHEREAS,** on May 6, 2024, the Debtors filed a Combined Disclosure Statement and Plan of Reorganization and/or Liquidation for Debtors (the "Plan"). Bankruptcy Case ECF. No. 92.

**WHEREAS,** on May 30, 2024, the Bankruptcy Court entered an order *(I) Approving the Disclosure Statement Contained in the Combined Plan and Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the Confirmation Notice; and (IV) Granting Related Relief.* Bankruptcy Case ECF. No. 133 (the "Order Approving the Disclosure Statement").

**WHEREAS,** a hearing to consider confirmation of the Plan is scheduled to be held before the Bankruptcy Court on July 23, 2024.

**WHEREAS,** on May 6, 2024, the Debtors filed a *Motion Seeking Entry of an Order Authorizing the Rejection of Certain Unexpired Leases and Granting Related Relief* (the "Rejection Motion") seeking to reject the Affiliate Leases (defined below), effective on the date of the closing of a Sale Transaction as to the applicable Debtor Property(ies). Bankruptcy Case ECF. No. 93. A hearing to consider the Rejection Motion is scheduled to be held before the Bankruptcy Court on July 23, 2024.

2

**WHEREAS**, Purchaser is the "Successful Bidder" (as such term is defined in the Sale Procedures Motion, as hereinafter defined), and accordingly, Sellers desire to sell the Properties (defined below) to Purchaser, and Purchaser desires to purchase the Properties from Sellers, on the terms set forth in this Agreement, in accordance with and pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

**1.1** <u>Definitions</u>. In addition to the terms defined elsewhere in this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Section 1.1. Any capitalized term in the Agreement that is not defined herein shall have the meaning ascribed to it in the Plan.

"Affiliate" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Affiliate Leases" means those master leases or sub-leases regarding the Property listed at **Exhibit C** hereto.

"Affiliate Tenants" means those tenants or subtenants identified in the Affiliate Leases.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all federal, state, and local statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, board of fire underwriters and similar quasi-governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Assumed Liabilities" has the meaning set forth in Section 2.4 hereof.

"Business Day(s)" shall mean every day other than (i) Saturdays, (ii) Sundays, (iii) all days observed by the Federal Government of the United States as legal holidays and (iv) all days on which commercial banks in New York State are required by law to be closed.

3

"Buyer's Premium" means the 1% fee due to CBRE and to be paid by Purchaser at closing as set forth in the Sale Procedures Motion. The Buyer's Premium shall be in addition to the Purchase Price.

"Casualty" has the meaning set forth in Section 13.1 hereof.

"Closing" has the meaning set forth in Section 10.1 hereof.

"Closing Date" has the meaning set forth in Section 10.1 hereof.

"Closing Statement" means a title closing statement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations, rulings and guidance issued by the Internal Revenue Service.

"Condemnation" has the meaning set forth in Section 13.2 hereof.

"Contracts" means, collectively, the Leases and Executory Contracts and any written or oral note, bond, mortgage, contract, license, lease, sublease, covenant, commitment, power of attorney, proxy, indenture, or other binding agreement or arrangement.

"Confirmation Order" means the Order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

"Cure Amounts" or "Cure Costs" mean the aggregate monetary sum required to be paid to the counterparties under the Purchased Contracts to be assigned by the applicable Sellers and assumed by Purchaser in accordance with Section 2 hereof, not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00).

"Deeds" has the meaning set forth in Section 10.2.1(a) hereof.

"Earnest Money" means, at the time in question, the amounts then deposited with Escrow Agent (and any additional amounts as may be deposited with Escrow Agent pursuant to Section 10.1 hereof), together with all interest and any other amounts earned thereon.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1 hereof.

"Environmental Claims" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous Substances over, on, in, under or from any one or more of the Properties, or (ii) violation of any Environmental Laws with respect to any one or more of the Properties.

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other

4

environmental media, including, without limitation, (a) the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); (b) the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.) ("RCRA"); (c) the National Environmental Policy Act (42 U.S.C. §§ 4321 et seq. (1969), as amended); (d) the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.); (e) the Clean Air Act (42 U.S.C. §§ 7401 et seq.); (f) the Clean Water Act (33 U.S.C. §§ 1251 et seq.); (g) the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.); (h) the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101 et seq.); (i) any state, county, municipal or local Applicable Laws similar or analogous to the federal statutes listed in parts (a)-(h) of this definition; and (j) any rules, regulations, directives, or orders pursuant to or implementing the Applicable Laws listed in parts (a)-(i) of this definition.

"Executory Contract Order" means a Final Order determining the Assumption/Rejection Motion.

"Executory Contract" means any existing executory contract or unexpired lease of personal property between any Seller and any other Person or Persons regarding the Properties. For avoidance of doubt, the RDA is an Executory Contract.

"Final Order" means an Order of the Bankruptcy Court or a court of competent jurisdiction to hear appeals from the Bankruptcy Court that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing shall then be pending; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

"Governmental Authority" means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question. For the avoidance of doubt, Governmental Authority shall include all Taxing Authorities.

"Hazardous Substances" means all substances, chemicals, wastes, materials, pollutants, or contaminants defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or defined as hazardous or toxic by, or regulated as such under, any applicable Environmental Law, including RCRA hazardous wastes, CERCLA hazardous substances, asbestos, toxic mold, and polychlorinated biphenyls.

"Land" has the meaning set forth in Section 2.1.1 hereof.

"Lease" means, other than an Affiliate Lease, any lease, master lease, sublease or sub-sublease, letting, license, sublicense or sub-sublicense, concession, or other agreement (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of the Property, and every modification, amendment, or other agreement

5

(whether written or oral) relating to such lease, license, or other agreement entered into in connection with such lease, license, or other agreement, whether in existence before or after the Petition Date. A list of "Unexpired Leases" is attached at **Exhibit D** hereto.

"Liability" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"Licenses and Permits" has the meaning set forth in Section 2.1.7 hereof.

"Lien" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in Section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Material Casualty" has the meaning set forth in Section 13.1.1 hereof.

"Material Condemnation" has the meaning set forth in Section 13.2.1 hereof.

"Order" means an order or judgment entered in the Bankruptcy Case by the Bankruptcy Court as entered on the Docket as well as any writ, judgment, decree, award, ruling, subpoena, verdict, injunction or similar order of any Governmental Authority (in each such case whether preliminary or final).

"Permitted Exceptions" has the meaning set forth in Section 5.3 hereof.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Petition Date" means April 2, 2024, the date upon which the Debtors filed petitions commencing the Bankruptcy Case.

"Plans and Specifications" has the meaning set forth in Section 2.1.8 hereof.

"Properties" has the meaning set forth in Section 2.1 hereof.

"Prorations" has the meaning set forth in Section 11.1 hereof.

"Retained Liabilities" has the meaning set forth in Section 2.5 hereof.

"Release" means any release, spill, emission, discharge, leaking, leaching, pumping, pouring, dumping, emptying, injection, deposit, disposal of or migration into or through the indoor or outdoor environmental medium or into or out of any property.

"Rejected Contract(s)" means those Executory Contracts and Leases which are rejected by the Debtors pursuant to Section 365 of the Bankruptcy Code.

6

#319616022.1

"Rejection Claim" means any Claim under the Bankruptcy Code that arises in favor of the Third Party to any Executory Contract or Lease that is a Rejected Contract.

"Sale Order" shall mean the Final Order of the Bankruptcy Court, substantially similar to the form of Sale Order attached at **Exhibit E** hereto, approving the sale of the Property free and clear of all liens, encumbrances and claims other than the Permitted Exceptions.

"Tax Appeal" means those certain actions as set forth in **Schedule 3**.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Sellers with respect to the Properties, including any assessment, interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Tenant" means a Person counterparty to a Lease entered into with a Seller.

"Title Commitments" has the meaning set forth in Section 5.1 hereof.

"Title Company" means Cortes & Hay

"Unpermitted Exceptions" has the meaning set forth in Section 5.3 hereof.

1.2     Unless the context clearly indicates to the contrary, the following rules shall apply to the construction of this Agreement:

1.2.1    All references herein to articles or sections without reference to a specific document are references to articles or sections of this Agreement.

1.2.2    The terms "hereby", "hereof", "hereto", "herein", "hereunder" and any similar terms, as used in this Agreement, refer to this Agreement in its entirety and not the article or section of this Agreement in which they appear.

1.2.3    The word "including" means "including but not limited to."

1.2.4    All Recitals and Exhibits to this Agreement, including any amendments and supplements hereto, are hereby incorporated herein and made a part of this Agreement.

## ARTICLE II
## THE PROPERTIES AND LIABILITIES

2.1     Description of the Properties. Subject to the terms set forth in this Agreement, including entry of the Sale Order by the Bankruptcy Court, at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all right, title and interest of Sellers in and to the properties and assets set forth in this Section 2.1 (collectively, the "Properties"):

7

2.1.1. all of the fee simple interest in, to and under the land of FER 1 Property, FER 2 Property and FER 3 Property, described in **Exhibit B** attached hereto, (collectively, the "Land");

2.1.2. all of Seller's right, title and interest in, to and under all privileges and easements appurtenant to the Land, including, without limitation, all of Seller's right, title and interest in, on and under the Land, all easements, rights of way or other appurtenances of Seller used in connection with the beneficial use and enjoyment of the Land and all assignable permits, licenses, approvals and authorizations issued by any Governmental Authority (collectively, the "Appurtenances");

2.1.3. all of Seller's right, title and interest in and to all improvements and fixtures located on the Land, including, without limitation, all buildings and structures located on the Land (collectively, the "Improvements");

2.1.4. subject to the provisions of Section 2.2 hereof, all of Seller's right, title and interest in and to the Executory Contracts and Unexpired Leases identified on **Schedule 1** hereto;

2.1.5. subject to the provisions of Section 2.2 hereof, all leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Properties, together with all deposits made thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (collectively, the "Equipment Leases") each if which are referenced on **Schedule 2** attached hereto;

**2.2**   Executory Contracts and Unexpired Leases.

2.2.1   On the Closing Date, pursuant to a Final Order granting the Rejection Motion, the Affiliate Leases shall be deemed rejected pursuant to Section 365(a) of the Bankruptcy Code and terminated and Purchaser shall take title to the Property free and clear of the Affiliate Leases and any rights, claims or interests of any Affiliate Tenants. Purchaser shall have no liability for any Rejection Claim of an Affiliate Tenant.

2.2.2   Purchaser herby designates the Executory Contracts and Unexpired Leases, Equipment Leases, identified on **Schedules 1-2** hereto as "Purchased Contracts" under this Agreement. Any Executory Contracts and Unexpired Leases, Equipment Leases that are not identified on **Schedules 1-2** hereto shall be deemed an "Excluded Contract" under this Agreement. Any Excluded Contract may be assumed or rejected by Sellers in their sole discretion.

2.2.3   Within seven (7) days after the execution of this Agreement, Purchasers shall deliver to the Town of Harrison the Requirements for Consideration of Assignment of the RDA, as identified in Exhibit F.

2.2.4   Within seven (7) days after the execution of this Agreement, the Sellers shall file a motion regarding the proposed assumption or rejection of Purchase Contracts and Excluded Contracts (the "Assumption/Rejection Motion"). The Assumption/Rejection Motion shall provide all applicable counterparties with (i) notice of the proposed treatment of their respective executory contract(s) or unexpired lease(s); (ii) the amount to be paid, if any, to cure any existing default(s) – the Cure Costs; (iii) establishing deadlines for objection to the proposed treatment of the

8

executory contract/unexpired lease as set forth in the Assumption/Rejection Motion, including payment of the Cure Costs; and (iv) establishing a hearing date for the resolution of any filed objections to the Assumption/Rejection Motion.

2.2.5   Subject to entry of a Final Order on the Assumption/Rejection Motion and the Sale Order, on the Closing Date the Purchased Contracts shall be deemed assumed by the Seller and assigned to Purchaser pursuant to Sections 365(b)(l)(A) and (B) and 365(f) of the Bankruptcy Code. In addition to the Purchase Price, Purchaser shall assume all obligations and Liabilities under the Purchased Contracts, including any Cure Amounts allowed by Final Order. For the avoidance of doubt, after the Closing Sellers shall not be responsible for compliance with any Purchased Contract and shall not be responsible for any costs associated therewith. If there are any costs or fees associated with the assignment of a Purchased Contract to Purchaser, Purchaser shall be responsible for payment of all such costs and fees. All Cure Costs shall be the responsibility of Purchaser, in addition to the Purchase Price and payment of Cure Costs shall not be credited/deducted from the Purchase Price.

2.2.6   Purchaser shall have no Liability for any Cure Costs or Rejection Claim of a counterparty to an Excluded Contract.

2.2.7   Notwithstanding the foregoing, so long as an Excluded Contract has not been rejected by the Sellers pursuant to Section 365 of the Bankruptcy Code and Final Order of the Bankruptcy Court, Sellers shall, upon written request by Purchaser, seek to assign such Excluded Contract to Purchaser, and Purchaser shall assume the same in accordance with Sections 2.2 hereof.

2.3   Cure Costs. Subject to a Final Order on the Assumption/Rejection Motion and the Sale Order, Cure Costs shall be paid (or in the case of a dispute, the disputed amount escrowed with the Escrow Agent pursuant to an escrow arrangement reasonably acceptable to Sellers and Purchaser) at the Closing.

2.4   Assumed Liabilities. At Closing, Purchaser shall assume all Liabilities arising or occurring from and after the Closing with respect to the Properties and the Purchased Contracts, but expressly excluding the Retained Liabilities (all Liabilities, except for the Retained Liabilities, shall be referred to herein as "Assumed Liabilities").

2.5   Retained Liabilities. At Closing, Sellers shall retain all Liabilities arising or occurring prior to the Closing Date with respect to the Properties, the Purchased Contracts or the Excluded Contracts (the "Retained Liabilities").

2.6   Survival. The Parties rights and obligations under this Article II shall survive the Closing.

## ARTICLE III
## PURCHASE PRICE

3.1   Purchase Price. The purchase price for the Properties is Forty-Eight Million and 00/100 Dollars ($48,000,000.00) (the "Purchase Price"), as same has been allocated by Purchaser in its Bid among FER 1 Property, FER 2 Property, and FER 3 Property and as set forth herein in **Schedule 4**, as adjusted by the prorations and adjustments provided elsewhere in this Agreement.

9

**3.2**     Earnest Money.

3.2.1.  Earnest Money Deposit. Prior to 5:00 pm eastern time on Wednesday, August 14, 2024, Purchaser shall deposit with Escrow Agent the sum which is equal to ten percent (10%) of the Purchase Price (the "Earnest Money Deposit"). The Earnest Money Deposit shall be held by Escrow Agent in escrow as earnest money pursuant to an escrow agreement, entered into among Sellers, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"). The Earnest Money Deposit shall be maintained by the Escrow Agent as to comply with the requirements of the Bankruptcy Court and the Sale Procedures Order. Except as specifically set forth in this Agreement or in the Sale Order, the Earnest Money Deposit shall be nonrefundable to Purchaser.

3.2.2.  Disbursement of Earnest Money to Sellers. At Closing, the Earnest Money Deposit shall be applied to the Purchase Price. At Closing, Escrow Agent is authorized and directed to disburse, and Purchaser shall otherwise cause Escrow Agent to disburse, the Earnest Money to Sellers or in such manner as Sellers shall instruct Escrow Agent, and Purchaser shall receive a credit against the Purchase Price in the amount of the Earnest Money disbursed to Sellers. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Earnest Money Deposit pursuant to the express provisions of this Agreement, the Earnest Money Deposit shall be disbursed to Sellers. This Section 3.2.2 shall survive the termination of this Agreement.

**3.3**     Payment of Purchase Price. At Closing, Purchaser shall pay to Sellers, in immediately available funds, an amount equal to the Purchase Price as adjusted by the prorations and adjustments provided elsewhere in this Agreement and less the Earnest Money Deposit.

**3.4**     Like-Kind Exchange.

Notwithstanding anything to the contrary in this Agreement, each Party acknowledge and agrees that the other Party or Parties (as the case may be) has the right to designate this transaction to qualify as a tax-free exchange under Section 1031 of the Code, and that Purchaser shall have the right to assign this Agreement to a "qualified intermediary" (as defined in Treas. Reg. § 1.1031(k)-1(g)(4) of the Code) or such other entity or entities as is necessary to carry out a 1031 Exchange. Each Party shall execute and deliver such documents as may reasonably and customarily be required to complete the transactions contemplated by any such tax-free exchange, which are in form and substance reasonably acceptable to the other applicable Parties, and otherwise cooperate in all reasonable respects with respect to such tax-free exchange, provided that (i) Sellers shall not be required to take title to any property, and (ii) neither such tax-free exchange nor Sellers' cooperation therewith shall result in any delay to the Closing, nor the imposition of any cost or liability upon Sellers or Purchaser, as the case may be.

**ARTICLE IV**
**CONTINGENCIES**

**4.1**     No Contingencies. The Purchaser's obligation to close title herein is expressly conditioned on assignment of the RDA to Purchaser Otherwise, Purchaser acknowledges and agrees that Purchaser has completed all of its due diligence investigations with respect to the Properties and is satisfied with the same. For the avoidance of doubt, it is expressly understood and agreed to by Purchaser that there is no due diligence or financing contingency, or other contingency under this

10

#319616022.1

Agreement, which gives Purchaser a right of termination. Purchaser's only termination rights are set forth in Sections 5.3, 5.4, 12.1, 13.1.1, 13.2.1 hereof.

## ARTICLE V
## TITLE TO THE PROPERTY

5.1     Title Commitments. Within ten (10) days of the Effective Date of this Agreement, Purchaser shall obtain at Purchaser's sole cost and expense, a commitment (or commitments separately as to each FER 1 Property, FER 2 Property, and FER 3 Property) for an owner's title insurance policy (or policies, as the case may be) from a title company of its choosing for the Properties (collectively, the "Title Commitment").

5.2     Exceptions to Title. Except as provided in this Agreement or otherwise accepted by Purchaser in writing, the sale of the Properties to Purchaser hereunder shall be subject to the Permitted Exceptions defined below but otherwise free and clear of any interest or liens in accordance with the Sale Order.

5.3     Permitted Exceptions and Unpermitted Exceptions. Within five (5) days of receipt of the Title Commitment, Purchaser shall give written notice to Sellers (the "Exception Notice") of all of Purchaser's exceptions to title which Purchaser is unwilling to take title subject to (the "Unpermitted Exceptions"). Any exception to title not raised as an Unpermitted Exception shall be deemed Permitted Exceptions. Other than Permitted Exceptions, Sellers shall notify Purchaser within seven (7) Business Days after receipt of the Exception Notice whether it will cure the matters set forth therein which Purchaser has indicated it is unwilling to accept title subject to. If Sellers notify Purchaser that Sellers will not cure all such other matters, then, within five (5) Business Days thereafter, Purchaser shall, by notice to Sellers either, elect to terminate this Agreement or accept such matters as Permitted Exceptions; and, if Purchaser does not notify Sellers that it has elected to accept such matters, Purchaser shall be deemed to have elected to accept title subject to such matters without any reduction to the Purchase Price. Purchaser shall cause copies of all updates and/or continuations of the Title Commitments to concurrently be delivered to Sellers' attorneys. Purchaser acknowledges and agrees that Purchaser shall be obligated to take title to the Properties and complete the Closing subject to all Permitted Exceptions.

5.4     Failure to Cure. Sellers shall have until the Closing Date (as the same may be adjourned, extended, or postponed by Sellers or Purchaser pursuant to the terms hereof) to cure any Unpermitted Exceptions. In the event that Sellers shall be unable to deliver title as required under this Article V, including without limitation, the curing of any Unpermitted Exceptions, Purchaser's sole and exclusive right shall be either to (i) terminate this Agreement, in which case the Earnest Money Deposit shall be refunded to Purchaser and the Parties shall have no further recourse, rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) proceed to Closing pursuant to this Agreement and accept title to the Properties subject to the Unpermitted Exceptions, which thereafter shall be deemed to constitute Permitted Exceptions without offset or deduction from the Purchase Price. Notwithstanding anything to the contrary set forth in this Agreement, Sellers shall have the right extend the Closing Date for a period of up to sixty (60) days in order to effect cure of any Unpermitted Exceptions.

11

#319616022.1

5.5    Conveyance of the Properties. At Closing, Sellers shall convey insurable fee simple title (as determined by the Title Company) to the Properties, subject to all Permitted Exceptions and otherwise in accordance with the terms of the Sale Order.

## ARTICLE VI
## CONDITION OF THE PROPERTY

**6.1**    Remediation Activities and Permits.

6.1.1.    Current Regulatory Status of Property. A summary of the regulatory history and environmental condition of the Properties is set forth in the informational documents listed in **Exhibit G**, which Purchaser acknowledges receiving from Seller or its consultants prior to the execution of this Agreement.

6.1.2.    Remediation Activities. Purchaser shall be solely responsible at its sole cost and expense for completing any required remediation of environmental conditions at the Properties which may exist as of the Closing Date and which may arise thereafter ("**Remediation Activities**").

6.1.3.    Remedial Action Permits/ Remedial Action Outcome.  Purchaser shall at its sole cost and expense obtain and comply with the terms of any Remedial Action Permits required to be issued by NJDEP pursuant to N.J.A.C. 7:26C-7.1 et seq. with respect to the Properties, including but not limited to maintenance of any engineering controls required for remediation of soils at FER 1 Property, FER 2 Property, and FER 3 Property, individually, and the Properties, collectively, submittal of any certifications regarding inspection and maintenance of such engineering controls, the establishment and maintenance of any financial assurances required to ensure ongoing inspection and maintenance of such engineering controls, and compliance with the terms of any Classification Exception Areas/Well Restriction Areas (CEA/WRAs) established for the Properties, and shall obtain a Site wide Remedial Action Outcome (RAO) for the Properties.  For the avoidance of doubt, after the Closing Date, Sellers shall not be responsible for the costs of compliance with any Remedial Action Permit issued by NJDEP for FER 1 Property, FER 2 Property, and/or FER 3 Property, individually, and/or the Properties, collectively, for obtaining or maintaining a RAO for FER 1 Property, FER 2 Property, and/or FER 3 Property, individually, and/or the Properties, collectively, or for compliance with any other requirements established under Environmental Laws applicable to the FER 1 Property, FER 2 Property, and FER 3 Property, individually, and the Properties, collectively.

**6.2**    Release and Indemnity. By accepting Sellers' deeds at Closing, Purchaser irrevocably waives and releases, on behalf of Purchaser, Purchaser's agents, Purchaser's affiliates, agents, and all successors in title to the Properties, any claims against Sellers (and against Sellers' members, managers, officers, representatives) as owner, operator or otherwise, arising out of or in connection with any conditions, including environmental and subsurface conditions, whether known or unknown, latent or apparent, and whether such claims are based on or sound in contract, tort, statute, common law liability, contribution, indemnity, strict liability or any other theory or cause of action. Further, Purchaser shall indemnify, defend and hold Sellers harmless in respect of any and all claims, proceedings, losses, damages, liabilities and expenses, whether or not due and payable, asserted against, incurred or suffered by Sellers due to (i) the negligent, improper or

12

#319616022.1

ineffective maintenance of any capping engineering controls required for remediation of the soils at the Properties which Purchaser is obligated to maintain pursuant to this Agreement; (ii) the failure to submit any required certifications and establish and maintain financial assurances to ensure ongoing inspection and maintenance of all engineering controls as required by any Soils Remedial Action Permit; (iii) post-Closing changes in soil remediation standards by an order of magnitude or greater than the soil remediation standards in effect as of the Closing, as set forth at N.J.S.A. 58:10B-13(e), or any obligation to remediate the Properties to such more stringent standards; (iv) Purchaser's failure to comply with the conditions of any Groundwater Remedial Action Permit and requirements of any CEA/WRA; or (v) an environmental condition alleged to have arisen after Closing or from the exacerbation after Closing of a condition of the Properties that existed prior to Closing.

**6.3**     'AS-IS', 'WHERE IS' Condition. Purchaser acknowledges and agrees that (a) the purchase of the Properties shall be on an "As Is", "Where Is", "With All Faults" basis, subject to wear and tear from the Effective Date until Closing Date, and (b) except as expressly set forth in this Agreement, Seller has no obligation to repair any damage to or defect in the Properties, replace any of the Properties or otherwise remedy any matter affecting the condition of the Properties. Upon Closing, Purchaser shall assume the risk that adverse matters, including but not limited to, construction defects and adverse physical and environmental conditions, may not have been revealed by Purchaser's investigations, and Purchaser, upon Closing, except as otherwise expressly set forth in this Agreement, shall be deemed to have waived, relinquished and released Sellers from and against any and all claims, demands, causes of action (including causes of action in tort), losses, damages, liabilities, costs and expenses (including attorneys' fees and court costs) of any and every kind or character, known or unknown, which Purchaser might have asserted or alleged against Sellers at any time by reason of or arising out of any latent or patent construction defects or physical conditions, violations of any applicable laws (including, without limitation, any environmental laws) and any and all other acts, omissions, events, circumstances or matters regarding the Properties. Seller agrees to maintain the Properties in substantially the same condition as it is in as of the Effective Date of this Agreement.

**6.4**     No Reliance on Seller. Purchaser is entering into this Agreement on the basis of Purchaser's own independent evaluation and investigation, and Purchaser does not rely on any statement or representation by Sellers or any of Sellers' representatives. Notwithstanding anything to the contrary, Sellers are not making, and specifically disclaim, any representations, warranties or covenants of any kind or character, express or implied, with respect to the operational, environmental or physical condition of the Properties, including, but not limited to, representations, warranties or covenants as to: (a) matters of title, zoning, permitted uses, tax consequences, physical or environmental conditions (including but not limited to Purchaser's phase one environmental assessment), availability of access, ingress or egress, operating projections, valuations, governmental approvals, governmental regulations or any other matter or thing relating to or affecting the operational, environmental or physical condition of the Properties; (b) the value, condition, merchantability, marketability, profitability, suitability or fitness for a particular use or purpose of the Properties; (c) the Properties' compliance or non-compliance with Environmental Laws applicable to the Properties or the presence or absence of hazardous or toxic materials, wastes or substances on, at or under the Properties or migrating to or from the Properties; or (d) the manner, quality, state of repair or lack of repair of the Properties.

13

#319616022.1

**6.5**    Survival. The provisions of this Article VI shall survive Closing.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

**7.1**    Seller's Representations and Warranties. Sellers hereby make the following representations and warranties to Purchaser, upon which Sellers acknowledge and agree that Purchaser is entitled to rely.

7.1.1.    Organization and Authority. Subject to approval of the Bankruptcy Court and entry of the Sale Order, (i) Sellers have full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Sellers pursuant to this Agreement (collectively, the "Sellers Documents"), and to perform the respective obligations of Sellers under each of the Sellers Documents, (ii) the execution and delivery by the signer on behalf of each party comprising Seller of each of the Sellers Documents, and the performance by each party comprising Seller of its obligations under each of the Sellers Documents, has been (or as of Closing will be) duly and validly authorized by all necessary action by each party comprising Seller, and (iii) each of the Sellers Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller enforceable against the Parties comprising Seller in accordance with their terms, except to the extent Purchaser is in default thereunder.

7.1.2    No Conflicting Agreements. The execution and delivery by Seller of, and the performance of and compliance by Seller with, the terms and provisions of this Agreement, do not (a) conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, Seller's by-laws, or any other agreement or instrument to which Seller is a Party or by which all or any part of the Property is bound, (b) violate any restriction, requirement, covenant or condition to which all or any part of the Property is bound, (c) constitute a violation of any applicable code, resolution, law, statute, regulation, ordinance or rule applicable to Seller or the Property, (d) constitute a violation of any judgment, decree or order applicable to Seller or specifically applicable to the Property, or (e) require the consent, waiver or approval of any third party.

7.1.3    Title. To the best of Seller's knowledge, there are no unrecorded or undisclosed documents or other matters which affect title to the Property.

7.1.4    FIRPTA. Seller is not a "foreign person" within the meaning of Section 1445(f) of the Code.

7.1.5    Condemnation Proceedings/Property Damage. To the best of Seller's knowledge, there are no presently pending or, to the best of Seller's knowledge, contemplated proceedings to condemn the Property or any part of it.

7.1.6    Option to Purchase. Seller has not granted any option or other right to purchase or otherwise acquire any portion of the Property, or any interest therein, to any party except Purchaser pursuant to this Agreement and there are no existing and outstanding agreements affecting or relating to the Property, including, but not limited to, agreements for the sale of the Property (or any portion thereof), option agreements, leases, licenses, or powers of attorney, to which the Seller is a party or by which the Seller or the Property is bound.

14

#319616022.1

7.1.7    Environmental Matters.

(a)    Seller has delivered to Purchaser copies of all material, non-privileged reports, assessments, audits, studies, analyses, and tests initiated by or on behalf of or in the possession of Seller pertaining to the environmental condition of, or any Hazardous Substance in, on, or under, the Property or concerning compliance by Seller with Environmental Laws.

(b)    To the knowledge of Seller, Seller does not operate, or permit to be operated, any business at the Property which has a North American Industry Classification System ("NAICS") number, which is subject to the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6, et seq., and the regulations promulgated thereunder ("ISRA").

(c)    This Section 7.1.7 contains the sole and exclusive representations and warranties of Seller with respect to matters arising under Environmental Laws or any other environmental matters.

7.1.8    Anti-Terrorism. None of Sellers' property or interests is subject to being "blocked" under any Anti-Terrorism Laws and neither Sellers nor any Person holding any direct or indirect interest in Sellers is in violation of any Anti-Terrorism Laws. Neither Sellers nor any of their affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "Seller Party") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Purchaser from conducting the business activities contemplated by this Agreement with Sellers. Sellers, including their Seller Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. §5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. §1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

7.1.9    Survival. All of the representations, warranties, and covenants made by Seller with regard to Environmental Matters contained in Section 7.1.7 survive Closing.

15

#319616022.1

7.2    Purchaser Representations and Warranties. Purchaser hereby makes the following representations and warranties to Sellers, upon which Purchaser acknowledges and agrees that Sellers are entitled to rely.

7.2.1    Organization and Authorization. Purchaser has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby. To the extent applicable, the execution, delivery and performance of this Agreement and all documents contemplated hereby have been duly and validly authorized by all necessary action on the part of Purchaser and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which Purchaser is a Party or otherwise bound.

7.2.2    Authority and Binding Obligation (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the "Purchaser Documents"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent Sellers is in default thereunder.

7.2.3    No Conflicting Agreements. The execution, delivery and performance of this Agreement and all documents contemplated hereby by Purchaser have been duly and validly authorized by all necessary action on the part of Purchaser and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which Purchaser is a Party or otherwise bound.

7.2.4    Sufficient Funds. Purchaser represents it has sufficient funds and/or assets to pay the full amount of the Purchase Price and consummate the Closing, without the need to obtain any financing.

7.2.5    No Violation of Anti-Terrorism Laws. None of Purchaser's property or interests is subject to being "blocked" under any Anti-Terrorism Laws, and neither Purchaser nor any Person holding any direct or indirect interest in Purchaser is in violation of any Anti-Terrorism Laws. Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "Purchaser Party") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the OFAC of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot

16

Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Sellers from conducting the business activities contemplated by this Agreement with Purchaser.

7.2.6    Patriot Act. Purchaser, including its Purchaser Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

7.2.7    Survival. All of the representations, warranties, and covenants made by Purchaser survive Closing.

## ARTICLE VIII
## COVENANTS

**8.1**    Conduct of the Business.

8.1.1.    Operation in Ordinary Course of Business. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers will operate the Properties in the ordinary course and pursuant to the Cash Collateral Order in effect in the Bankruptcy Case, including maintaining current insurance coverages.

8.1.2.    Contracts. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers shall not, without Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) or Bankruptcy Court Order, (i) amend, extend, renew or terminate any Leases, Executory Contracts or Licenses and Permits regarding the Properties, except in the ordinary course of business or (ii) enter into any new Leases or Executory Contracts regarding the Properties.

**8.2**    Tax Contests.

8.2.1.    Taxable Period Terminating Prior to Closing Date. Sellers shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. Seller has initiated Tax Appeals for the Properties, which are currently pending before the Hudson County Tax Court. Sellers represent that they have not initiated any tax contest for a taxable period which includes the Closing Date and any periods thereafter.

**8.3**    Further Assurances. From the Effective Date until the Closing or earlier termination of this Agreement, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to

17

consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. After the Closing, Sellers and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement.

## ARTICLE IX
## CLOSING CONDITIONS

**9.1** Mutual Closing Condition.

9.1.1. Satisfaction of Mutual Closing Condition. The respective obligations of Sellers and Purchaser to close the transaction contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following condition precedent (the "Mutual Closing Condition"): The Bankruptcy Court shall have entered the Sale Order and there shall be no applicable stay ordered by the Bankruptcy Court which is in effect.

9.1.2. Failure of Mutual Closing Condition. If the Mutual Closing Condition is not satisfied at Closing, then each Party shall have the right to terminate this Agreement by providing written notice to the other Party, in which case the Earnest Money Deposit shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination.

**9.2** Purchaser Closing Conditions.

9.2.1. Satisfaction of Purchaser Closing Conditions. In addition to the Mutual Closing Condition, Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Purchaser Closing Conditions"):

(a) Seller's Deliveries. All of the Sellers' Closing Deliveries shall have been delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser upon the consummation of the Closing.

(b) Representations and Warranties. The representations or warranties of Sellers in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(c) Covenants and Obligations. The material covenants and material obligations of Sellers in this Agreement shall have been performed in all material respects.

9.2.2. Failure of Purchaser Closing Condition. If any of the Purchaser Closing Conditions are not satisfied on the Closing Date (as the same may be extended, adjourned, or postponed by Sellers or Purchasers to the extent they have the express right to do so under this Agreement), then

18

#319616022.1

Purchaser shall have the right (i) to terminate this Agreement by providing written notice to Sellers, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) to waive any of the Purchaser Closing Conditions at or prior to Closing, without offset or deduction from the Purchase Price; provided, however, that any such waiver shall be made in writing by Purchaser. Nothing contained herein shall be deemed or construed to limit Purchaser's rights under Section 12.1 hereof.

**9.3**    Sellers Closing Conditions.

9.3.1.   Satisfaction of Sellers Closing Conditions. In addition to the Mutual Closing Condition, Sellers' obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Sellers Closing Conditions"):

(a)    Receipt of the Purchase Price. Purchaser shall have (A) paid to Sellers or deposited with Escrow Agent with written direction to disburse the same to Sellers, the Purchase Price (as adjusted pursuant to Section 3.1 hereof), and (B) delivered written direction to Escrow Agent to disburse the Earnest Money to Sellers.

(b)    Purchaser's Deliveries. All of the Purchaser Closing Deliveries shall have been delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers at Closing.

(c)    Representations and Warranties. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(d)    Covenants and Obligations. The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

9.3.2.   Failure of Sellers Closing Condition. If any of the Sellers Closing Conditions is not satisfied on the Closing Date, then Sellers shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Sellers in accordance with Section 3.2.2 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Sellers Closing Conditions at or prior to Closing; provided, however, that any such waiver shall be made in writing executed by Sellers. Nothing contained herein shall be deemed or construed to limit Sellers' rights under Section 12.2 and/or 12.3 hereof.

**ARTICLE X**
**CLOSING**

**10.1**    Closing Date. The closing of the transaction described in this Agreement (the "Closing") shall occur on the date which is no later than fourteen (14) days following the entry of the Sale Order, or such other date as agreed to in writing between Sellers and Purchaser (the date on which the Closing occurs is referred to herein as the "Closing Date").

19

#319616022.1

**10.2**   Closing Deliveries.

10.2.1. Seller's Deliveries. At the Closing, Sellers shall deliver or cause to be delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser at Closing, all of the (i) documents set forth in this Section 10.3.1, each of which shall have been duly executed by Sellers and acknowledged (if required) and (ii) other items set forth in this Section 10.3.1 (the "Sellers Closing Deliveries"), as follows:

(a)    Deeds conveying the Properties to Purchaser, subject to the Permitted Exceptions, to the extent applicable, respectively, to the Properties as set forth in the Sale Order (collectively, the "Deeds")[1];

(b)    Title Documents. Such other documents and instruments, executed and properly acknowledged by Seller, if applicable, as Title Company may require from Seller in order to issue the Title Policy, including but not limited to Affidavits of Title and limited liability company resolutions in a form reasonably acceptable to the Purchaser's Title Company;

(c)    A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(d)    A resolution of each party comprising Seller, signed by each party comprising Seller's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(e)    The Sale Order;

(f)    The Closing Statement;

(g)    Such other documents and instruments as may be reasonably requested by Purchaser in order to consummate the transaction described in this Agreement;

10.2.2. Purchaser's Deliveries. At the Closing, Purchaser shall deliver or cause to be delivered to Sellers or deposited with Escrow Agent in the Closing Escrow to be delivered to Sellers all of the (i) documents set forth in this Section 10.3.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.3.2 (the "Purchaser Closing Deliveries"), as follows:

(a)    The Purchase Price (as adjusted pursuant to this Agreement) to be paid by Purchaser;

(b)    A letter of direction to Escrow Agent authorizing and directing Escrow Agent to disburse the Earnest Money to Sellers or to such party or parties as Sellers shall designate;

---

[1] **"At the written direction of the Sellers and the Purchaser (the "DILF Direction"), at Closing the DILF Holder shall execute, convey and deliver the deed (in recordable form), affidavit of title, affidavit of consideration and any other agreements, affidavits or documents as may be reasonably required by Sellers or Purchaser (the "DILF Transfer Documents") to the applicable DILF Property to: (a) the applicable Seller (for conveyance of the Property to the Purchaser or the Purchaser Designees at Closing), or (b) the Purchaser or the Purchaser Designees."**

#319616022.1

(c)    A counterpart of each of the documents and instruments to be delivered by Sellers under Section 10.2 hereof which require execution by Purchaser;

(d)    Such other documents and instruments as may be reasonably requested by Sellers or the Title Company in order to consummate the transaction described in this Agreement;

(e)    The Cure Amounts required under the Sale Order or Bankruptcy Court Order determining the Assumption/Rejection Motion; and

(f)    The Buyer's Premium of One Percent (1%) of the Purchase Price payable to CBRE.

**10.3**    Possession. Sellers shall deliver possession of the Properties and Properties to Purchaser upon completion of the Closing, subject to the rights of counterparties under the Purchased Contracts.

## ARTICLE XI
## PRORATIONS AND EXPENSES

**11.1**    Items to Be Prorated. The following shall be prorated between Seller and Purchaser as of the Closing Date with Purchaser being deemed the owner of the Property as of the Closing Date and with Purchaser receiving credit for or charged with the entire day of the Closing: Taxes, Water and Sewer. Except as hereinafter expressly provided, all prorations shall be done on the basis of the actual number of days in the year in which Closing occurs for the actual number of days elapsed to the Closing Date or the actual number of days in the month in which the Closing occurs and the actual number of days elapsed in such month to the Closing Date, as applicable. Any assessment for improvements completed prior to closing shall be Seller's responsibility. Notwithstanding anything else set forth herein, in the event any unpaid utilities could become liens, then Seller shall obtain a final reading within three days prior to the Closing, failing which Seller shall escrow a reasonable amount with the title company. All other customary purchase and sale closing costs and charges shall be paid by Seller or Purchaser in accordance with the law and customs with respect to title closings where the Property is located.

## ARTICLE XII
## DEFAULT AND REMEDIES

**12.1**    Sellers Default. If, at the time of Closing, Sellers fail to perform their material covenants or material obligations under this Agreement and no Purchaser Default has occurred (a "Seller Default") that has prevented the satisfaction of the conditions to the obligations of Purchaser to close the transactions set forth in Section 9 hereof, then Purchaser, as its sole and exclusive remedy, may elect upon written notice to Sellers to (a) terminate this Agreement, and if Sellers fail to remedy the Seller Default within fifteen (15) days thereafter, this Agreement shall terminate (a "Sellers' Breach Termination Event") and the Earnest Money Deposit shall be refunded to Purchaser, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without offset or deduction to the Purchase Price; or (c) obtain a court order for specific performance. Purchaser hereby waives any and all other rights and/or remedies it may otherwise have at law and/or in equity.

21

**12.2**   Purchaser's Default. If Purchaser fails to perform any of its material covenants or material obligations under this Agreement and no Seller Default has occurred which remains uncured (a "Purchaser Default"), then Sellers, as their sole and exclusive remedy, may elect to (a) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money Deposit shall be disbursed to Sellers in accordance with Section 3 hereof, and the Parties shall have no further recourse, rights, liabilities or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing pursuant to this Agreement.

**12.3**   LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 12 HEREOF, THE DAMAGES THAT SELLERS WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLERS SHALL RETAIN THE EARNEST MONEY DEPOSIT AS A FAIR AND REASONABLE SUM AND AS FAIR MEASURE OF DAMAGES, AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLERS' SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION. NOTWITHSTANDING THE FOREGOING, THE REMEDY OF LIQUIDATED DAMAGES SHALL NOT LIMIT, AND SHALL NOT BE DEEMED TO LIMIT, IN ANY WAY THE RIGHTS AND REMEDIES AVAILABLE TO SELLERS WHICH SURVIVE TERMINATION OF THIS AGREEMENT.

### ARTICLE XIII
### RISK OF LOSS

**13.1**   Casualty. If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Properties or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Sellers shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

13.1.1. Material Casualty. If the amount of the repair restoration of the Properties required by a Casualty equals or exceeds twenty-five percent (25%) of the Purchase Price, as estimated by Sellers' architect (a "Material Casualty") then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of the estimate from Sellers' architect, to (a) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing, without terminating this Agreement, in which case Sellers shall (i) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (A) the applicable insurance deductible, and (B) and the reasonable estimated costs for the repair or restoration of the Properties required by such Material Casualty, and (ii) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty and lost profits insurance policies maintained by Sellers with respect to the Properties or the Business. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

13.1.2. Non-Material Casualty. In the event of any Casualty which is not a Material Casualty, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall (A) provide Purchaser with a credit against the Purchase Price

22

in an amount equal to the lesser of: (1) the applicable insurance deductible under Sellers' applicable insurance policy, and (2) the reasonable estimated costs for the repair or restoration required by such Casualty, and (B) transfer and assign to Purchaser all of Sellers' right, title and interest in and to all proceeds from all casualty insurance policies maintained by Sellers with respect to the Properties.

**13.2**   Condemnation. If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Properties (a "Condemnation"), Sellers shall give written notice of such Condemnation to Purchaser promptly after Sellers receive notice of such Condemnation.

13.2.1. Material Condemnation. If the Condemnation would (i) result in the permanent loss of more than twenty-five percent (25%) of the fair market value of the Land or Improvements of the Properties, (ii) result in any permanent material reduction or restriction in access to the Land or Improvements of the Properties, or (iii) have a permanent materially adverse effect on the Business as conducted prior to such Condemnation (a "Material Condemnation"), then Purchaser shall have the right to elect, by providing written notice to Sellers within ten (10) days after Purchaser's receipt of Sellers' written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Material Condemnation. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

13.2.2. Non-Material Condemnation. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Sellers shall assign to Purchaser all of Sellers' right, title and interest in all proceeds and awards from such Condemnation.

## ARTICLE XIV
## SURVIVAL

**14.1**   Survival. Except only as expressly set forth in this Section 14.1, all representations, warranties, covenants, liabilities and obligations shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

14.1.1. Survival of Representations and Warranties. The payment of the Purchase Price by Purchaser and the delivery of the deed(s) by Sellers to Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement.

14.1.2. Survival of Covenants and Obligations. If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly

23

survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

14.1.3. <u>Survival of Indemnification</u>. All rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

14.1.4  Notwithstanding anything to the contrary contained herein, Articles II, VI, XII and XIV and Sections 3.2.2, 7.1.7, and 7.2 hereof shall survive the termination of this Agreement.

**ARTICLE XV**
**MISCELLANEOUS PROVISIONS**

**15.1**   <u>Notices</u>.

15.1.1. <u>Method of Delivery</u>. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) facsimile transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address, facsimile number or e-mail address:

If to Seller:

Supor Property Enterprises LLC
433 Bergen Avenue
Kearny, NJ
Attention:  Joseph Supor, III
owner24@jsupor.com

J Supor 136-1 Realty LLC
433 Bergen Avenue
Kearny, NJ
Attention:  Joseph Supor, III
owner24@jsupor.com

Supor-172 Realty LLC
433 Bergen Avenue
Kearny, NJ
Attention:  Joseph Supor, III
owner24@jsupor.com

With Required Copy to:       Forman Holt
365 West Passaic Street, Suite 400
Rochelle Park, NJ 07662

24

#319616022.1

Attention: Michael E. Holt, Esq.
mholt@formanlaw.com

K&L Gates LLP
One Newark Center, 10th Fl.
1085 Raymond Blvd.
Newark, NJ 07102
Attention: Daniel Eliades, Esq
Daniel.eliades@klgates.com
Jennifer Mazawey, Esq.
Jennifer.mazawey@klgates.com
William Waldman, Esq.
william.waldman@klgates.com

Joseph Supor, III
583 Princeton Avenue
Brick, NJ 08724

Global International Advisors,
LLC.
312 Sawmill Lane
Wyckoff, NJ 07481
Attn: Kevin M Cassidy
kcassidy@globalintadvisors.com

If to Purchaser:

H Capital Holdings, LLC,
Attn: Anthony He
One Bridgeview Plaza, Suite 830
Fort Lee, New Jersey 07605
ahe@hequitiesllc.com

With a copy to:

Michael A. Ochs, Esq.
89 Headquarters Plaza
North Tower, Suite 1201
Morristown, New Jersey 07960
201-321-7816
mochs@tm-firm.com

15.1.2. Receipt of Notices. All Notices sent by a Party (or its counsel pursuant to Section 16.1.4 hereof) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. **[Eastern]** on a Business Day, otherwise the

#319616022.1

following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to Section 16.1.3 hereof.

15.1.3. <u>Change of Address</u>. The Parties and their respective counsel shall have the right to change their respective address and/or facsimile number for the purposes of this Section 16.1 by providing a Notice of such change in address and/or facsimile number as required under this Section 16.1.

15.1.4. <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**15.2** <u>No Recordation</u>. No Party shall record this Agreement, or any memorandum of this Agreement, in any public records.

**15.3** <u>Time is of the Essence</u>. Time is of the essence as to all dates and/ or times, as applicable, set forth in this Agreement; provided, however, that notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**15.4** <u>Assignment</u>. Purchaser shall not assign this Agreement or any interest therein to any Person, without the prior written consent of Sellers, which consent may be withheld in Sellers' sole discretion. Notwithstanding the foregoing, Purchaser shall have the right to designate any affiliate(s) (which is intended to be broader than the defined term "Affiliate") as its nominee to receive title to the Properties, or assign all of its right, title and interest in this Agreement to any affiliate(s) of Purchaser by providing written notice to Sellers no later than five (5) days prior to the Closing, provided that in any such event the originally named Purchaser shall remain liable for all Purchaser obligations hereunder.

**15.5** <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**15.6** <u>Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**15.7** <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**15.8** <u>Rules of Construction</u>. The following rules shall apply to the construction and interpretation of this Agreement:

#319616022.1

15.8.1. Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

15.8.2. All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement. All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

15.8.3. The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

15.8.4. Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

15.8.5. The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

15.8.6. The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

15.8.7. The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

**15.9**     Severability. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

**15.10**  JURISDICTION   AND   VENUE.   ANY   LITIGATION   OR   OTHER   COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE BANKRUPTCY COURT AND SELLERS (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURT AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

**15.11**  WAIVER OF TRIAL BY JURY. EACH PARTY HEREBY WAIVE ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT.

#319616022.1

**15.12**  Incorporation of Recitals, Exhibits and Schedules. The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 15.14 hereof) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement. Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**15.13**  Entire Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**15.14**  Amendments, Waivers and Termination of Agreement. No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**15.15**  Not an Offer. The delivery by Sellers of this Agreement executed by Sellers shall not constitute an offer to sell the Properties, and Sellers shall have no obligation to sell the Properties to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties and unless the Sale Order is entered.

**15.16**  Execution of Agreement. A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**15.18**  Substantial Contribution. Purchaser hereby waives any right it may have to pursue a substantial contribution claim in the Bankruptcy Case pursuant to 11 U.S.C. §503.

**15.19**  Real Estate Commission. Seller and Purchaser each represent and warrant to the other that neither Seller nor Purchaser has contacted or entered into any agreement with any real estate broker, agent, finder or any other party in connection with this transaction other than Seller's broker, CBRE ("Broker"), and that neither Party has taken any action which would result in any real estate broker's, finder's or other fees or commissions being due and payable to any Party other than Broker with respect to the transaction contemplated hereby. Purchaser shall pay Broker a real estate commission of One Percent (1%) of the Purchase Price as a Buyers' Premium at the Closing. This shall be in addition to the Purchase Price. Purchaser hereby indemnifies and agrees to hold the Seller harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the Seller by reason of a breach of the representation and warranty made by Purchaser in this Section. Seller hereby indemnifies and agrees to hold the Purchaser harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the Purchaser by reason of a breach of the representation and warranty made by Seller in this Section.

**15.20**  Bulk Sale Notice. Both Seller and Purchaser shall cooperate with each other in complying with the requirements of the NJ Bulk Sale Act. In the event the Bulk Sale Department (the

28

#319616022.1

"Department") determines that any or all of the Seller's proceeds are to held back as an escrow pending a determination by the Department of any taxes due and owing from the Seller, then such funds as determined by the Department shall be withheld out of the Seller's proceeds at the Closing by Escrow Agent until such time as the parties are in receipt of a tax clearance letter from the Department authorizing the release of the escrow. The parties shall comply with any directive from the Department, including but not to any request to either remit sums from the sales proceeds to the Department or to hold sums in escrow with Purchaser's attorney. Purchaser shall submit the required notification of the pending sale to the Department, including notification that the sale is occurring pursuant to a Bankruptcy Court Order, not less than ten (10) business days prior to Closing, and the Seller agrees to fully cooperate with such submissions (including but not limited to submitting a TTD form). Seller may submit a TTD form and any supplemental documents it deems reasonably necessary to receive the tax clearance letter from the Department authorizing the release of the escrow. The last four digits of Seller's federal tax identification number are contained in Exhibit A attached here.

**15.21** Flood Notification. In accordance with the provisions of New Jersey's flood risk notification laws, N.J.S.A. 56:8-19.2, attached at **Exhibit H** is Seller's required Flood Risk declaration.

**[Remainder of page intentionally left blank;
Signatures on following pages]**

29

#319616022.1

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER:**

**Supor Properties Enterprises LLC**

Witness/Attest

Name: Kevin Cassidy
Title: Financial Consultant

By:
Name: Joseph Supor III
Title: President

**SELLER:**

**J Supor 136-1 Realty LLC**

Witness/Attest

Name:
Title:

By:
Name:
Title:

**SELLER:**

**Supor-172 Realty LLC**

Witness/Attest

Name:
Title:

By:
Name:
Title:

**PURCHASER:**

Witness/Attest

Name: HONG HONG TANG
Title: Executive Assitant to Chairman

By:
Name:
Title:

## Exhibit A

## SELLER ENTITIES

Supor Properties Enterprises LLC (Seller of FER 1 Property) (EIN: ███5580)

J Supor 136-1 Realty LLC (Seller of FER 2 Property) (EIN: ███3205)

Supor-172 Realty LLC (Seller of FER 3 Property) (EIN: ███5662)

**Exhibit B**

**FER 1 PROPERTY:**

Legal Description

ALL THAT CERTAIN LOT, PARCEL OR TRACT OF LAND, SITUATE AND LYING IN THE TOWN OF HARRISON, COUNTY OF HUDSON, STATE OF NEW JERSEY, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**TRACT ONE:**

BEGINNING AT A POINT ESTABLISHED AS FOLLOWS: COMMENCING AT A POINT IN THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (F/K/A SOUTH FOURTH STREET) AT A POINT THEREIN DISTANT AS MEASURED ALONG THE SAID EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH ON A COURSE OF NORTH 2 DEGREE 47 MINUTES EAST, 1474.49 FEET FROM A POINT IN THE PIER HEAD AND BULKHEAD LINE OF THE PASSAIC RIVER AS FIXED BY THE UNITED STATES HARBOR LINE BOARD AND APPROVED MAY 22, 1916 AND FROM THENCE RUNNING

1.  (1) NORTH 1 DEGREE 47 MINUTES EAST 150.76 FEET TO A POINT; THENCE

2.  (2) SOUTH 88 DEGREES 13 MINUTES EAST 398.83 FEET TO A POINT; THENCE

3.  (3) NORTH 1 DEGREE 47 MINUTES EAST 70.00 FEET TO A POINT; THENCE

4.  (4) SOUTH 88 DEGREES 13 MINUTES EAST 126.77 FEET TO A POINT; THENCE

5.  (5) SOUTH 01 DEGREE 47 MINUTES WEST 220.76 TO A POINT; THENCE

6.  (6) NORTH 88 DEGREES 13 MINUTES WEST 59.85 FEET TO A POINT; THENCE

7.  (7) NORTH 1 DEGREE 47 MINUTES EAST 78.00 FEET TO A POINT; THENCE

8.  (8) NORTH 88 DEGREES 13 MINUTES WEST 314.00 FEET TO A POINT; THENCE

9.  (9) SOUTH 1 DEGREE 47 MINUTES WEST 78.00 FEET TO A POINT; THENCE

10. (10)       NORTH 88 DEGREES 13 MINUTES WEST 151.75 FEET TO THE POINT OR PLACE OF BEGINNING.

THE ABOVE DESCRIPTION IS IN ACCORDANCE WITH A SURVEY MADE BY BORRE, MCDONALD & WATSON, LAND SURVEYORS, DATED AUGUST 11, 2010.

FOR INFORMATIONAL PURPOSES ONLY: ALSO KNOW AS LOT 17.02 IN BLOCK 137 ON THE TOWN OF HARRISON TAX MAP.

319856285.1

**TRACT TWO:**

BEGINNING AT A POINT ESTABLISHED AS FOLLOWS: COMMENDING AT A POINT IN THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (F/K/A SOUTH FOURTH STREET) AT A POINT THEREIN DISTANT AS MEASURED ALONG THE SAID EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH ON A COURSE OF NORTH 1 DEGREE 47 MINUTES EAST, 1501.36 FEET FROM A POINT IN THE PIER HEAD AND BULKHEAD LINE OF THE PASSAIC RIVER AS FIXED BY THE UNITED STATES HARBOR LINE BOARD AND APPROVED MAY 22, 1916 AND FROM THENCE RUNNING ALONG A LIEN SOUTH 88 DEGREES 13 MINUTES EAST 942.93 FEET AND PARALLEL WITH THE NORTHERN LINE OF GUYON DRIVE, AND FROM SAID BEGINNING POINT RUNNING THENCE

(1)     NORTH 88 DEGREES 13 MINUTES WEST 417.33 FEET TO A POINT; THENCE

(2)     NORTH 1 DEGREE 47 MINUTES EAST 377.62 FEET TO A POINT; THENCE

(3)     SOUTH 88 DEGREES 13 MINUTES EAST 29.30 FEET TO A POINT; THENCE

(4)     SOUTH 1 DEGREE 47 MINUTES WEST 30.62 FEET TO A POINT; THENCE

(5)     SOUTH 88 DEGREES 13 MINUTES EAST 111.70 FEET TO A POINT; THENCE

(6)     NORTH 1 DEGREES 47 MINUTES EAST 4.50 FEET TO A POINT; THENCE

(7)     SOUTH 88 DEGREES 13 MINUTES EAST 5.75 FEET TO A POINT; THENCE

(8)     NORTH 1 DEGREE 47 MINUTES EAST 143.56 FEET TO A POINT; THENCE

(9)     SOUTH 88 DEGREES 13 MINUTES EAST 5.00 FEET TO A POINT; THENCE

(10) NORTH 1 DEGREES 47 MINUTES EAST 71.00 FEET TO A POINT; THENCE

(11) SOUTH 88 DEGREES 13 MINUTES EAST 170.43 FEET TO A POINT; THENCE

(12) SOUTH 1 DEGREE 4 MINUTES WEST 113.00 FEET TO A POINT; THENCE

(13) SOUTH 88 DEGREES 13 MINUTES EAST 91.15 FEET TO A POINT; THENCE

(14) SOUTH 1 DEGREE 47 MINUTES WEST 6.67 FEET TO A POINT; THENCE

(18) SOUTH 1 DEGREE 47 MINUTES WEST 340.00 FEET TO THE POINT OR PLACE OF BEGINNING

THE ABOVE DESCRIPTION IS IN ACCORDANCE WITH A SURVEY MADE BY BORRE, MCDONALD & WATSON LAND SURVEYORS, DATED AUGUST 11, 2010.

FOR INFORMATIONAL PURPOSES ONLY: ALSO KNOWN AS LOT 1.02 IN BLOCK 149 AND LOT 5.02 IN BLOCK 151 ON THE TOWN OF HARRISON TAX MAP.

319856285.1

**FER 2 PROPERTY:**

ALL THAT CERTAIN LOT, PARCEL OR TRACT OF LAND, SITUATE AND LYING IN THE TOWN OF HARRISON, COUNTY OF HUDSON, STATE OF NEW JERSEY, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TRACT THREE:

BEGINNING AT A POINT IN THE DIVIDING LIEN BETWEEN BLOCK 136 LOT 1.07 AND LOT 1.06, SAID POINT OF BEGINNING BEING THE FOLLOWING 3 COURSES FROM THE INTERSECTION OF THE PROLONGATION OF THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (FORMERLY SOUTH FOURTH STREET (80 FEET WIDE) AND THE PROLONGATION OF THE NORTHERLY LINE OF GUYON DRIVE 74 FEET WIDE):

1.    ALONG THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (FORMERLY SOUTH FOURTH STREET) (80 FEET WIDE), NORTH 03 DEGREES 08 MINUTES 49 SECONDS WEST 271.11 FEET TO A POINT; THENCE

2.    ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.03 AND BLOCK 137 LOT 35.03, NORTH 50 DEGREES 59 MINUTES 11 SECONDS EAST, 187.00 FEET TO A POINT; THENCE

3.    ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.03 AND LOT 1.06, NORTH 50 DEGREES 59 MINUTES 11 SECONDS EAST, 139.13 FEET TO THE POINT OF BEGINNING, RUNNING FROM THE POINT OF BEGINNING THENCE

4.    ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 AND LOT 1.03 THE FOLLOWING 3 COURSES, NORTH 50 DEGREES 59 MINUTES 11 SECONDS EAST 290.86 FEET TO A POINT; THENCE

5.    NORTH 53 DEGREES 33 MINUTES 41 SECONDS EAST 71.78 FEET TO A POINT; THENCE

6.    NORTH 58 DEGREES 47 MINUTES 11 SECONDS EAST 2.23 FEET TO A POINT; THENCE

7.    ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 ND BLOCK 150 LOT 16.01 THE FOLLOWING 13 COURSES, SOUTH 03 DEGREES 01 MINUTES 49 SECONDS EAST 33.72 FEET TO A POINT; THENCE

8.    SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 9.85 FEET TO A POINT; THENCE

9    SOUTH 04 DEGREES 14 MINUTES 49 SECONDS EAST 12.35 FEET TO A POINT; THENCE

10.    NORTH 86 DEGREES 51 MINUTES 11 SECONDS EAST 1.21 FEET TO T POINT; THENCE

319856285.1

11.     SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 9.87 FEET TO A POINT; THENCE

12.     NORTH 86 DEGREES 51 MINUTES 11 SECONDS EAST 3.77 FEET TO A POINT; THENCE

13.     SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 12.97 FEET TO A POINT; THENCE

14.     SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 21.68 FEET TO A POINT; THENCE

15.     SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 68.85 FEET TO A POINT; THENCE

16.     SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 11.58 FEET TO A POINT; THENCE

17.     SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 19.23 FEET TO A POINT; THENCE

18.     SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 4.38 FEET TO A POINT; THENCE

19.     SOUTH 03 DEGREES 08 MINUTES 49 SECONDS EAST 118.58 FEET TO A POINT; THENCE

20.     ALONG THE DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 AND B LOCK 137 LOT 1, SOUTH 86 DEGREES 51 MINUTES 11 SECONDS WEST 355.33 FEET TO A POINT; THENCE

21.     ALONG THE NEW DIVIDING LINE BETWEEN BLOCK 136 LOT 1.07 AND BLOCK 136 LOT 1.06, NORTH 03 DEGREES 08 MINUTES 49 SECONDS WEST 64.71 FEET TO THE POINT OF BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY ALSO KNOWN AS LOT 1.07 IN BLOCK 136 ON THE TOWN OF HARRISON TAX MAP.

**FER 3 PROPERTY:**

ALL that certain lot, tract or parcel of land situate lying and being in the Town of Harrison in the County of Hudson and the State of New Jersey and being all of Block 172 Lot 1, said lot as shown on the Official Tax Map of the Town of Harrison, said lot also as shown on a certain plan entitled "ALTA/NSPS Land Title Survey of J. Supor Harrison Redevelopment Block 136 Lot 1.07, Block 137 Lot 17.02, Block 149, Lot 1.02, Block 151 Lot 5.02, Block 172 Lot 1 prepared by Maser Consulting dated August 23, 2017" and being more particularly bounded and described as follows, to wit:

319856285.1

BEGINNING at a point in the existing northerly line of Lot 1.03 Block 174, said point being the following bearings and distances from the point of intersection formed by the existing northerly line of Guyon Drive (74' R.O.W.) and the existing easterly line of Frank E. Rogers Boulevard South (F.K.A. South Front Street) (variable width R.O.W.) as shown on the aforesaid map and plan.

A)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86° 52' 53" E) one thousand fourteen and seventy-eight hundredths feet (1,014.78') along the aforesaid existing northerly line of Guyon Drive to a point in the same, thence

B)      North three degrees seven minutes seven seconds West (N 03° 07' 07" W) sixteen and eighty-eight hundredths feet (16.88') along an existing easterly line of Lot 16.01 Block 150, said adjoining lot as shown on the aforesaid map and plan, thence

C)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86° 52' 53" E) thirty-three and twenty-two hundredths feet (33.22') along an existing southerly line of Lot 16.01 Block 150 to a point in the same, thence

D)      South three degrees seven minutes seven seconds East (S 03° 07' 07" E) seven and six hundredths feet (7.06') along an existing easterly line of Lot 16.01 Block 150 to a point in the same

AND from said point running, thence

1)      North three degrees seven minutes seven seconds West (N 03° 07' 07" W) four hundred eight and zero hundredths feet (408.00') along the aforesaid existing easterly line of Lot 16.01 Block 150 to a southerly line of same, thence

2)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86° 52' 53" E) one hundred ninety-three and zero hundredths feet (193.00') along the aforesaid southerly line of Lot 16.01 Block 150 to a point in the same, thence

3)      South three degrees seven minutes seven seconds East (S 03° 07' 07" E) two hundred sixty-five and eighty-one hundredths feet (265.81') along the existing westerly line of Lot 2.02 Block 169, said adjoining lot as shown on the aforesaid map and plan, thence

4)      North eighty-six degrees fifty-two minutes fifty-three seconds East (N 86° 52'53" E) twenty-five and zero hundredths feet (25.00') along an existing southerly line of Lot 2.02 Block 169 to a point in the same, thence

5)      South three degrees seven minutes seven seconds East (S 03° 07' 07" E) one hundred forty-two and nineteen hundredths feet (142.19') along an existing westerly line of Lot 2.02 Block 169 to a point in the same, thence

6)      South eighty-six degrees fifty-two minutes fifty-three seconds West (S 86° 52' 53" W) two hundred eighteen and zero hundredths feet (218.00') along the existing northerly line of Lot 1.03 Block 174, said adjoining lot as shown on the aforesaid map and plan to a point in the same the point and place of BEGINNING.

BEING and intended to be the same premises conveyed to Grantor herein by way of Deed from Kevrich Associates, a New Jersey Partnership, dated April 19, 2001, recorded May 18, 2001 in the Register's Office of the County of Hudson, New Jersey in Deed Book 5805, Page 230.

319856285.1

## Exhibit C

### AFFILIATE MASTER LEASES AND SUBLEASES

1. Master Lease dated December 31, 2020, between J Supor 136-1 Realty LLC as Landlord and J. Supor Realty LLC as Tenant as to property located at 1000 Frank E Rodgers Blvd (Block 136; Lot 1.07) Harrison, NJ.

2. Master Lease dated December 31, 2020, between J Supor 172 Realty LLC as Landlord and J. Supor & Son Trucking and Rigging Co., Inc. as Tenant as to property located at 1000 Frank E Rodgers Blvd (Block 172; Lot 1) Harrison, NJ.

3. Master Lease dated December 31, 2020, between J Supor 172 Realty LLC as Landlord and J. Supor & Son Trucking and Rigging Co., Inc. as Tenant as to property located at 1000 Frank E Rodgers Blvd (Block 136; Lot 1.07) Harrison, NJ.

319856285.1

## EXHIBIT D

## UNEXPIRED LEASES

1. Parking Facility Management Agreement dated October 1, 2015 by and between S&B Realty and M&J Coraprelli, LLC for the exclusive right and obligation to manage parking at 1000 Frank E Rodgers Blvd., Harrison, NJ.

## EXHIBIT E

## DRAFT SALE ORDER

319856285.1

**EXHIBIT F**

**Requirements for Consideration of Assignment
of a Redevelopment Agreement
in the Town of Harrison, County of Hudson, New Jersey**

**I. Introduction:**

A request has been made to the Town of Harrison, County of Hudson, New Jersey ("Harrison") for the assignment of a current Financial Agreement (the "FA") authorizing a Long Term Tax Abatement. The FA is a contract by and between the Town of Harrison, with offices located at 318 Harrison Avenue, Harrison, NJ 07029 and
_____ , the designated redeveloper ("Redeveloper") for the redevelopment project located at
_____ (the "Project"). The entity requesting the assignment shall be referred to hereafter as the "Transferee". The statutes governing such contracts and projects is referred to hereafter collectively as the "Law".

NOTE: Assignment of the FA presumes that the Transferee will also be the assignee for any and all "Redeveloper Agreements" (the "RDA") by and between Harrison and/or any instrumentalities of Harrison and the Redeveloper.

**II. Basis for Approval:**

Under the terms of the FA, such assignments are only permitted with the approval of Harrison, which approval is subject to the satisfaction of the following requirements:

    1) the Transferee does not own any other Project subject to long term tax exemption at the time of transfer;

    2) the Transferee is formed and eligible to operate under the Law;

    3) the Redeveloper is not then in Default of the FA or the Law;

    4) the Entity's obligations under the FA are to be fully assumed by the Transferee;

    5) the Transferee agrees to abide by all terms and conditions of the FA including, without limitation, the filing of an application pursuant to N.J.S.A. 40A:20-8, and any other terms and conditions of the Town in regard to the Project;

    6) the principal owners of the Transferee entity possess a similar business reputation, financial qualifications and credit worthiness as the Redeveloper and are otherwise reputable.

The Town reserves the right, at its sole discretion, to waive any of the requirements for the approval of the assignment.

319856285.1

**III. Fees:**

The Town charges a fee of two percent (2%) of the then applicable Annual Service Charge for that portion of the Project being transferred for processing any application for assignment of the FA.

**IV. Information Required:**

1. <u>Description of Transferee and Its Capabilities</u> - Provide a brief description of the Transferee organization and its capabilities to implement the Project and to meet the requirements of the RDA and the FA. Include a notarized statement disclosing the ownership and capital structure of the Transferee. The disclosure should set forth the names and addresses of all general partners, if a partnership, or all shareholders who own 10% or more of its stock of any class using the form attached hereto as Exhibit A. If any stockholder or partner is itself a partnership or corporation, the disclosure should include the names and address of partners or shareholders who own 10% or more of the stock of any class thereof. This process should continue along the chain or ownership until all names and addresses of every non-incorporated and non-partnership individual having the specified level of involvement, are disclosed. The disclosure should also identify the percentage of ownership by minorities and women.

2. <u>Personnel</u> - Please provide a brief resume of the individuals in the Transferee organization who would be responsible to implement the Project, indicating who will serve as the Project Manager. Provide a brief resume for each such person and describe his/her other experience in on projects of a similar nature to the Project.

3. <u>Summary of Related Experience</u> - Provide evidence of the Transferee's ability to perform on projects of a similar scope and nature. At a minimum, the statement should provide a list of at least three projects of similar scope which were completed after January 1, 2018.

4. <u>Current Projects</u> - Provide a list of all current projects and identify how such projects will not serve to inhibit the Transferee's ability to meet the requirement of the RDA and the FA.

5. <u>Sub-Contracting Requirements</u> - Indicate what portions of work, if any, would be performed by other entities operating on a sub-contract basis.

6. <u>New Jersey Presence</u> - Describe Transferee's presence in New Jersey, specifically including the number and type of staff and the location of offices.

7. <u>References</u> - Provide the names, addresses and phone numbers of three professionals within the redevelopment industry, other than sub-contractors or former employees, who are qualified to comment on the Transferees previous performance as a redeveloper. Indicate the basis of each reference's knowledge of such previous performance.

8. <u>Assurances Regarding Performance</u> - Please indicate what types of guarantees or assurances that the Transferee intends to utilize to provide comfort to Harrison that the Transferee will be

319856285.1

able to complete the Project. Some examples might include the use of performance bonds, pledged letters of credit or similar financial instruments that indicate a third party's confidence in Transferee's capability.

9. Financial Condition – Please provide an audited financial statement for the Transferee for the most recently completed fiscal year. If the Transferee is a subsidiary organization, provide audited financial statements for the most recently completed fiscal year for all entities to which the Transferee is subordinate. (Note: Harrison reserves the right to require the submission of audited financial statements for other fiscal periods and to require submission of other related financial information if it deems it necessary as part of the process for the approval of the assignment)

10. Bank Reference – Please provide the name, address and contact person for the principal bank utilized by the Transferee.

11. Defaults – Please provide a complete list of any and all projects for which the Transferee, and/or any entities to which it is subordinate, for any reason, failed to complete any development project for which it was responsible. Provide explanations in each case as to reasons why the project was not completed.

12. Conflicts - Describe any existing or potential legal or other policy conflicts of interest or appearance of conflict of interest the Transferee may have, or which reasonably might arise, because of Transferee's involvement in this Project. In preparing the response, please be aware that Harrison's redevelopment activities frequently involve other entities, including other governmental entities and other redevelopers.

13. Investigations - State whether Transferee, any entities to which it is subordinate or any of the principals of Transferee or any entities to which it is subordinate has been (in the past three years), or are currently the subject of any Federal, State or County investigation, and indicate the nature of that investigation.

14. Litigation - Indicate any pending litigation in which Transferee and/or any entities to which it is subordinate and/or any of the principals of Transferee or any entities to which it is subordinate has been is involved which may directly or indirectly affect the Transferee's ability to complete the Project.

15. Authorization for Release of Information –Provide evidence that written authorization has been given to all persons, corporations or other related entities to furnish such information as may be necessary to verify the representations made to Harrison.

16. Other Information - Discuss any other factors not mentioned above which you believe are relevant to Harrison's approval of the request for assignment of the RDA and FA.

17. Authorization to Apply – Provide a corporate resolution, notarize3d or attested to by the Secretary of Transferee, that the Transferee has the legal authority to submit such documents as

319856285.1

are required herein and that it is willing to be bound by all of the conditions set forth herein, to be submitted generally in a form as set forth in the attached Exhibit B.

EXHIBIT A-1

## DISCLOSURE OF OWNERSHIP

Instructions:

New Jersey law (NJSA 52:25-24.2) requires that all corporations and partnerships seeking a public contract submit a list of the names and addresses of all principals who own more than 10% of any class of stock, or 10% or more of the total stock (if a corporation), or 10% or more of the partnership. In addition, if the Developer has as one or more of its owners a corporation or partnership, the ownership of those entities must be similarly disclosed, and that process shall continue down the entire chain of ownership until the names and addresses of every unincorporated stockholder and/or individual partner with more than a 10% interest is disclosed.

This information must be provided on the forms following these instructions entitled "Disclosure of Ownership." Separate forms should be used for each corporation or partnership included in the chain of ownership. Each form must be signed by an officer of the corporation and be attested to by the secretary (if a corporation) or by all partners (if a partnership). Partnership forms must be notarized as well.

Failure to properly complete this disclosure statement or to submit it as part of the application will be grounds for the application to be rejected.

319856285.1

EXHIBIT A-2

DISCLOSURE OF OWNERSHIP

(for use by Partnerships)

I.     Partners

Name                          Home Address                        Signature

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____
Name of Partnership

_____   _____
Signature of Notary as to Signatures            Date

319856285.1

EXHIBIT A-3

DISCLOSURE OF OWNERSHIP

(for use by Corporations)

I.    Principals (list all owners of 10% or more of stock)

| Name | Home Address | Title | %Owned |
|---|---|---|---|
| | | | |

Name of Corporation

By: _____

_____

Signature of Officer        Date

Attested by:   _____  _____

Secretary of Corporation    Date

(Affix Corporate Seal)

319856285.1

EXHIBIT B

RESOLUTION AUTHORIZING SUBMISSION OF APPLICATION

Please attach a notarized resolution that follows the format below:

FORM OF CERTIFIED CORPORATE RESOLUTION

PLEASE TAKE NOTICE that a meeting of the Board of Directors of the

_____ was held at _____ A.M. on _____
   (Name of Corporation)                              P.M.       (Date)
at

_____
                    (Address)
at which time the following RESOLUTION was unanimously adopted:

     RESOLVED that this Corporation is authorized to submit an application to the
Municipality for the assignment of a long term tax abatement.

     BE IT FURTHER RESOLVED that if this Corporation's application is accepted by
the Municipality, the President of this Corporation is authorized to execute and deliver on its
behalf, a contract with the Municipality, substantially in agreement with the terms of these
Requirements, with such changes thereto as may be negotiated by the parties.

     The undersigned Secretary of this Corporation hereby certifies that the foregoing
Resolution was lawfully adopted by the Board of Directors of this Corporation on the date
set forth above, that the foregoing Resolution is a true, accurate and complete copy of
the Resolution so adopted and placed in the Corporation's records, and that they are in
full force and effect as of the date hereof.


_____    _____
Secretary                            Date


(Affix Corporate Seal)

       (Use of a NJ Notary Public in lieu of a corporate secretary is acceptable)

319856285.1

## EXHIBIT G

## ENVIRONMENTAL DOCUMENTS

FER 1 PROPERTY, FER 2 PROPERTY, and FER 3 PROPERTY
- Phase I Environmental Site Assessment/Preliminary Assessment Report, dated July 19, 2024

FER 1 PROPERTY (1000 Frank E. Rodgers Blvd., Harrison, NJ, Block 151, Lot 5.02; Block 149, Lot 1.02; Block 137, Lot 17.02)
- 2018 PAR
  - PAR CID
  - S&B October 2018 PAR Compiled
- 2019 SIR RIR
  - RI CID
  - SI CID – correct
  - SI RI Compiled
  - Appendices
  - Drawings
  - Forms
  - Tables

FER 2 PROPERTY (1000 Frank E. Rodgers Blvd., Harrison, NJ, Block 136, Lot 1.07)
- 2018-06-4 RAO-A Letter
- 2018-12-11 RAO-A Letter
- 2019-02-07 RAO-A Letter
- July 12, 2017 Peak Environmental Response to NOV
- 2018 UST-RIR-RAR
  - Compiled SIR-RIR-RAR
  - Appendices
  - Drawings
  - Forms
  - Lab Data
  - Tables
- 2019 PAR
  - Compiled PAR 2019
- 2019 SIR
  - Appendices
  - Drawings
  - Forms
  - Tables
  - 2019 SIR text
- 2021 RIR RAW
  - 2021 RAW CID
  - 2021 RIR RAW Text

- o Appendices
- o Drawings
- o Forms
- o Tables

<u>FER 3 PROPERTY (1000 Frank E. Rodgers Blvd., Harrison, NJ, Block 172, Lot 1)</u>
- September 2017 PAR
- 2019 PAR
- 2020 SIR RIR
  - o SIR RIR Text
  - o Appendices
  - o Drawings
  - o Forms
  - o Tables
- 2021 RAR
  - o Farber 2021 RAR Text
  - o Appendices
  - o Drawings
  - o Forms
  - o Tables
- 06232022 Farber RAO
- 20240529 RAO Amendment

319856285.1

## EXHIBIT H

### FORM OF FLOOD NOTIFICATION

1.  Is any or all of the property located wholly or partially in the Special Flood Hazard Area ("100-year floodplain") according to FEMA's current flood insurance rate maps for your area?  Portion of Block 137, Lot 17.02 only

2.  Is any or all of the property located wholly or partially in a Moderate Risk Flood Hazard Area ("500-year floodplain") according to FEMA's current flood insurance rate maps for your area? Portion of Block 137, Lot 17.02 only

3.  Is the property subject to any requirement under federal law to obtain and maintain flood insurance on the property? NO. Properties in the special flood hazard area, also known as high-risk flood zones, on FEMA's flood insurance rate maps with mortgages from federally regulated or insured lenders are required to obtain and maintain flood insurance. Even when not required, FEMA encourages property owners in high-risk, moderate-risk, and low-risk flood zones to purchase flood insurance that covers the structure and the personal property within the structure. Also note that properties in coastal and riverine areas may be subject to increased risk of flooding over time due to projected sea level rise and increased extreme storms caused by climate change which may not be reflected in current flood insurance rate maps.

4.  Have you ever received assistance, or are you aware of any previous owners receiving assistance, from FEMA, the U.S. Small Business Administration, or any other federal disaster flood assistance for flood damage to the property? NO. For properties that have received federal disaster assistance, the requirement to obtain flood insurance passes down to all future owners. Failure to obtain and maintain flood insurance can result in an individual being ineligible for future assistance.

5.  Is there flood insurance on the property? NO. A standard insurance policy typically does not cover flood damage. You are encouraged to examine your policy to determine whether you are covered.

6.  Is there a FEMA elevation certificate available for the property? NO. If so, the elevation certificate must be shared with the buyer. An elevation certificate is a FEMA form, completed by a licensed surveyor or engineer. The form provides critical information about the flood risk of the property and is used by flood insurance providers under the National Flood Insurance Program to help determine the appropriate flood insurance rating for the property. A buyer may be able to use the elevation certificate from a previous owner for their flood insurance policy.

319856285.1

7. Have you ever filed a claim for flood damage to the property with any insurance provider, including the National Flood Insurance Program? If the claim was approved, what was the amount received? NO.

8. Has the property experienced any flood damage, water seepage, or pooled water due to a natural flood event, such as heavy rainfall, costal storm surge, tidal inundation, or river overflow? NO. If so, how many times? N/A

Explain any "yes" answers that you give in this section:

319856285.1

## ACKNOWLEDGMENT OF SELLER

Seller affirms that the information set forth in this Disclosure Statement is accurate and complete to the best of Seller's knowledge, but this Disclosure Statement is not a warranty as to the condition of the Property.

SELLER PRINT NAME: Joseph Sypor III

SELLER SIGNATURE:

DATE: 8/15/24

## RECEIPT AND ACKNOWLEDGMENT BY PROSPECTIVE BUYER

Purchaser acknowledges receipt of this Disclosure Statement prior to signing this Agreement. Purchaser acknowledges that this Disclosure Statement is not a warranty by Seller and that it is Purchaser's responsibility to satisfy itself as to the condition of the Property.

PURCHASER PRINT NAME:

PURCHASER SIGNATURE:

DATE:

319811024.2

## LIST OF SCHEDULES

Schedule 1        Purchased Contracts

Schedule 2        Equipment Leases

Schedule 3        Tax Appeals

Schedule 4        Purchaser Bid Allocation

Schedule 1
Purchased Contracts

Parking Facility Management Agreement dated October 1, 2015 by and between S&B Realty and M&J Coraprelli, LLC for the exclusive right and obligation to manage parking at 1000 Frank E Rodgers Blvd., Harrison, NJ.

Amended and Restated Redevelopment Agreement for a Portion of the Redevelopment Area in the Town of Harrison, Hudson County, New Jersey by and Between The Harrison Redevelopment Agency, The Town of Harrison (but only with respect to the specific limited provisions enumerated herein) and Supor 136- 1 Realty LLC, Supor Properties Enterprises LLC and Supor- 172 Realty LLC, dated February 24, 2021

319856285.1

Schedule 2
Equipment Leases

Not Applicable

319856285.1

Schedule 3
Pending Tax Appeals

FER 3 Property: Block 172, Lot 1 – 1000 FE Rogers Boulevard – Appealed for years 2020, 2021

FER 1 Property: Block 149, Lot 1.02 – 1000 FE Rogers Boulevard – Appealed for years 2020, 2021

FER 2 Property: Block 136, Lot 1.07 – 1000 FE Rogers Boulevard – Appealed for years 2020, 2021

319856285.1

Schedule 4
Purchase Price Allocation

Allocation: $48,000,000
- 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149) ("FER 1 Property"); $24,000,000.00
- 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 1.07 in block 136) ("FER 2 Property");  $9,600,000
- 1000 Frank E Rodgers Boulevard, Harrison New Jersey (lot 1 in block 172) ("FER 3 Property"),  $14,400,00

# EXHIBIT B

# TRIF & MODUGNO
## ——— ATTORNEYS AT LAW ———

**Michael A. Ochs, Esq.**
**mochs@tm-firm.com**

September 14, 2024

**Sent Via Email and Hand Delivery**

Harrison Redevelopment Agency Authority
318 Harrison Avenue
Harrison, NJ 07029

        Re:      Application for Consideration of Assignment of Amended and Restated Redevelopment Agreement dated February 24, 2021 (the "RDA") by and between the Town of Harrison and various entities owned or controlled by Joseph Supor (collectively, the "Supor Entities") for the redevelopment project located at 1000 Frank E Rodgers Boulevard, Harrison, New Jersey lot 50.2 in block 151, lot 17.02 in block 137, and lot 1.02 in block 149) ("FER 1 Property"), and 1000 Frank E Rodgers Boulevard, Harrison, New Jersey Lot 1.07 in block 136 ("FER 2 Property"); and 1000 Frank E. Rodgers Boulevard, Harrison, New Jersey lot 1 in block 173 ("FER 3 Property") (collectively "the Properties") to H Capital FER 1, LLC, H Capital FER 2, LLC and H Capital FER 3, LLC (collectively "the H Capital Entities").

Dear Sir or Madam,

In connection with the above referenced matter, I represent the H Capital Entities. We are in receipt of the review letter dated September 10, 2024 from The Bank er Group, LLC (the "Review Letter"),

Please see the attached supplemental responses to the Review Letter.

Thank you for your continued consideration.

                        Very truly yours,

MAO/                              Michael A. Ochs/s

cc:     Client

**NEW JERSEY**
89 Headquarters Plaza
North Tower, Suite 1201
Morristown, New Jersey 07960
973-547-3611,
Facsimile: 973-554-1220

**NEW YORK**
811 Broadway
Suite 615
New York, New York 10004
917-477-2999
Facsimile: 973-554-1220

**PENNSYLVANIA**
1700 Market Street
Suite 1005
Philadelphia, Pennsylvania 19103
267-869-0050
Facsimile: 267-869-0051

www.tm-firm.com

**Issue 1: Organization Chart:** *The information on the chart is inconsistent with the information about the entities included elsewhere in the application. It is unclear whether there are additional entities or whether the entities are being referred to by multiple names.*

See attached Exhibit A for the updated organization chart which outlines the ownership structure between H Capital Holdings, LLC and its affiliated entity Eastone Equities, LLC (Eastone), which owns the current and existing projects and properties mentioned throughout the application.

In our application, we defined and abbreviated H Capital Holdings, LLC as "H Capital" which may have also caused some confusion.

**Issue 2: Personnel:** *The applicant has not identified any of the personnel that will actually implement the project, nor anyone's qualifications to do so.*

The below is our prospective team to oversee this redevelopment project. It includes individuals who are currently on our team, and two who will join the Company before the end of the year if we successfully acquire the project site.  It is anticipated additional individuals will join the project throughout the development process. By way of example, we anticipate retaining project level superintendents, a MEP superintendent, and building out the marketing, brokerage, leasing, and property management teams and property managers also will be required and hired as necessary.

Matt Higgins - *Construction Executive*

Mr. Higgins has been in the construction industry for over 40 years in New Jersey and New York. Over his career Mr. Higgins has held leadership roles as a general contractor, construction manager, owner's representative and consultant. Mr. Higgins specializes in operational leadership and subcontractor relations. Mr. Higgins holds a Bachelor of Arts from Lafayette College.

John Chu - *Project Manager*

Mr. Chu has over 20 years of construction management experience and managed the development of many significant projects which included new construction, building renovation, and building conversions in New York and New Jersey. Mr. Chu has overseen the development of over 1,143,000 square feet of new construction. Mr. Chu attended the City College of New York and holds a Bachelor of Science in Electrical Engineering.

Robert Unice – *Construction Superintendent*

Mr. Unice has overseen multiple projects simultaneously and his talents include managing ground up construction and renovations of large warehouse, office, and retail facilities, coordinating all aspects of construction from contracts to inspections and completion of projects well before the scheduled finish dates. Mr. Unice has more than 20 years of experience in New

Jersey construction. Mr. Unice will lead the on site team through his hands-on leadership style. Mr. Unice attended Fairleigh Dickinson University.

New Hire #1  - *Portfolio/Asset Manager*

New Hire #1 is a seasoned real estate executive with over 25 years of experience in development, construction, and asset management. With a proven track record of delivering successful projects and driving profitable growth, New Hire #1 has led initiatives totaling over $15 billion in value. His expertise spans various asset classes and includes roles in strategic planning, financial analysis, team leadership, and operational execution. New Hire #1 attended Rutgers University and holds a Bachelor of Science in Organizational Psychology.

New Hire #2 - *Senior Project Manager*

New Hire #2 is a civil engineer with more than 17 years of experience in construction management. New Hire #2 has significant experience in constructing warehouse, hi-rise, hospitality, residential, commercial, and governmental projects. New Hire #2 attended Stevens Institute of Technology, where he received his master's in construction management, and holds several professional certificates including Project Manager Professional certification, 3-D and 4-D BIM modeling and Revit architecture, structure and MEP.

**Issue 3: Current Projects:** *Because of the issue with the organization chart, it is not possible to understand which legal entities are actually responsible for the various projects discussed in the application, nor the actual role that the applicant has/had in such projects.*

See attached Exhibit A for the updated organization chart which outlines Eastone Equities, LLC ownership of the current and existing projects referenced in the application. Eastone, through single purpose entities, serves as the primary owner and sponsor of each development project. As set forth in the organizational chart, Eastone shares common ownership with H. Capital.

**Issue 4: Sub-Contracting***: The applicant has acknowledged that it expects to rely heavily on subcontractors, but failed to identify any of the sub-contractors to be used or anything about the qualifications and experience of any sub-contractors.*

We have included a non-exhaustive list of potential subcontractors with whom we have previously collaborated or held discussions specific to this project. It is important to clarify that none of these subcontractors have been officially engaged, nor have any submitted formal bids. As the project progresses, we welcome bids from additional subcontractors. All subcontractor positions will be awarded through a transparent, competitive bidding process once the final building plans and project requirements are finalized.

Please refer to Exhibit B – Sub-Contractors for more details.

**Issue 5: Financial Capability:** *The applicant does not provide any evidence of its financial capability, other than by general references to amounts invested in other projects. The application indicates that "Financial documentation is available upon request. This is that*

*request. NOTE: Applicant referred to some financial information about one of its many entities as being "on-file with the township". Because of the lack of clarity on the identity of the various entities controlled by the applicant and their relationships to each other, it is not possible to rely on any previously filed financials from an entity different than the applicant as being responsive to the request.*

See Exhibit C for the financial statement and accompanying accountant's report for H Capital Holdings, LLC

**Issue 6 – References***: The criteria requires references from "professionals within the redevelopment industry, other than sub-contractors or former employees, who are qualified to comment on (Applicant's) previous performance as a redeveloper". Applicant only provided information about lawyers who are employed by the applicant, who are sub-contractors to the applicant.*

Councilman Joseph Cervieri – Real Estate Broker and Politician for the Borough of Fort Lee, NJ
- Phone number: 201-592-3500 x1003
- Address: 309 Main Street Fort Lee, NJ 07024
- Councilman Cervieri is well-informed about our redevelopment project in Fort Lee, NJ

Ira Saferstein – Co-Owner and Managing Member, Titan Capital
- Phone number: 212-888-0004
- Address: 140 East 45th Street, 40th Floor, New York, NY 10017
- Mr. Saferstein is a hard money lender whom we have engaged with over the past decade

Hans Hertell – Chairman & CEO, The Hertell Group | Former the US Ambassador to the Dominican Republic
- Phone number:  202 904 8234
- Address: N/A
- Mr. Hertell is a close confidant and network partner of the company

Stephen R. Preuss Sr – Vice Chairman Investment Sales and Capital Markets, RIPCO Real Estate
- Phone number: 718-663-2639
- Address: 80-02 Kew Gardens Road, 3rd Floor, Queens, NY 11415
- Mr. Preuss is a commercial real estate investment sales broker whom we have known for more than a decade

**Issue 7 – Acceptance of Existing Requirements of the RDA***: The assignment criteria make it clear that the applicant needs to be willing and able to perform all the requirements of the existing RDA and is willing to accept that obligation. The applicant makes multiple representations in the application that suggest that it may not be willing and able to do so. In particular, the applicant states: "the Transferees may request future modifications to the RDA to*

*... " and elsewhere that "A potential conflict may exist as to timing and obligations of the Project and the Harrison Yards project. It is anticipated that there may be impact to timing for future phases of both projects". Those statements, and the remainder of their responses to this criteria, strongly suggest that the applicant is not prepared to accept the existing terms of the RDA without substantial modification. While the HRA/Town may be willing to consider such changes as may be desired, it cannot do so at this time, since no proffer is made as to the terms that would be acceptable. It is strongly recommended that the application not be considered unless and until the HRA/Town are provided with an exhaustive list of all the changes that the applicant intends to seek in the RDA or any other redevelopment documents if it is designated as the redeveloper.*

Given the limited time allotted to the acquisition opportunity through a bankruptcy sale, the Applicant is not prepared to submit any list of proposed changes. Given the accretive nature of the additional adjoining sites to the existing Eastone site, we (the Applicant and the HRA/Town), collectively have any opportunity to reexamine the existing agreements to and collaboratively consider revisions. Notwithstanding the opportunity to improve the overall project through a collaborative reexamination, the Applicant is willing and able to perform pursuant the existing RDA.

## EXHIBIT A – Organizational Chart



Project

Entities

**H Equities, LLC**
Delaware State
Sole Owner: Tong He (Individual)
(Holding Company)

**H Capital Holdings, LLC**
Delaware State
Sole Owner: H Equities LLC
(Parent & Subsidiary Company)

**Eastone Equities, LLC**
Delaware State
Sole Owner: H Equities LLC
(Parent & Subsidiary Company)

**H Capital FER 1, LLC**
New Jersey State
Sole Owner: H Capital Holdings LLC
(Subsidiary Company)

**H Capital FER 2, LLC**
New Jersey State
Sole Owner: H Capital Holdings LLC
(Subsidiary Company)

**H Capital FER 3, LLC**
New Jersey State
Sole Owner: H Capital Holdings LLC
(Subsidiary Company)

**Hudson Lights Phase II**
2062 Lemoine Ave
Fort Lee, NJ 07024
(Project - Owner/Sponsor)

**Huron Pier**
Greenpoint, Brooklyn
Block: 2520 Lot: 100
(Project - Owner/Sponsor)

**Harrison Yards Redevelopment**
600 Frank E Rodgers Blvd S
Harrison, NJ 07029
(Project - Owner/Sponsor)

**Yotel LIC**
38-65 11th St
Long Island City, NY 11101
(Project - Owner/Sponsor)

**249 East 50th Street Condominiums**
251 E 50th St
New York, NY 10022
(Project - Owner/Sponsor)

**Meridian Towers Condominiums**
37-21 32nd Street
Long Island City, NY 11101
(Project - Owner/Sponsor)

**62-41 Forest Avenue Condominiums**
62-41 Forest Ave
Ridgewood NY, 11385
(Project - Owner/Sponsor)

*The listed projects above are referenced in the HRA application. The applicant has additional legacy developments not referenced in the application but are part of the applicant's portfolio*

# Exhibit B – Sub-Contractors

**Ferreira Construction**

- **Trade:** Site Work/Environmental
- **Website:** www.ferreiraconstruction.com
- **About Ferreira:** Ferreira is a national leader in the construction industry. Ferreira has headquarters in New Jersey, with regional offices in Florida, New York, California, Rhode Island, and Virginia. Ferreira has expanded its services to include transportation, utility, power, marine construction, and renewable energy. Ferreria Construction has significant experience in Harrison, including the site work and environmental work for the Red Bull Stadium development.

**Esposito Construction**

- **Trade:** Site Work, Paving, Utility, & Landscape
- **Website:** www.espositoconstruction.net
- **About Esposito**: Esposito is a NJ based site work and paving contractor with over 50 construction projects running simultaneously every day in the tri-state area. Esposito Construction's over 400 employee workforce is comprised of top-quality engineers, project managers, operators, laborers, and safety professionals.

**Minno & Wasko**

- **Trade:** Architect and Planner
- **Website:** www.minnowasko.com
- **About Minno & Wasko**: Minno & Wasko Architects and Planners is an award-winning, mid-sized firm with offices in New Jersey. They serve the Northeast region, specifically New Jersey, Philadelphia, New York, and Connecticut.

**Air Group** MEP

- **Trade:** Heating, Cooling, Plumbing, Electrical
- **Website:** www.minnowasko.com
- **About Air Group**: Air Group is a family-owned HVAC contractor servicing commercial builders in New Jersey for over 50 years. Air Group now has over 500 employees.  See www.airgroupllc.com

**CTCI**

- **Trade:** Construction Technology Intergrator
- **Website:** www.ctcitechnology.com
- **About CTCI**: CTCI is an NJ-based company with over 40 years of experience in structural cabling, security systems, lighting, and property tech.  See for project lists and experience.

**Pentel Drywall**

- **Trade:** Light Gauge Metal Framing, Drywall, Insulation

- **Website:** www.penteldrywall.com
- **About Pentel**: Pentel Drywall is a New Jersey-based company specializing in light gauge metal framing, drywall hanging and finishing, ceilings and soffits, and insulation. They work on both new constructions and renovations, delivering high-quality, large-scale projects.

## Ocean Steel & Construction Ltd.

- **Trade:** Structural Steel
- **Website:** www.oceansteel.com
- **About Ocean Steel:** Ocean Steel & Construction Ltd. is part of the OSCO Construction Group, established in 1955. They are a leading provider of structural steel, precast concrete, and construction management services across Canada, the Eastern U.S., and the Caribbean.

## Midway Glass and Mirror

- **Trade:** Commercial Glazing
- **Website:** www.midwayglass.com
- **About Midway Glass:** Midway Glass specializes in commercial glazing and architectural aluminum solutions, with over 30 years of experience in the industry. Based in Carlstadt, NJ, they handle large and small commercial projects across northern New Jersey.

## Mr. Concrete

- **Trade:** Concrete
- **Website:** www.mrconcretecorp.com
- **About Mr. Concrete:** Mr. Concrete is a New Jersey-based company that supplies commercial concrete. They focus on providing high-quality concrete for large-scale projects in the tri-state area.

## Pella

- **Trade:** Windows and Doors
- **Website:** www.pella.com
- **About Pella:** Pella is a leading national supplier of windows and doors, known for innovation in design and energy efficiency.

## Pereira Electric

- **Trade:** Electrical
- **Website:** www.perreiraelectric.com
- **About Pereira Electric:** Pereira Electric has over 25 years of experience as an electrical contractor with 85 employees in New Jersey, serving commercial and industrial clients.

## S&S Roofing

- **Trade:** Roofing
- **Website:** www.ssroofinginc.com
- **About S&S Roofing:** NJ-based commercial roofing company with over 35 years of experience.

**STMR**

- **Trade:** General Contracting
- **Website:** www.stmrinc.com
- **About STMR:** STMR is a New Jersey-based general contracting firm offering end-to-end construction management services.

**Target Fire Protection**

- **Trade:** Fire Protection Systems
- **Website:** www.targetfireprotection.com
- **About Target Fire Protection:** Target Fire Protection specializes in fire sprinkler systems for commercial properties in New Jersey.

**Kemsco Construction**

- **Trade:** Utilities
- **Website:** N/A
- **About Kemsco:** A Newark, NJ-based electrical contractor specializing in utility work.

**Meli Plumbing**

- **Trade:** HVAC
- **Website:** N/A
- **About Meli:** Hackensack, NJ-based commercial plumbing specialty contractor.

**PSG Interiors**

- **Trade:** Finishes
- **Website:** N/A
- **About PSG:** New Jersey-based finishes and demolition contractor.

## Exhibit C – Accountant's Report

# HENG HSIN, LEE C.P.A.

# Certified Public Accountant

# 61-41 184TH Street Suite 688

# FRESH MEADOW, NY 11365

## <u>ACCOUNTANT'S REPORT</u>

# H Capital Holding LLC

# Financial Statement

# Table of Contents

| | |
|---|---|
| **Cover Page** | **1** |
| **Table of Contents** | **2** |
| **Accountant Report** | **3** |
| **Statement of Balance Sheet** | **4** |
| **Statement of Operation** | **5** |
| **Statement of Cash Flows** | **6** |
| **Notes to the Financial Statements** | **7-9** |

# HENG HSIN, LEE C.P.A.

## Certified Public Accountant

## 61-41 184TH Street Suite 688

## FRESH MEADOW, NY 11365

### ACCOUNTANT'S REPORT

H Capital Holding LLC

We have audited the accompanying financial condition of H Capital Holding LLC  as of June 30, 2024 and the related statements for the period year then ended. An audit includes primarily applying analytical procedures to the individual's financial data and making inquiries of relevant company owners.

Owner is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America and for designing, implementation, and maintaining internal control relevant to the preparation and fair presentation of the financial statements.

Our responsibility is to conduct the audit in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. Those standards require us to perform procedures to obtain assurance that there are no material modifications that should be made to the financial statements. We believe that the results of our procedures provide a reasonable basis for our report.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

**HENG HSIN, LEE C.P.A.**

**Certified Public Accountant**

# H Capital Holding LLC
## Balance Sheet
## As of June 30, 2024

| ASSETS | | Jun-24 |
|---|---|---|
| **Cash and Cash Equivalents** | $ | 7,901,965 |
| **Escrow Deposits** | | |
| **Long-term Investments** | | 325,579,529 |
| (Business Real Estate and Property) | | |
| **Total Assets** | $ | **333,481,495** |

| Liabilities And Shareholder's Equities | | |
|---|---|---|
| **Long-term Mortgages and Loans** | | $109,154,226 |
| **Shareholder's Equity** | | |
| Capital | | 65,000,000 |
| Paid In Capital | | 10,997,495 |
| Retained Earnings | | 117,688,051 |
| Net Unrealized Gains | | 30,641,724 |
| **Total Liabilities and Shareholder's Equities** | $ | **333,481,495** |

# H Capital Holding LLC
## Statement of Operation
## For 06/30/2024

|  |  | Jun-24 |
|---|---|---|
| **UNREALIZED CAPITAL GAINS** | $ | **32,012,124** |
| **OPERATING EXPENSES** | | |
| Officers Compensation | | 596,400 |
| Staff Salaries and Benefits | | 237,600 |
| Rent | | 160,200 |
| Utilities Expenses | | 3,000 |
| Conference and Events | | 185,400 |
| Meals | | 62,400 |
| Travelling and Entertainment | | 60,600 |
| Office Supplies | | 17,400 |
| Other business expenses | | 17,400 |
| **TOTAL EXPENSES** | $ | **1,340,400** |
| Excess of revenues over expenses before provision for income tax | | **30,671,724** |
| Less: Provision for income tax | | 30,000 |
| **Net Investment Unrealized Gains** | $ | **30,641,724** |

# H Capital Holding LLC
## Statement of Cash Flows
### For June 30, 2024

**Reconciliation of (loss) income from operations to net cash provided by operating activities used in operating activities:**

|  | 6/30/2024 |
|---|---|
| Income from operations | **30,641,724** |
| Adjustments to reconcile loss from operations to net cash used in operating activities: | |
| Changes in assets and liabilities: | |
| Long-term Investments | 17,975,867 |
| Long-term Mortgage and Loans | (24,770,188) |
| **Net cash provided by operating activities** | 23,847,402 |
| Income from Investing Activities | |
| Additional Invested Capital | (21,945,436) |
| Retained Earning Adjustment | |
| **Net increase in cash and cash equivalents** | 1,901,965 |
| **Cash and cash equivalents, beginning of year** | 6,000,000 |
| **Cash and cash equivalents, end of term** | **7,901,965** |

# H Capital Holding LLC

Notes to Financial Statements

As of June 30, 2024

## Note 1: Long Term Investment (Business Real Estate and Property):

**H Capital Holding LLC**
**Business Real Estate Property**

| No. | Address | Property Type | % Owned | Asset Owned Amount as of 06/30/24 |
|---|---|---|---|---|
| 1 | 3865 11th Street, LIC, NY | Hotel | 100% | $35,000,000 |
| 2 | 3721 32nd Street, Long Island City, NY | Mixed-use | 25% | $19,000,000 |
| 3 | Huron Pier | Residential Condo | 50% | $30,742,944 |
| 4 | 6241 Forest Avenue, Ridgewood, NY | Mixed-use | 50% | $15,500,000 |
| 5 | 2062 Lamoine Avenue, Fort Lee, NJ | Mixed-use | 50% | $36,598,743 |
| 6 | Phase 1 - 700 Frank E Rogers Blvd South, Harrison, NJ | Mixed-use | 97% | $111,103,592 |
| 7 | Phase 2 - 700 Frank E Rogers Blvd South, Harrison, NJ | Mixed-use | 100% | $70,000,000 |
| **Total** | | | | **$325,579,529** |

# H Capital Holding LLC

Notes to Financial Statements

As of June 30, 2024

## Note 2: Long Term Mortgages and Loans:

**H Capital Holding LLC**
**Long-term Mortgages and Loan**

| No. | Address | % Owned | Mortgage Owned 06/30/2024 |
|---|---|---|---|
| 1 | 3865 11th Street, LIC, NY | 100% | $ 10,000,000.00 |
| 2 | 3721 32nd Street, Long Island City, NY | 25% | $ 5,750,000.00 |
| 3 | Huron Pier | 50% | $ - |
| 6 | 6241 Forest Avenue, Ridgewood, NY | 50% | $ 5,000,000.00 |
| 7 | 2062 Lamoine Avenue, Fort Lee, NJ | 50% | $ - |
| 8 | Phase 1 - 700 Frank E Rogers Blvd South, Harrison, NJ | 97% | $ 58,904,226.00 |
| 9 | Phase 2 - 700 Frank E Rogers Blvd South, Harrison, NJ | 100% | $ 29,500,000.00 |
| Total | | | $ 109,154,226.00 |

# EXHIBIT C

# TRIF & MODUGNO
## ─── ATTORNEYS AT LAW ───

**Michael A. Ochs, Esq.**
mochs@tm-firm.com

September 20, 2024

**Sent Via Email**
Harrison Redevelopment Agency Authority
318 Harrison Avenue
Harrison, NJ 07029

> Re:     Application for Consideration of Assignment of Amended and Restated Redevelopment Agreement dated February 24, 2021 (the "RDA") by and between the Town of  Harrison and various entities owned or controlled by Joseph Supor (collectively, the "Supor Entities") for the redevelopment project located at 1000 Frank E Rodgers Boulevard, Harrison, New Jersey lot 50.2 in block 151, lot 17.02 in block 137, and lot 1.02 in block 149) ("FER 1 Property"), and 1000 Frank E Rodgers Boulevard, Harrison, New Jersey Lot 1.07 in block 136 ("FER 2 Property"); and 1000 Frank E. Rodgers Boulevard, Harrison, New Jersey lot 1 in block 173 ("FER 3 Property") (collectively "the Properties") to H Capital FER 1, LLC, H Capital FER 2, LLC and H Capital FER 3, LLC (collectively "the H Capital Entities").

Dear Sir or Madam,

In connection with the above referenced matter, I represent the H Capital Entities. We are in receipt of the review letter dated September 18, 2024 from The Banker Group, LLC (the "Review Letter").

Please see the attached supplemental responses to the Review Letter.

Thank you for your continued consideration.

Very truly yours,

MAO/                                                                    Michael A. Ochs/s

cc:     Client

| **NEW JERSEY** | **NEW YORK** | **PENNSYLVANIA** |
|---|---|---|
| 89 Headquarters Plaza | 811 Broadway | 1700 Market Street |
| North Tower, Suite 1201 | Suite 615 | Suite 1005 |
| Morristown, New Jersey 07960 | New York, New York 10004 | Philadelphia, Pennsylvania 19103 |
| 973-547-3611, | 917-477-2999 | 267-869-0050 |
| Facsimile: 973-554-1220 | Facsimile: 973-554-1220 | Facsimile: 267-869-0051 |

www.tm-firm.com

**Issue 1– Organization Chart:** *The information on the chart suggests that the applicant entity, H Capital Holdings, LLC ("HCH"), is separate from the existing entity doing business in Harrison, Eastone Equities, LLC ("Eastone"), and that the projects owned by the overall holding company (H Equities, LLC) are nominally controlled by Eastone. It is therefore difficult to understand the "Accountant's Report" submitted with the supplemental information, as it purports to be based on HCH's finances. If Eastone controls the existing projects, it is unclear as to how the HCH Report can claim such a large amount of assets and liabilities. It appears perhaps, that the Accountant's Report may be based on either the financial activity of Eastone or perhaps the overall financial activity of the holding company H Equities, LLC. This needs to be clarified as to which entity the Accountant's Report is covering.*

The previous organization chart mislabeled the affiliation between Eastone Equities, LLC and H Capital Holdings, LLC. Specifically, Eastone Equities, LLC is not solely owned by H Equities, LLC as mentioned incorrectly in our previous supplemental submission dated September 14, 2024.

Eastone Equities, LLC is solely owned by H Capital Holdings, LLC.  As such, Eastone Equities, LLC assets and liabilities are consolidated under H Capital Holdings LLC. See Exhibit A for the updated organization chart, which reflects the accurate ownership structure and affiliation between the aforementioned entities.

**Issue 2 – Personnel:** *It appears that the applicant does not have its project team assembled. The HRA/Town will need to decide whether it is okay to allow a new redeveloper to assemble a team without HRA/Town consideration.*

The personnel identified in our supplemental submission includes the certain project team members (Mr. Higgins, Mr. Chu, and Mr. Unice) that were responsible for the development of Harrison Yards Phase I. This existing team will be supplemented throughout the course of development. We have several construction projects in various stages of completion. As projects complete, additional manpower becomes available. It is our experience that a successful development does not require significant numbers of in-house staff, but rather a combination of external professionals, subcontractors, and consultants.

Regarding the individuals noted in the prior supplement, we previously identified two additional team members. The anticipated start date of New Hire #1 is on or before October 1, 2024. The anticipated start date of New Hire #2 is January 1, 2025. These two individuals are currently employed by other institutional real estate companies, which is why we redacted their names. However, we contacted these individuals and have received their approval to submit their redacted resumes.

**Issue 3 – Current Projects:** *The supplemental information regarding other projects in which the redeveloper is involved appears to be incomplete, as it refers to "additional legacy developments not referenced in the application but are part of the applicant's portfolio". This is further validated by information included in an email to Jim Bruno, which suggests that the*

*financial position of the applicant will be favorably affected by the sale of two major assets, neither of which is referenced in the information supplied with the application. As will be discussed under section 5 below, the financial capability of the applicant is clearly affected by ALL of its holdings, so the lack of completeness is a material defect*

With respect to Jim Bruno's email that suggested the financial position of the applicant with be favorable affected by the sale of two major assets, these assets are listed under Summary of Related Experience in the original application – namely, Meridian Towers Condominium (37-21 32nd Street Long Island City, NY 1110) and 249 East 50 St Condominiums (251 E 50th St, New York, NY 10022). These two projects are also referenced in the organization chart provided. We have updated the organization chart to include the status of each project to provide more clarity. Additionally, as of September 20, 2024, the Applicant has finalized the sale of 137-31 45th Avenue, Queens, NY, and has in excess of $50mm of pending incoming wire transfers into our attorney's trust account. It is anticipated that these funds will be received by the time of the next HRA hearing.

**Issue 4 – Sub-Contracting:** *The applicant has acknowledged that it expects to rely heavily on subcontractors, but has only listed sub-contractors with which it is familiar and which have no legal connection to the Project. As with the issue of personnel, the HRA/Town will need to decide whether it is okay to allow a new redeveloper to assemble its construction team without HRA/Town consideration.*

It is a practical impossibility for the Applicant to provide a satisfactory answer under the confines of the bidding schedule of the Bankruptcy Court. The Applicant cannot hire subcontractors on the speculation that we will be the owner of the site. Further, without fully developed plans and construction drawings, there is no ability to receive bids.  We plan to engage and request bids from the sub-contractors previously identified when we are 1) approved for the purchase and assignment of the Redevelopment Agreement and 2) have firm plans in place for the sub-contractors to bid on.

Moreover, in prior submissions, we have identified speculative subcontractors with existing relationships. The list was, by no means, exhaustive. We anticipate a competitive bidding process with existing and new subcontractors.

**Issue 5  – Financial Capability:** *The organization chart and other references suggest that the actual owner of everything involved in the application is Tong He. The HRA/Town requires full disclosure of everything related to Mr. He's financial capabilities. As discussed above, the only financial information provided is not presented as being that of Mr. He and it is unclear as to if it is even representative of the part of Mr. He's organization that it purports to be. Based on the HRA/Town's experience with Mr. He's entities, and as acknowledged by email from one of the attorneys representing Mr. He's entities, the recent sale of some significant assets is expected to relieve the cash flow issues that have been a problem for those entities, which is an admission that the entities have in fact had major financial issues during the last few years. Unless and until the HRA/Town can evaluate the entirety of Mr. He's finances, it is impossible to conclude that the applicant has the financial capability to carry out the Project in accordance*

*with the Redevelopment Plan and the existing Redevelopment Agreement. This finding should be considered a formal request for full disclosure of Mr. He's personal financial capabilities.*

Mr. Tong He is the ultimate beneficial owner of H Equities, LLC, which owns 100% of H Capital Holdings, LLC. The majority of Mr. He's assets are from his ownership of H Equities, which is domiciled in the U.S. Mr. He's remaining assets are primarily domiciled in China. See Exhibit B for Mr. Tong He's personal financial statement. Note that this financial statement is dated as of June 2024 and will not reflect any transactions that have occurred in the interim.

It also should be noted that while the last development cycle for the Applicant required more capital than originally anticipated, we would not characterize the issue as a "major financial issue." Rather, project cost overrun is an offshoot of the inherent risk of development. We did not anticipate a global pandemic. We did not anticipate that the contractor that we engaged would file for bankruptcy. Each of these items required multiple extensions with our lenders and with the HRA. Notwithstanding, H Capital Holdings, LLC has successfully weathered the storm and continued to inject liquidity into completing all projects despite the difficulties encountered.

**Issue 6 – References**: *The criteria requires references from "professionals within the redevelopment industry, other than sub-contractors or former employees, who are qualified to comment on (Applicant's) previous performance as a redeveloper". The references provided may not be in a position to provide independent opinions, as they all appear to have some direct relationship to the entities controlled by Mr. He.*

The references provided are professionals within the redevelopment industry. It should be noted that third party opinions, whether independent or not cannot compare to the HRA's first-hand knowledge of the developer's capabilities.

**Issue 7 – Acceptance of Existing Requirements of the RDA:** *The previous report on the application stated: "Acceptance of Existing Requirements of the RDA: The assignment criteria make it clear that the applicant needs to be willing and able to perform all the requirements of the existing RDA and is willing to accept that obligation. The applicant makes multiple representations in the application that suggest that it may not be willing and able to do so. In particular, the applicant states: "the Transferees may request future modifications to the RDA to ... " and elsewhere that "A potential conflict may exist as to timing and obligations of the Project and the Harrison Yards project. It is anticipated that there may be impact to timing for future phases of both projects". Those statements, and the remainder of their responses to this criteria, strongly suggest that the applicant is not prepared to accept the existing terms of the RDA without substantial modification. While the HRA/Town may be willing to consider such changes as may be desired, it cannot do so at this time, since no proffer is made as to the terms that would be acceptable." In the supplemental information, the applicant again indicated an expectation that it would seek material changes to the RDA and potentially the Plan, as they openly contemplate some form of connection between the developments for which they are currently designated and the development to take place on the former Supor properties. Given that there are extremely large financial obligations that would be affected by any such changes, it is recommended that the Town not approve the application unless and until the applicant*

*indicates exactly what changes they are contemplating and the HRA/Town has the ability to evaluate whether such changes would be acceptable to the HRA/Town.*

To the extent the HRA is unwilling to engage in discussions to improve the development based on current market conditions, the Applicant reaffirms their willingness and ability to perform the obligations set forth in the existing RDA.

The constraints of the Bankruptcy Court bid process and tight timeline do not permit the Applicant sufficient time to fully absorb and substantively articulate proposed changes promptly. However, the Applicant reaffirms their willingness and ability to perform the obligations set forth in the existing RDA.

# **EXHIBIT A**



*Note: The listed projects above are referenced in the HRA application.*
*The applicant has additional legacy developments not referenced in the application but were previously part of the applicant's portfolio*

**EXHIBIT B**

# TONG HE
## Balance Sheet
## As of June 30, 2024

| ASSETS | | Jun-24 |
|---|---|---|
| Cash and Cash Equivalents | $ | 150,000 |
| Long-term Investments (Note 1) | | 349,382,712 |
| Securities - Stocks/ Bonds | | 19,500,000 |
| Fixed Assets, net of Accumulated Depreciation (Note 2) | | 16,377,500 |
| **Total Assets** | **$** | **385,410,212** |

## Liabilities And Net Worth

| | | |
|---|---|---|
| Account Payables - Credit Card and Car Payment | $ | 11,000 |
| Mortgage Notes Payable | | |
| Net Worth | | 385,399,212 |
| **Total Liabilities and Net Worth** | **$** | **385,410,212** |

*See accompanying notes of financial statements*

## Tong He
## Statements of Income and Expenses
## For Year Ended 6/30/2024

|  |  | Jun-24 |
|---|---|---|
| **INCOME-Executive Compensation** | $ | 242,500 |
|  |  |  |
| **TOTAL INCOME** | $ | **242,500** |
| **EXPENSES** |  |  |
| Meals |  | 7,469 |
| Travelling and Entertainment |  | 5,194 |
| Clothing and accessories |  | 3,240 |
| Personal Auto expenses |  | 40,788 |
| **TOTAL EXPENSES** | $ | **56,691** |
| Excess of revenues over expenses before provision for income tax |  | **185,809** |
| Less: Provision for income tax |  | 27,871 |
| **EXCESS OF REVENUES OVER EXPENSES** | $ | **157,938** |

*See accompanying notes of financial statements*

# Tong He

Notes to Financial Statements

As of June 30, 2024

## Note 1: Long-term Investment

The long-term investment consists of the following:

**Tong He**
**Majority Interest in Real Estate and Financial Companies - June 2024**

| | Total Asset | Total Liabilities | Equity | Ownership (Percent) | Amount |
|---|---|---|---|---|---|
| **H Equities** | 333,481,495 | 109,154,226 | 224,327,269 | 100% | 224,327,269 |
| **Shenzhen City Eastone Construction Co., Ltd.** | 132,075,443 | 9,050,000 | 123,025,443 | 100% | 123,025,443 |
| **Eastone Xingde Consulting Management (Shanghai) Co., Ltd.** | 2,150,000 | 120,000 | 2,030,000 | 100% | 2,030,000 |
| **Total** | **467,706,938** | **118,324,226** | **349,382,712** | $ | **349,382,712** |

## Note 2: Personal Properties

| **Fixed Assets As of** | **30-Jun-24** |
|---|---|
| Automobile - Ferrari | 220,000 |
| Automobile - Maserati | 100,000 |
| Automobile - Mercedes | 150,000 |
| Real Estate - Primary residence in Shanghai, China | 15,907,500 |
| **Net Value** | **16,377,500** |

Note

Personal properties represent the estimated values of automobile, personal effects, and jewelry, which are the appraisal values of those assets, determined by an independent appraiser for insurance purposes.

# EXHIBIT D



**Premier**

Level 6, HSBC Main
Building1, Queen's Road Central,
Central, Hong Kong

Questions?
**Phone: +852 2748 8288**

HE FAMILY TRUST
Rooms 05-15, 13A/F, South
Tower, World Finance Centre,
Harbour City, 17 Canton Road, Tsim
Sha Tsui, Kowloon, Hong Kong

——— **HSBC PREMIER SAVINGS**

**ACCOUNT NUMBER** ▉▉5608
**STATEMENT PERIOD** 08/01/24 TO 08/31/24

MR HE

HE FAMILY TRUST

| | |
|---|---|
| **BEGINNING BALANCE** | **$95,000,089.30** |
| DEPOSITS & OTHER ADDITIONS | $0.00 |
| WITHDRAWALS & OTHER SUBTRACTIONS | $0.00 |
| **ENDING BALANCE** | **$95,000,089.30** |

# EXHIBIT E

# HENG HSIN, LEE C.P.A.

# Certified Public Accountant

# 61-41 184TH Street Suite 688

# FRESH MEADOW, NY 11365

## <u>ACCOUNTANT'S REPORT</u>

# H Capital Holding LLC

# Financial Statement

# Table of Contents

| | |
|---|---|
| **Cover Page** | **1** |
| **Table of Contents** | **2** |
| **Accountant Report** | **3** |
| **Statement of Balance Sheet** | **4** |
| **Statement of Operation** | **5** |
| **Statement of Cash Flows** | **6** |
| **Notes to the Financial Statements** | **7-9** |

# HENG HSIN, LEE C.P.A.

## Certified Public Accountant

## 61-41 184TH Street Suite 688

## FRESH MEADOW, NY 11365

### ACCOUNTANT'S REPORT

H Capital Holding LLC

We have audited the accompanying financial condition of H Capital Holding LLC  as of June 30, 2024 and the related statements for the period year then ended. An audit includes primarily applying analytical procedures to the individual's financial data and making inquiries of relevant company owners.

Owner is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America and for designing, implementation, and maintaining internal control relevant to the preparation and fair presentation of the financial statements.

Our responsibility is to conduct the audit in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. Those standards require us to perform procedures to obtain assurance that there are no material modifications that should be made to the financial statements. We believe that the results of our procedures provide a reasonable basis for our report.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

**HENG HSIN, LEE C.P.A.**

**Certified Public Accountant**

# H Capital Holding LLC
## Balance Sheet
## As of June 30, 2024

| ASSETS | | Jun-24 |
|---|---|---|
| **Cash and Cash Equivalents** | $ | 7,901,965 |
| **Escrow Deposits** | | |
| **Long-term Investments** | | 325,579,529 |
| (Business Real Estate and Property) | | |
| **Total Assets** | $ | **333,481,495** |

### Liabilities And Shareholder's Equities

| | | |
|---|---|---|
| **Long-term Mortgages and Loans** | | $109,154,226 |
| **Shareholder's Equity** | | |
| Capital | | 65,000,000 |
| Paid In Capital | | 10,997,495 |
| Retained Earnings | | 117,688,051 |
| Net Unrealized Gains | | 30,641,724 |
| **Total Liabilities and Shareholder's Equities** | $ | **333,481,495** |

# H Capital Holding LLC
## Statement of Operation
## For 06/30/2024

|  |  | Jun-24 |
|---|---|---|
| **UNREALIZED CAPITAL GAINS** | $ | **32,012,124** |
| **OPERATING EXPENSES** | | |
| Officers Compensation | | 596,400 |
| Staff Salaries and Benefits | | 237,600 |
| Rent | | 160,200 |
| Utilities Expenses | | 3,000 |
| Conference and Events | | 185,400 |
| Meals | | 62,400 |
| Travelling and Entertainment | | 60,600 |
| Office Supplies | | 17,400 |
| Other business expenses | | 17,400 |
| **TOTAL EXPENSES** | $ | **1,340,400** |
| Excess of revenues over expenses before provision for income tax | | **30,671,724** |
| Less: Provision for income tax | | 30,000 |
| **Net Investment Unrealized Gains** | $ | **30,641,724** |

## H Capital Holding LLC
## Statement of Cash Flows
## For June 30, 2024

**Reconciliation of (loss) income from operations to net cash provided by operating activities**

| | |
|---|---|
| **used in operating activities:** | 6/30/2024 |
| Income from operations | **30,641,724** |
| Adjustments to reconcile loss from operations to net cash used in operating activities: | |
| Changes in assets and liabilities: | |
| Long-term Investments | 17,975,867 |
| Long-term Mortgage and Loans | (24,770,188) |
| **Net cash provided by operating activities** | 23,847,402 |
| Income from Investing Activities | |
| Additional Invested Capital | (21,945,436) |
| Retained Earning Adjustment | |
| **Net increase in cash and cash equivalents** | 1,901,965 |
| **Cash and cash equivalents, beginning of year** | 6,000,000 |
| **Cash and cash equivalents, end of term** | **7,901,965** |

# H Capital Holding LLC

## Notes to Financial Statements

As of June 30, 2024

## Note 1: Long Term Investment (Business Real Estate and Property):

**H Capital Holding LLC**
**Business Real Estate Property**

| No. | Address | Property Type | % Owned | Asset Owned Amount as of 06/30/24 |
|---|---|---|---|---|
| 1 | 3865 11th Street, LIC, NY | Hotel | 100% | $35,000,000 |
| 2 | 3721 32nd Street, Long Island City, NY | Mixed-use | 25% | $19,000,000 |
| 3 | Huron Pier | Residential Condo | 50% | $30,742,944 |
| 4 | 6241 Forest Avenue, Ridgewood, NY | Mixed-use | 50% | $15,500,000 |
| 5 | 2062 Lamoine Avenue, Fort Lee, NJ | Mixed-use | 50% | $36,598,743 |
| 6 | Phase 1 - 700 Frank E Rogers Blvd South, Harrison, NJ | Mixed-use | 97% | $111,103,592 |
| 7 | Phase 2 - 700 Frank E Rogers Blvd South, Harrison, NJ | Mixed-use | 100% | $70,000,000 |
| **Total** | | | | **$325,579,529** |

# H Capital Holding LLC

## Notes to Financial Statements

As of June 30, 2024

## Note 2: Long Term Mortgages and Loans:

**H Capital Holding LLC**
**Long-term Mortgages and Loan**

| No. | Address | % Owned | Mortgage Owned 06/30/2024 |
|---|---|---|---|
| 1 | 3865 11th Street, LIC, NY | 100% | $ 10,000,000.00 |
| 2 | 3721 32nd Street, Long Island City, NY | 25% | $ 5,750,000.00 |
| 3 | Huron Pier | 50% | $ - |
| 6 | 6241 Forest Avenue, Ridgewood, NY | 50% | $ 5,000,000.00 |
| 7 | 2062 Lamoine Avenue, Fort Lee, NJ | 50% | $ - |
| 8 | Phase 1 - 700 Frank E Rogers Blvd South, Harrison, NJ | 97% | $ 58,904,226.00 |
| 9 | Phase 2 - 700 Frank E Rogers Blvd South, Harrison, NJ | 100% | $ 29,500,000.00 |
| **Total** | | | **$ 109,154,226.00** |

# EXHIBIT F

**EXHIBIT B**

# TONG HE
## Balance Sheet
## As of June 30, 2024

| ASSETS | | Jun-24 |
|---|---|---|
| Cash and Cash Equivalents | $ | 150,000 |
| Long-term Investments (Note 1) | | 349,382,712 |
| Securities - Stocks/ Bonds | | 19,500,000 |
| Fixed Assets, net of Accumulated Depreciation (Note 2) | | 16,377,500 |
| **Total Assets** | **$** | **385,410,212** |

## Liabilities And Net Worth

| | | |
|---|---|---|
| Account Payables - Credit Card and Car Payment | $ | 11,000 |
| Mortgage Notes Payable | | |
| Net Worth | | 385,399,212 |
| **Total Liabilities and Net Worth** | **$** | **385,410,212** |

*See accompanying notes of financial statements*

**Tong He**
**Statements of Income and Expenses**
**For Year Ended 6/30/2024**

|  | | Jun-24 |
|---|---|---|
| **INCOME-Executive Compensation** | $ | 242,500 |
| **TOTAL INCOME** | $ | **242,500** |
| **EXPENSES** | | |
| Meals | | 7,469 |
| Travelling and Entertainment | | 5,194 |
| Clothing and accessories | | 3,240 |
| Personal Auto expenses | | 40,788 |
| **TOTAL EXPENSES** | $ | **56,691** |
| Excess of revenues over expenses before provision for income tax | | **185,809** |
| Less: Provision for income tax | | 27,871 |
| **EXCESS OF REVENUES OVER EXPENSES** | $ | **157,938** |

*See accompanying notes of financial statements*

Page | 2

# Tong He

Notes to Financial Statements

As of June 30, 2024

## Note 1: Long-term Investment

The long-term investment consists of the following:

**Tong He**
**Majority Interest in Real Estate and Financial Companies - June 2024**

| | Total Asset | Total Liabilities | Equity | Ownership (Percent) | Amount |
|---|---|---|---|---|---|
| **H Equities** | 333,481,495 | 109,154,226 | 224,327,269 | 100% | 224,327,269 |
| **Shenzhen City Eastone Construction Co., Ltd.** | 132,075,443 | 9,050,000 | 123,025,443 | 100% | 123,025,443 |
| **Eastone Xingde Consulting Management (Shanghai) Co., Ltd.** | 2,150,000 | 120,000 | 2,030,000 | 100% | 2,030,000 |
| **Total** | **467,706,938** | **118,324,226** | **349,382,712** | $ | **349,382,712** |

## Note 2: Personal Properties

| **Fixed Assets As of** | **30-Jun-24** |
|---|---|
| Automobile - Ferrari | 220,000 |
| Automobile - Maserati | 100,000 |
| Automobile - Mercedes | 150,000 |
| Real Estate - Primary residence in Shanghai, China | 15,907,500 |
| **Net Value** | **16,377,500** |

Note

Personal properties represent the estimated values of automobile, personal effects, and jewelry, which are the appraisal values of those assets, determined by an independent appraiser for insurance purposes.